**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | | |
|---|---|---|
| SECURENET CO., LTD. | ) | |
| | ) | **No. 00564** |
| *Plaintiff,* | ) | **Judge Bruggink** |
| v. | ) | |
| UNITED STATES, | ) | |
| *Defendant.* | ) | |

**SECURENET'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND FOR DECLARATORY AND INJUNCTIVE RELIEF**

SecureNet Co., Ltd ("SecureNet"), respectfully moves for judgment in favor of SecureNet and against the United States on the Administrative Record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). SecureNet further requests that the Court issue declaratory and injunctive relief under 28 U.S.C. § 1491(b)(2) and RCFC 65. As set forth in the accompanying Memorandum, the Government's contract award was premised on a perceived a price difference between the SecureNet and the Awardee that exists only by virtue of the Government's departure from the solicitation's evaluation scheme and its arbitrary evaluation of the offerors' proposals. Moreover, the balance of harms and the public interest decisively weigh in favor of the issuance of declaratory and injunctive relief to remedy these violations of procurement law.

Accordingly, SecureNet respectfully requests that the Court enter, based on the administrative record: (1) a declaratory judgment that (a) the Government's conduct in this procurement and its award of the contract to Joeun were arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law; (b) performance of the Contract awarded to Joeun is permanently enjoined and Joeun is disqualified from the procurement because its proposal is technically unacceptable; (c) if the Government awards a contract, it should be to SecureNet as the lowest, technically acceptable offeror; (d) if the Government amends or cancels the Soclitication, SecureNet is entitled to recover all proposal preparation costs incurred in connection with this procurement; (2) a permanent injunction consistent with and enforcing the Court's declaratory judgment; and (3) an order granting such other and further relief as the Court deems necessary, just and proper. A proposed order is attached.

Respectfully submitted,

s/__________________

Rand L. Allen
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006
(202) 719-3193 (O)
(202) 719-7049 (F)
rallen@wrf.com
*Counsel for Plaintiff*

September 1, 2006

*Of counsel*:
Thomas J. Seymour
KIM & CHANG
Seyang Building
223 Naeja-Dong, Jongro-Gu
Seoul, Korea 110-720
(+82-2) 3703-9092

Kevin J. Maynard
Antonella Karlin
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006
(202) 719-3143 (O)
(202) 719-7049 (F)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | | |
|---|---|---|
| SECURENET CO., LTD. | ) | |
| | ) | **No. 00564** |
| *Plaintiff,* | ) | **Judge Bruggink** |
| v. | ) | |
| UNITED STATES, | ) | |
| *Defendant.* | ) | |

**ORDER**

Plaintiff SecureNet Co., Ltd. ("SecureNet"), has moved for judgment on the Administrative Record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), and for declaratory and injunctive relief under 28 U.S.C. § 1491(b)(2) and RCFC 65. Having considered this motion, as well as all other relevant materials and arguments, it is hereby

ORDERED that SecureNet's Motion for Judgment on the Administrative Record be and hereby is GRANTED;

FURTHER ORDERED that the Army's conduct in this procurement and its award of the resulting contract to Joeun were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

FURTHER ORDERED that the Army's contract award to Joeun hereby is DECLARED INVALID;

FURTHER ORDERED that no contract award under this Solicitation may be made to Joeun as it is a technically unacceptable offeror;

FURTHER ORDERED that if the Army makes a new award on this Solicitation, it must award to SecureNet as the lowest priced, technically acceptable offeror;

FURTHER ORDERED that if the Army amends or cancels the Solicitation in this procurement, SecureNet is entitled to recover all proposal preparation costs incurred in connection with this procurement; and

FURTHER ORDERED that the Army is permanently enjoined from taking any action inconsistent with the declarations made herein, including expending public funds or otherwise allowing performance of the contract awarded to Joeun, and amending or cancelling the solicitation without paying SecureNet all proposal preparation costs incurred in connection with this procurement.

______________________________
ERIC G. BRUGGINK
Judge, U.S. Court of Federal Claims

Dated: September __, 2006

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| SECURENET CO., LTD.<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES,<br><br>*Defendant.* | **No. 00564**<br>**Judge Bruggink**<br><br>**Public Version** |

**MEMORANDUM IN SUPPORT OF PLANTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND FOR DECLARATORY AND INJUNCTIVE RELIEF**

Rand L. Allen
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006
(202) 719-3193 (O)
(202) 719-7049 (F)
rallen@wrf.com

*Counsel for Plaintiff*

*Of counsel*:
Thomas J. Seymour
KIM & CHANG
Seyang Building
223 Naeja-Dong, Jongro-Gu
Seoul, Korea 110-720
(+82-2) 3703-9092

Kevin J. Maynard
Antonella Karlin
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006
(202) 719-3143 (O)
(202) 719-7049 (F)

September 1, 2006

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| SECURENET CO., LTD. | **No. 00564** |
| *Plaintiff,* | **Judge Bruggink** |
| v. | **Public Version** |
| UNITED STATES, | |
| *Defendant.* | |

# MEMORANDUM IN SUPPORT OF PLANTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND FOR DECLARATORY AND INJUNCTIVE RELIEF

SecureNet Co., Ltd., ("SecureNet"), respectfully files this memorandum in support of its motion for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), and for declaratory and injunctive relief under 28 U.S.C. § 1491(b)(2) and RCFC 65.

## I.
## STATEMENT OF THE ISSUES

This bid protest challenges the significant errors in the decision by the U.S. Army Contracting Command Korea ("Defendant" or the "Army") to award a $120 million contract to Joeun Systems, Co. Ltd. ("Joeun" or "Awardee") under Solicitation No. W91QVN-06-R-0062 (the "Solicitation" or "RFP"), for security guard services at military installations across the Republic of South Korea ("ROK"), for the U.S. Forces Korea ("USFK") and Installation Management Agency Korean Region Office ("IMA KORO").

This is the third effort by the Army to conduct a proper competition for these services. The Army's decision to undertake this latest round of procurement was driven by the allegation

that the previous evaluation failed to adequately evaluate offerors' proposed staffing levels – in particular, the number of supervisors proposed by each offeror – and their resulting ability to meet certain specified turnaround requirements called for in the statement of work. To address this concern, the Army dictated in this latest procurement that all offerors use a common level of supervisor support – expressed as a specific number of hours – in developing their proposals.

Despite this effort to "level the playing field," the Army's latest award decision is fatally flawed. Although all offerors were required to propose the same number of supervisor hours, the Awardee [redacted]. In an effort to [redacted], the Awardee proposed to provide the required hours by [redacted]. In fact, while SecureNet [redacted] to account for the additional supervisory effort called for in this Solicitation, Joeun's proposed price [redacted] the increased level of effort.

This approach should have raised obvious concerns regarding the feasibility of Joeun's approach and the risk of unsuccessful performance, the adequacy and realism of its price, and its ability to comply with applicable labor laws. Instead, the record shows that the Government failed to adequately evaluate this proposed approach as called for in the Solicitation:

- As a threshold matter, the record shows that because of the Awardee's failure to adequately explain its staffing approach and price in its revised proposal, the Army engaged in a significant number of improper discussions with the Awardee that involved the exchange of new information on this key aspect of the Awardee's proposal, after the date for submission of final proposal revisions.
- Nevertheless, the record shows that the Army failed to properly consider the obvious implications of the information it received during these improper discussions, or to evaluate its impact on the *feasibility* or *risk* associated with the Awardee's proposed

staffing approach. In particular, the Army completely failed to analyze whether it was feasible for the Awardee to meet all of the requirements in the Solicitation given the [redacted] and the apparent plan to [redacted] not captured in the proposal (and not communicated to the Government until after submission of final proposal revisions). In addition, the Army failed to consider the potential risks that the Awardee's proposal to [redacted], might have on its ability to recruit and retain a qualified workforce. As a result, the Army awarded to a contractor whose staff may not be able to meet all of the requirements forth in the Solicitation.

- Moreover, the Army failed to evaluate whether the Awardee's price was "*adequate*," "*reasonable and realistic*" and "*complete*," as required under the terms of the Solicitation. Specifically, the Army ignored the Awardee's failure to include any allowance for payment [redacted] (as required by law), as well as the Awardee's failure to account for the additional hours needed under its apparent plan (communicated after final proposal revisions) to [redacted]. As a result, the Army awarded a contract on a proposal that does not reflect the true cost to perform the work called for under the Contract.
- In addition to these specific errors, as a general matter the Army failed to maintain a *level playing field* in conducting this procurement. In particular, by re-opening the competition, disclosing SecureNet's winning price for these services (where price was the ultimate driver of the award decision), and allowing the Awardee to subsequently [redacted] in direct contravention of the proposal instructions, the Army undermined the integrity and fairness of the procurement process and provided the current Awardee with an unfair competitive advantage.
- Finally, and independently dispositive of this protest, the Army failed to evaluate whether the Awardee's proposed staffing approach complied with Korean *labor law*, a material requirement of the solicitation, and ignored clear evidence that Joeun's proposed use of overtime violated the legal cap on overtime hours. As a result, the Army awarded a contract to an offeror who cannot legally deliver the services called for under the

Contract through its proposed staffing approach, and therefore should have been deemed technically unacceptable.

As a result of these errors, the Army's decision to award to Joeun was arbitrary and capricious, an abuse of discretion, or otherwise contrary to law, and should be overturned.

## II. STATEMENT OF FACTS

Plaintiff SecureNet is one of the leading providers of security services in the Republic of Korea. It has a separate division dedicated solely to providing the U.S. Government with security services for the U.S. Armed Forces in Korea (the "security services"). Between May 2005, and April 2006, the Army conducted three separate rounds of competition for the security services, each time awarding a five-year contract (one base year and four option years). In the first two rounds, the Army awarded SecureNet the contract for security services. Although SecureNet participated in the third round, the Army awarded the resulting contract to Joeun. Had the Army complied with its legal obligations in conducting the third competition, SecureNet would have again been awarded the contract for security services.

### A. General Solicitation Requirements

Although the Army conducted three separate rounds of competition before awarding the current Contract to Joeun, the terms of the Solicitations for each round were identical in many respects. The following is a brief overview of the common solicitation requirements.

#### 1. Nature of The Services

The Contract at issue in this case is for the delivery of security guard services at over sixty military installations in four geographically dispersed areas (Area I, II, III, and IV) throughout the ROK. S*ee* Administrative Record Tab 1 at 101F-101Q.[1] Under the Contract, the

[1] All references to the Administrative Record will hereinafter be cited as "AR Tab _."

successful contractor will be required to provide "well-trained, qualified, armed, and uniformed security guard services, 24-hours a day, seven (7) days per week for all full time posts as well as those posts designated at less then 24 hours or 7 days." AR Tab 1 at 49. To deliver these services, the contractor is required to provide three categories of personnel:

- Supervisors ("Area Commander," "Sergeant of Guard" and "Corporal of Guard");
- English Qualified Guards ("ER Guard"); and
- Non-English Qualified Guards ("NER Guard").

AR Tab 1 at 2-48; Tab 2 at 103-27. Each version of the Solicitation included a "Post Schedule" for each Area, which identified the locations where guards are to be stationed ("Posts"), as well as the Estimated Yearly Total Labor Hours for ER and NER Guards at each of those locations. AR Tab 1 at 101A-101R. While each version of the Solicitation included estimated hours for ER and NER Guards, it did not initially provide any estimated labor hours for supervisory personnel. Instead, each offeror was initially required to estimate the number of supervisors and total labor hours necessary to satisfy the requirements of the Solicitation. AR Tab 1 at 53, 94-95.

However, as discussed below, this aspect of the Solicitation was ultimately changed, in response to a bid protest filed by the incumbent contractor challenging the Army's failure to evaluate offerors' staffing of the Supervisor position(s). *See infra,* Section II.E.1.

2. Proposal Instructions

Each version of the Solicitation required that proposals "contain sufficient details to enable a thorough evaluation and sound conclusions as to the technical and management competence of offerors and their ability to perform the required contract services" and "be precise, factual, complete, and describe in sufficient detail the proposed method(s) of accomplishing tasks set forth in the Performance Work Statement (PWS)." AR Tab 2 at 160. In particular, each proposal was required to include three volumes: Volume I( FACTOR A),

Management Proposal; Volume II (FACTOR B), Technical Proposal; and Volume III (FACTOR C), Pricing. AR Tab 2 at 161-63. Factors A and B were further subdivided into various subfactors. *Id*. For each subfactor, offerors were required to submit plans that adequately explained, among other things, how they would meet the PWS requirements. *Id*.

With respect to staffing, the Solicitation required offerors to provide the following:

> The offeror is required to submit as a part of the technical proposal, a complete staffing plan through which, the offeror shall acknowledge and provide a methodology of how all the specific tasks and responsibilities in the PWS would be accomplished, demonstrate effective overall management of this requirement … [and] effective management of supervisory personnel (overall the Government requests the offerors to provide their management approach to include how the contractor intends to provide and staff supervisors. *The Government wants a STAFFING CHART to reflect, at a minimum, the number of supervisors, areas that supervisors are responsible for by post, the contractor chain of command and the hours per supervisor* . . . .

AR Tab 2 at 163 (emphasis added).[2] The Solicitation explained that Volume III, the Pricing Proposal, was to consist of an offer breakdown consisting of the following elements: (1) materials, (2) labor (loaded rates), (3) transportation and equipment, and (4) other items. AR Tab 2 at 163-64. According to the Solicitation, "the burden of proof of price credibility is the offeror's responsibility." AR Tab 2 at 164. Thus, offerors were required to demonstrate that their pricing, including their proposed rates, were "*adequate*, *complete* and *reasonable* to assess the offeror's understanding of the solicitation." AR Tab 2 at 164.

Finally, each version of the Solicitation made clear that proposals had to comply with Korean law. First, compliance with Korean law was listed as a specific task under Section C.5 of the PWS. AR Tab 1 at 50 ("The Contractor shall comply with all … local ROK laws and

---

[2] Throughout this Memorandum, all emphasis is added unless otherwise noted.

requirements necessary for performance of this contract."). Second, the Solicitation incorporated Clause 52.0000-4404 Korean Labor Law, which provides as follows:

> Contractor shall honor employees' rights in full compliance with Korean Labor Law, including the rights of succession of employment. *Failure to comply may be deemed breach or default of the contract and evidence of nonresponsibility*. Such violation of Korean Labor Law may be evidenced by a Republic of Korea Ministry of Labor determination, a court decision, or a Labor Relations Commission adjudication. If a contractor is found to be in serious violation and fails to take adequate corrective action promptly, USFK may consider this grounds for determining the contractor to be non-responsible for future Government contracts.

AR Tab 1 at 77.

3. Evaluation Factors

The Solicitation notified offerors that the Army intended to award a contract to the "responsible offeror submitting the lowest priced, technically acceptable offer that receives a technical acceptable rating in all factors and subfactors, and satisfies all terms and conditions of this solicitation." AR Tab 1 at 100. Technically acceptability was defined as follows:

> For a proposal to be considered technically acceptable, an offeror must submit an offer breakdown (without cost data) for each contract line item. The offer breakdown must demonstrate that the offeror understands the Performance Work Statement by listing an appropriate amount of materials, labor, and transportation and equipment required to perform the contract. Failure to include a significant element in the data may indicate that the offeror fails to understand the requirement, and may be grounds for finding the proposal to be technically unacceptable.

*Id*.

The Solicitation also notified offerors that the Army would evaluate each subfactor under the Management and Technical factors "on an acceptable or unacceptable basis in terms of the offeror's *feasibility* of approach and the Government's perceived *risk* of unsuccessful performance." *Id*.

Finally, the Solicitation informed offerors that "[p]rice analysis will be performed to determine the extent to which it is adequate, reasonable, and complete." AR Tab 1 at 100. According to the Solicitation, an offeror's proposed price would be considered "*adequate*" only if "[t]he proposed price and the scope of work are compatible"; "*reasonable and realistic*" if, "in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business"; and "*complete*," if the price was "[r]esponsive to all RFP requirements, all Contract Line Items (CLINs) are included, and estimates can be traced without mathematical errors." AR Tab 1 at 95. Award would be made to the "responsible offeror submitting the lowest priced, technically acceptable offer." AR Tab 1 at 100. The evaluation would focus on the "offeror's feasibility of approach and the Government's perceived risk of unsuccessful performance." AR Tab 16 at 363.

**B. <u>The Initial Solicitation</u>**

On May 27, 2005, the Army issued Solicitation No. W91QVN-05-R-0087 ("Initial Solicitation"). *See* AR Tab 42.[3] SecureNet was the successful bidder on the Initial Solicitation, and was awarded the contract on August 19, 2005 ("First Contract"). *See* AR Tab 11 at 329; AR Tab 42. A protest of the first contract award decision was filed with the Government Accountability Office ("GAO"), *id.,* and on August 31, 2005, the Army sent SecureNet a Stop Work Order ("SWO") noting that a protest had been filed.

GAO ultimately dismissed the protest, and on September 22, 2005 the Army lifted the SWO. The First Contract was modified to reflect a start date of November 1, 2005, rather than September 1, 2005, and on November 1, 2005, SecureNet commenced Phase-In. Shortly

[3] According to the administrative record, this competition was conducted as a result of misconduct in connection with an earlier award. *See* AR Tab 11 at 328-29.

thereafter, however, on November 16, 2005, the Army terminated the First Contract for convenience, without explanation. AR Tab 11 at 329.

**C. <u>First Revised Solicitation</u>**

On December 23, 2005, the Army issued Solicitation No. W91QVN-06-R-0062 (hereinafter the "First Revised Solicitation"). AR Tab 1 at 2. The primary difference between the Initial and First Revised Solicitation was a reduction in the scope of services to be provided. The First Revised Solicitation required that offerors submit proposals no later than January 10, 2006. AR Tab 16 at 366.

Fifteen offerors, including both SecureNet and Joeun, submitted proposals. *Id.* SecureNet's proposed price was [redacted]. AR Tabs 36-37. Consistent with the requirements of the Solicitation, this price was based on (i) the [redacted]; as well as (ii) SecureNet's [redacted]. AR Tab 37 at 1382-84, 1426-49.

The proposals were evaluated separately by a Technical Evaluation Board ("TEB") and a Management Evaluation Board ("MEB"), and again SecureNet was determined to be the low price, technically acceptable offeror. AR Tabs 6-7. Accordingly, on January 27, 2006, the Army awarded SecureNet a five-year contract ("Second Contract") in the amount of [redacted].[4]

Between January 27 and February 3, 2006, the Army conducted debriefings with five unsuccessful offerors. *See* AR Tabs 16-20 at 361-425. At the debriefings the Army informed the other competitors that SecureNet was the low price, technically acceptable offeror with a price of [redacted]. *Id.* Although Joeun did not request a debriefing, the CO provided Joeun

[4] According to the Army, no formal record documenting the award decision was created at the time of the award.

with notice of contract award that provided essentially the same information provided to those offerors who were provided a debriefing. AR Tab 40 at 1592. In particular, the notice explained that the contract was awarded to the lowest priced technically acceptable proposal, SecureNet, and revealed SecureNet's winning price of [redacted]. *Id.* It also informed Joeun that its proposal was technically acceptable, but was not the lowest proposed price. *Id.*

**D. <u>Protests Of The Second Contract</u>**

Following the Army's debriefings of unsuccessful offerors, two protests were lodged against the Army's award decision. First, on February 7, 2006, HDS Security Company ("HDS") filed a protest at GAO challenging the Army's evaluation of proposals and the time for offerors to submit proposals. AR Tab 41 at 1595. Then, on February 10, 2006, Group 4 Falck Korea ("Group 4") filed a separate protest at GAO challenging the Second Contract award decision. AR Tab 41 at 1601. Group 4 argued that SecureNet did not propose a sufficient number of supervisors to be able to comply with Section C.6.6.4 of the PWS and, therefore, the Army's award decision was arbitrary and capricious. AR Tab 41 at 1605. SecureNet was notified of HDS's protest, but was not informed of Group 4's protest until much later, after corrective action had taken place.

On March 9, 2006, the Army requested that GAO dismiss the protests as moot based on the Army's decision to take corrective action in response to the bid protest of Group 4. *See* AR Tab 41 at 1624-27. However, the Army did not initially notify SecureNet of its intent to take corrective action by reopening the solicitation. Instead, on Friday March 10, 2006, the Army requested that SecureNet clarify how the number of supervisors and number of supervisor hours it proposed by area and per post would meet Section C6.6.4 of the PWS. AR Tab 14 at 353. The letter instructed SecureNet that it had until 10:00 am on Monday, March 13, 2006, to respond.

SecureNet sent the CO a response on the afternoon of Monday, March 13, 2006, but the Army claimed that it was too late. AR Tab 14 at 353. Although the Army had already notified GAO of its intent to take corrective action four days earlier, the CO faxed SecureNet a response stating that "[y]our firm was provided sufficient time to clarify the following and has failed to provide a timely response….Your firm's failure to submit a timely reply forces the Government to execute an alternative course of action in resolving this issue." *Id.*

## E. <u>The Second Revised Solicitation</u>

Following Group 4's protest, and the Army's disclosure of SecureNet's winning price to the other competitors, the Army initiated corrective action by again amending the Solicitation, requesting revised proposals, and making a new award decision. AR Tab 41 at 1624-27. Shortly thereafter, on March 13, 2006, the Army issued Amendment No. 7 (hereinafter the "Second Revised Solicitation"). *See* AR Tab 2

### 1. <u>Revisions To The Solicitation</u>

The changes imposed by Amendment No. 7 focused almost entirely on the number of supervisors required to meet the requirements in the PWS. In particular, Amendment No. 7:

- changed the requirements in Sections C.6.6.4 and C.6.15.a regarding the amount of time required for supervisors to respond to respond to emergency calls;
- revised the instructions in Section L.2.c(3)(d) to specify, for the first time, the estimated number of supervisor hours required in each of the four regions covered by the contract; and
- added one guard location, and a small number of corresponding hours, at the Waegwan Pump Station in Area IV.

AR Tab 2 at 165.

Of the changes imposed by Amendment No. 7, the most significant was the change to Section L.2.c(3)(d), which dictated that offerors include the following supervisory hours:

| <u>Area</u> | **Supervisor Hours** | <u>Affected CLINs</u> |
|---|---|---|

| | **Required** | |
|---|---|---|
| Area I | 134,320 hrs per yr[5] | CLINs 0002AA, 1002AA, 2002AA, 3002AA, 4002AA) |
| Area II | 143,080 hrs per yr[6] | CLINs 0003AA, 1003AA, 2003AA, 3003AA, 4003AA |
| Area III | 46,720 hrs per yr[7] | CLINs 0004AA, 1004AA, 2004AA, 3004AA, 4004AA |
| Area IV | 151,840 hrs per yr[8] | CLINs 0005AA, 1005AA, 2005AA, 3005AA, 4005AA |
| Total | 457,960 hrs per yr | |

In making these changes, Amendment No. 7 expressly stated that "[a]ll other terms and conditions of the [First Revised Solicitation] remain *unchanged*." AR Tab 2 at 165. Accordingly, the Amendment advised that "**[o]fferors may submit only those portions of their proposals affected by this amendment."** *Id*. (emphasis in original).

On March 15 and 16, 2006, the Army issued two additional clerical Amendments. *See* AR Tabs 3, 4. Neither of these clerical amendments had any substantive impact on the Solicitation. Instead, Amendment No. 8 simply corrected the due dates and attachment references; while Amendment No. 9 answered offerors' questions regarding certain aspects of Amendment No. 7. With respect to the submission of proposals, Amendment No. 9 stated:

> Offerors may submit a revised price & technical proposal or may submit only the Staffing Plan and revised price proposal *according to Amendment 0007*.

AR Tab 4 at 186.

At no time were offerors advised that they were free to revise any portions of their previously submitted proposals, other than those relating to the estimated number of supervisor hours dictated by Amendment No. 7. Thus, consistent with the narrow focus of Amendment 7,

---

5 AR Tab 2 at 174-76; *see also* AR Tab 2 at 104, 108-09, 113-14, 118, and 123.

6 AR Tab 2 at 177-79; *see also* AR Tab 2 at 105, 110, 114, 119-120, and 124.

7 AR Tab 2 at 180; *see also* AR Tab 2 at 106, 111, 116, 120-21, and 125-26.

8 AR Tab 2 at 181-82; *see also* AR Tab 2 at 107, 112, 117, 122, and 126-27.

the Army provided only three days, until March 17, 2006, for offerors to submit revised proposals. AR Tab 2 at 165.

2. Responses To The Second Revised Solicitation

In response to the Second Revised Solicitation, proposals were submitted by eleven offerors, including SecureNet and Joeun. Consistent with the Solicitation instructions, SecureNet updated its staffing plan and pricing to include the additional Supervisor hours specified in Amendment 7. *See* AR Tab 39. [redacted],[9] SecureNet proposed [redacted] Supervisors to deliver these hours – [redacted]. *Compare* AR Tab 36 at 1352-54 ([redacted]) *with* AR Tab 39 at 1557-81, 1583-85 ([redacted]). As a result, SecureNet's overall price [redacted] from approximately [redacted] to approximately [redacted]. AR Tab 11 at 330, AR Tab 39.

While SecureNet [redacted] to meet the additional hours mandated by Amendment No. 7, Joeun proposed [redacted]. *See* Exhibit A. In justifying its proposed staffing level, Joeun stated that "Supervisors will work [redacted]." AR Tab 35 at 978. In reality, however, a comparison of Joeun's proposed staffing levels with the number of hours required by [redacted] work its supervisors [redacted]. *See* Exhibit B-1. Despite this [redacted], Joeun did not include any allowance for [redacted].[10]

In addition to significantly changing its proposed [redacted], Joeun also significantly revised its proposed prices for all CLINs and all Areas –

[9] AR Tab 37 at 1382 (SecureNet proposal assumption regarding [redacted] workweek); *see also* AR Tab 45 at 1975, 1977, 1979, 1981 (Independent Government Cost Estimate assumption regarding [redacted] workweek).

[10] Under Korean law, employees are entitled to payment of time-and-a-half, or an equivalent number of hours of paid leave, for all hours over 40 hours per week. *See infra,* Section III.C.1.

including ER and NER Guards, even though Amendment No. 7 did not affect those CLINs (*see supra*, p.13), and instructed offerors to revise only the affected portions of their proposals (*see* AR Tab 2 at 165). In fact, Joeun [redacted] its proposed rates for all personnel in all Areas by anywhere from [redacted]. *See* Exhibit C.

Finally, even though Amendment No. 7 slightly *increased* the number of required hours for ER and NER Guards at one location in one Area (the Waegwan Pump Station in Area IV), Joeun also [redacted] (which was not affected by Amendment No. 7), resulting in a [redacted]. *Compare* AR Tab 34 at 638 (January proposal to provide [redacted] ER/NER Guards) *with* AR Tab 35 at 978 (March proposal to provide [redacted] ER/NER Guards). As with the Supervisors, Joeun justified its proposed [redacted] by explaining that they, too, would be required to [redacted] to deliver the hours required under the contract. *See* AR Tab 35 at 978 ("ER/NER will work [redacted].") Again, however, Joeun's proposal did not include any allowance or mention of overtime [redacted].

Thus, while Amendment No. 7 more than doubled the number of hours required for supervisory personnel (the most expensive labor category), and slightly increased the number of ER and NER hours required in Area IV, Joeun's total proposed price [redacted]. *Compare* AR Tab 34 at 706 *with* AR Tab 11 at 330.

3. Protest Of The Second Revised Solicitation

On March 24, 2006, HDS filed a protest at GAO challenging the Second Revised Solicitation. *See* AR Tab 41 at 1619-23. HDS argued that the three day period that the Army allowed for proposal revisions in response to the Second Revised Solicitation violated FAR

14.202, which requires that a contracting agency provide prospective bidders a reasonable time to prepare and submit bids. AR Tab 41 at 1622.

On April 7, 2006, the Army filed a response, requesting summary dismissal of HDS's protest. AR Tab 41 at 1628-38. The Army took the position that three days was a reasonable time for offerors to prepare and submit proposals because the Solicitation did not give offerors the opportunity to submit new proposals; rather it allowed offerors to submit revised proposals and, more specifically, limited the proposal revisions to only those areas of the offeror's original proposal that were affected by Amendment 0007. *See* AR Tab 41 at 1631 (arguing that the the to submit revised proposals "was deemed to be sufficient because the only change to the solicitation as stated in Amendment 0007 was the requirement for supervisory personnel responding to emergency situations."); *see also* AR Tab 41 at 1637 ("[T]he amendment only changed the requirement for supervisors to respond to an emergency, . . . [T]herefore all a firm had to do was revise their Staffing Plan accordingly, and make any price revisions."). Untimately, HDS's protest was withdrawn, and was dismissed by GAO on April 12, 2006. AR Tab 43 at 1941.

4. Technical And Management Evaluation Under The Second Revised Solicitation

Following dismissal of HDS' protest, the Army proceeded with the award process. According to the Price Negotiation Memorandum ("PNM") prepared by the Contracting Officer ("CO"), the agency's decision was based in part on the evaluations performed by the Technical Evaluation Board ("TEB") and the Management Evaluation Board ("MEB"). *See* AR Tab 11 at 331. Both the MEB and TEB evaluated each of the eleven proposals, using a checklist which set forth the key criteria that offerors had to satisfy. AR Tab 10 at 306. After their individual evaluations, the members of the TEB and MEB met and conducted discussions until a consensus was reached. *Id*. For each subfactor, a proposal was rated either acceptable or unacceptable.

According to the PNM, the proposals for the three lowest priced offerors [redacted]

[redacted] were determined to be technically unacceptable based on the MEB/TEB ratings and additional fact finding requested by the Source Selection Authority ("SSA"). AR Tab 11 at 333.[11] The CO therefore concluded that discussions with these three offerors were not necessary because they could not result in an otherwise technically acceptable proposal, given the significance of their deficiencies. AR Tab 11 at 337.

5. Evaluation Of Price Under The Second Revised Solicitation

Based on the final overall ratings of the eleven proposals, the CO considered three proposals technically acceptable—Joeun, SecureNet, and [redacted]. AR Tab 11 at 336-37. Of the three, Joeun's proposal offered the apparent lowest price. According to the PNM, the CO found no reason to discuss the technical acceptability of Joeun or the other offerors with technically acceptable proposals because no other offer submitted a lower price than Joeun. AR Tab 11 at 337. Therefore, the agency conducted a price evaluation of only Joeun's proposal. *Id.*

Although the RFP called for the Government to evaluate whether offerors' proposed prices were "*adequate*," "*reasonable and realistic*," and "*complete*," the record shows that the Army's evaluation focused on only the "price reasonableness" of Joeun's proposed labor rates. According to the PNM, the Army reasoned that because "[t]he Government will place delivery orders against [the Supervisory, English Qualified and Non-English Qualified guard] requirements CLINs for the desired number of supervisors, by geographic location . . . , *no discussion is required to determine the acceptability of any proposed staffing levels in relation to reasonableness of proposed prices*." *Id.* Therefore, the evaluation of "price reasonableness" (to the extent it was performed) was "focused on proposed, loaded labor rates, . . . ." *Id.*

[11] The MEB/TEB initially found [redacted] to be technically acceptable overall. The SSA, however, found that [redacted] experience with similar or equal effort was technically unacceptable, based on the MEB's incorrect assumption that [redacted] has a total guard force of [redacted], when, in fact, [redacted] proposal claimed a total guard force of only [redacted]. AR Tab 11 at 335.

In evaluating the reasonableness of Joeun's proposed rates, the agency first compared Joeun's rates to the average rates for the three technically acceptable offerors (including Joeun). AR Tab 11 at 339. Based on this comparison, the CO noted that Joeun's proposed rates for Supervisors ranged from [redacted] than the average rates for the three acceptable offerors. *Id.*[12] Moreover, the CO noted that there was [redacted] between Joeun's [redacted]. *Id.* Nonetheless, the CO concluded that Joeun's proposed rates for Supervisors were "fair and reasonable." *Id.* The CO based his conclusion on the fact that because Joeun's supervisory personnel would work [redacted], the total compensation for Joeun's supervisory personnel would be [redacted] than the total compensation for Joeun's non-supervisory personnel. *Id.* Additionally, the CO found Joeun's "extensive experience recruiting security guard personnel in the Korean labor market" justified his conclusion. *Id.*

The CO likewise concluded that Joeun's rates for non-supervisory personnel were "fair and reasonable," even though these rates were [redacted] than the average of all three acceptable offerors. *Id.*[13] However, the only basis for this conclusion was Joeun's "extensive experience recruiting security guard personnel in the Korean labor market." AR Tab 11 at 340.

Finally, in evaluating the reasonableness of Joeun's proposed rates, the CO relied on a DCAA Audit Report dated April 14, 2006, which evaluated the composition of Joeun's loaded labor rates to determine if they contained the benefits/allowances called for under Korean Labor Law. AR Tab 11 at 341. This report, which was prepared by DCAA at the explicit direction of the CO (AR Tab 54 at 2106) based on information supplied by Joeun after submission of its final

---

12 In fact, if Joeun's rates had been compared to the average of the other two offerors, the difference [redacted].

13 Again, however, if Joeun's rates had been compared to the average of the other two offerors, [redacted].

revised proposal (AR Tab 28 at 489), focused specifically on whether Joeun's proposed labor rates included certain fringe benefits required under Korean labor law. AR Tab 28 at 492. Although DCAA noted that Joeun's rates were "[redacted] compared to the incumbent's proposed rates," (AR Tab 28 at 490), it did not assess whether Joeun's proposed rates were "adequate," "realistic" or "complete." Nor did DCAA express any ultimate opinion regarding Joeun's proposed rates. AR Tab 28 at 489. Instead, as the DCAA made clear in its report, its review was limited (at the Army's request) to (a) determining "the basis for [Joeun's] proposed rates"; (b) determining whether Jouen included the required fringe benefits; and (c) comparing Joeun's proposed rates with the incumbent's (Group Four's) proposed rates. *Id.*

Thus, DCAA did not analyze whether Joeun's proposed rates or staffing plan, which called for [redacted], complied with Korean labor law regarding [redacted]. Instead, DCAA noted only that "the proposed monthly wages are computed based on [redacted] per week to [redacted]" (AR Tab 28 at 491) – an incorrect assumption, based on Joeun's proposal to work its supervisors an average of more than [redacted] per month (*see supra*, pp.14-15). DCAA also noted that Joeun's proposal did not include [redacted] in its proposed rates because Joeun "proposed [redacted] [sic]" – an assumption not contained in Joeun's proposal. (AR Tab 28 at 491)

Based on this analysis, the CO concluded that Joeun's revised price proposal was "fair and reasonable." Nowhere does the record reflect any consideration of whether the prices proposed by Joeun were evaluated to determine whether they were "adequate, "realistic" or "complete," as called for in the RFP. AR Tab 1 at 100.

6. <u>Award Under The Second Revised Solicitation</u>

On April 28, 2006, the Army awarded a Third Contract for the Services to Joeun, at a price of KRW 144,774,723,550 (USD $ 120,125,061.03). Following a debriefing, SecureNet

timely filed a protest of the award decision at GAO on May 8, 2006. In its protest, SecureNet challenged the Army's failure to comply with Korean labor law, in particular Joeun's presumed failure to propose adequate personnel to the meet the performance requirements and comply with the restrictions on overtime imposed under Korean labor law; and the Army's failure to ensure a fair competition in connection with the Third Procurement. *Id.* On May 26, 2006, the Army filed a request for summary dismissal. AR Tab 33 at 515. On July 20, 2006, GAO granted the Army's request, on an incomplete record and without fully addressing the merits of SecureNet's allegations. This action follows.

## III.
## ARGUMENT

### A. Legal Standard

Actions brought under the court's bid protest jurisdiction must be reviewed pursuant to the standards set forth in the APA, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4); *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 339, 341 (1997). The Court will set aside a procurement decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 28 U.S.C. § 1491(b)(4). The Court's application of this standard demands a rational basis for the agency's action and compliance with applicable procurement regulations and solicitation terms. As the Court of Appeals recently stated, an award will be set aside "if *either*: (1) the procurement official's decision *lacked a rational basis*; or (2) the procurement procedure involved a *violation of regulation or procedure*." *Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (emphasis added). Based on these standards, the Army's evaluation and award decision was arbitrary, capricious and contrary to law in at least four respects.

### B. The Army Engaged In Improper Discussions With The Awardee, After The Submission Of Final Revisions, Regarding The Key Aspect Of Its Proposal

According to the Federal Acquisition Regulation ("FAR"), "discussions" are a form of exchange or negotiation between the Government and offerors that occurs after the establishment of the competitive range, "with the intent of allowing the offeror to revise its proposal. These negotiations may include bargaining. Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract." FAR 15.306(d). Thus, if an agency obtains information from an offeror that makes a previously unacceptable proposal acceptable for award, such information generally constitutes a material change to the proposal. *Aquasis Servs., Inc.*, B-240841.3, 91-2 CPD ¶ 94.

In conducting discussions, the FAR warns that "Government personnel involved in the acquisition shall not engage in conduct that . . . [f]avors one offeror over another." FAR 15.306(d)(1). Consistent with this principle, if a procuring agency holds discussions with one offeror, it must hold discussions with all offerors whose proposals are in the competitive range. *Int'l Res. Group*, B-286663, Jan. 31, 2001, 2001 CPD ¶ 35, at 6. In fact, the Solicitation in this case expressly stated that "if the Government conducts discussions with any offeror in the competitive range, the Government shall conduct discussions with all offerors in the competitive range." Solicitation Section L.1.a(3)

As noted above, the Second Revised Solicitation required all offerors to base their proposed staffing and proposed prices on the same estimated number of hours for Supervisors in each of the four areas. AR Tab 2 at 176-82. In order to meet this requirement, Joeun [redacted] the number of Supervisors in its staffing plan, [redacted] Supervisors, and informed the Army that these employees would work "[redacted]" (AR Tab 35 at 978) to meet the required number

of hours.[14] In addition, while Amendment Nos. 7-9 only affected certain CLINs in certain Areas, Joeun significantly reduced its pricing for all CLINs in all Areas.

In order to evaluate these changes in Joeun's approach, the CO requested that DCAA perform an evaluation of Joeun's proposal, for the express purpose of evaluating the reasonableness of Joeun's proposed price. In its final report (which is relied upon in the Army's PNM), DCAA expressly acknowledged that it based its evaluation on post-FPR discussions that occurred between the Government and Joeun: "We discussed the factual matters with the contractor's representative, Mr. Kim Chul Shoo, Executive Director, on April 12, 2006. He acknowledges our findings." AR Tab 28 at 489. Consistent with this acknowledgement, the DCAA Report contains the following additional information, none of which was contained in the proposal submitted by the March 17 deadline for submission of final proposals:

- [redacted]
- [redacted]
- [redacted]
- [redacted].
- [redacted].

AR Tab 28 at 490-492.

[14] In reality, Joeun's proposal showed that its Supervisors would in fact be required work [redacted] per month; in particular, Joeun's proposal called for each Supervisor to work an average of [redacted] per week, [redacted] per month, and more than [redacted] per year per employee. *See* Exhibit B-1.

This information, which DCAA relied on to perform the requested evaluation of Joeun's fringe rates and other benefits, was new or supplemental information not contained in Joeun's proposal. In some cases, Joeun's proposal did not contain any information comparable to that relied on by DCAA – including, for example, information regarding the number of days of holiday leave, or the [redacted]. In other cases, the information relied on by DCAA in its analysis was different from the information contained in Joeun's proposal – including, for example, the assumption that employees would work [redacted] per week (when in fact Joeun's March 17 proposal showed a [redacted] workweek for Supervisors), or the assumption that Joeun included a [redacted] allowance (when the revised proposal expressly proposes an [redacted]). AR Tab 35 at 1069.

Thus, the record shows that the Army relied on information supplied by Joeun after submission of final proposals, in order to conduct its evaluation of Joeun's proposed labor rates. Importantly, no similar opportunity was afforded to SecureNet. This was inconsistent with the Army's obligation not to engage in discussions that favor one offeror over another. To the extent the Army required additional information to evaluate the basis for Joeun's pricing, it should have rejected Joeun's proposal as non-compliant.[15] Alternatively, it should have engaged in comparable discussions with SecureNet. However, it could not do what it did – favor one offeror

[15] *See Solicitation* Section L.2.c(3)(a) ("Failure to submit the offer breakdown as required will be grounds for determining the offeror technically unacceptable and ineligible for contract award in accordance with the evaluation criteria set forth in Section M of this solicitation.").

at the expense of another.[16] By holding these discussions with only Joeun after the submission of proposals,[17] the Army violated these basic rules, and provided an unfair advantage to Joeun.

### C. The Army Failed To Properly Consider The Feasibility And Risk Associated With The Awardee's Proposed Use Of Excessive Overtime

When a Solicitation requires the evaluation of an offeror's proposed staffing plan, the contracting agency must evaluate the performance risks associated with the offeror's proposed labor practices. *See Meridian Mgm't Corp.*, B-281287.10, *et al.*, Feb. 8, 2000, 2001 CPD ¶ 5; *Pacifica Servs., Inc.*, B-280921, Dec. 7, 1998, 98-2 CPD ¶ 137, at 6-8 (holding that proposal was unacceptable where the Solicitation required, and the proposal failed to demonstrate, an adequate quantity and appropriate allocation of staff for each requirement set forth in the statement of work). A proposal that clearly suggests that the offeror will engage in harsh labor practices presents an excessive performance risk, regardless whether the proposed practice complies with all of the material terms of the Solicitation, because of the increased risk of workforce disruption. *See Northrop Grumman Tech. Servs., Inc.*, B-286012, *et al.*, Nov. 1, 2000, 2000 CPD ¶, at 6 ("[S]election of a contractor that will engage in harsh labor practices, even if generally compliant

[16] *See, e.g., Global Assocs. Ltd.*, B-271693, *et al.*, Aug. 2, 1996, 96-2 CPD ¶ 100 (an agency can reject a proposal that does not demonstrate compliance with a mandatory clause, or can allow the other parties the same opportunity to revise their proposals, but it cannot favor one offeror and allow that offeror to submit additional information to show compliance with a mandatory clause of the solicitation).

[17] In fact, these discussions apparently continued beyond the award date, with the Army requesting additional information from Joeun regarding the acceptability of its proposal even after the award decision. For example, the record shows that the Army in May requested that Joeun obtain an opinion from the Korean Ministry of Labor regarding the Joeun's compliance with Korean labor law – a request that Joeun complied with, though it was based on different staffing assumptions and working hours than were reflected in its proposal. AR Tab 32. SecureNet is also waiting for the Government to produce a copy of a May 19 submission from Joeun to the Army regarding its "Monthly fixed working hour calculation," which was requested by the Army and referenced in the administrative record. *See* AR Tab 32 at 504. Such post-award communications, conducted to determine the acceptability of an offeror's proposed approach, are likewise improper. *See also ALT Comms., Inc.* B-246315, Mar. 2, 1992 ("[A]ward . . . on the basis of initial proposals was improper because [awardee's] initial offer did not demonstrate compliance with the solicitation requirements. That being so, we also view the post-award discussions with [the awardee] as being conducted for the purpose of giving [awardee] the opportunity to make its proposal acceptable. Such discussions with one offeror, instead of with all offerors whose proposals are in a competitive range, are improper.") (citing *See Federal Data Corp.*, B-236265.2, Jan. 25, 1990, 90-1 CPD ¶ 104).

with the requirements of the Service Contract Act, could increase the risk of workforce disruption for the agency. When such practices are clearly shown, we will sustain a protest that the agency has failed to properly consider the risks associated with its selection decision.").

Consistent with these principles, the Army was required under Section M, Factor A, to evaluate all offerors' technical and management plans "on an acceptable or unacceptable basis" to determine "the offeror's feasibility of approach and the Government's *perceived risk of unsuccessful performance*." Solicitation, Section M, Factor A, B (emphasis added). Despite this requirement, the record shows that the Army failed to evaluate the feasibility or risk associated with Joeun's proposed staffing approach – particularly in light of Joeun's proposed use of [redacted] required by law.

In response to the Second Revised Solicitation, Joeun proposed to [redacted] its Supervisor staff [redacted], and to work these personnel "[redacted] or above" (AR Tab 35 at 978) to meet the hours and performance requirements in the Solicitation. However, Joeun's proposal showed that its Supervisors would in reality be required to [redacted] per month; in particular, Joeun's proposed staffing approach called for each Supervisor to work an average of more than [redacted] per week, [redacted] month, and more than [redacted] per year per employee. See Exhibit B-1. Based on the 40-hour workweek mandated by Korean labor law (*see infra* Section III.F.1), this equates to more than [redacted] of overtime per year. *Id.*

Based on this information, Joeun's proposed staffing approach raised a number of significant issues regarding the feasibility and risk of its proposed approach:

- First, while Joeun's proposal includes [redacted], it does not address any [redacted]. However, information supplied by Joeun after the submission of final proposals indicates that Joeun intends to [redacted] through [redacted]

[redacted]. *See* AR Tab 28 at 491. Because employees are entitled to compensation at 150% of their basic wages (*see infra* Section III.F.1), this approach if permitted would require Joeun to provide more than [redacted] for Supervisors alone. However, there is no indication in Joeun's proposal that these [redacted] were taken into account; instead, Joeun's proposal assumed that all hours were productive hours, which are required to perform the work. There is no indication that the Army considered this failure to account for all productive hours required to perform the work, or its impact on the feasibility or risk of Joeun's proposal.

- Second, despite the [redacted] proposed, Joeun's proposal contains no indication that Joeun intended to [redacted] required under Korean labor law. (*See infra*, Section III.F.2) In fact, information apparently supplied to DCAA after proposal revisions were submitted (but prior to award) indicates that Joeun [redacted], even though the [redacted] provides this required benefit. AR Tab 28 at 491. However, there is no indication in the record that the Army gave any consideration to the risk that this proposal to [redacted] would have on Joeun's ability to assemble and retain a qualified workforce to perform these important services.

- Finally, Joeun's proposal calls for employees to work [redacted] permitted by Korean law. (*See infra* Section III.F.2) However, there is no evidence that Joeun addressed, or that the Army made any effort to evaluate, how Joeun would meet all of the performance requirements (including response times) if the staff it proposed were [redacted], from working the [redacted] proposed by Joeun.

The record shows that the Army failed to consider any of these issues in evaluating the feasibility or risk of Joeun's proposal. Instead, the record shows that the analysis of Joeun's staffing plan was cursory at best, as indicated in the following excerpt from the final TEB report:

> Staffing Plan –Acceptable.
>
> (1) On page 60 a staffing chart is provided that shows the [redacted]. On page 65-66, there is a [redacted]. Attachment 1 clearly [redacted] for supervisors.
>
> (2) The board consensus is that the staffing plan is an [redacted].

AR Tab 10 at 307.

Thus, other than verifying that a staffing chart was provided, and the conclusory statement that the plan was "[redacted]," there is no evidence that the TEB performed a substantive evaluation of the adequacy of Joeun's proposed staffing plan. Indeed, the CO's statement before GAO confirmed the cursory nature of this review, when he explained that "[t]he TEB considered an offeror's number of supervisors proposed acceptable if the number did not require an offeror to work their Supervisors beyond a 12-hour workday." AR AR Tab 33 at 529.

Thus, despite the obvious concerns raised by Joeun's [redacted], no consideration was given to this issue and the impact that might have on Joeun's performance, or its ability to recruit and/or retain qualified personnel to perform the important mission called for under this Contract. *See* AR Tab 41 at 16. This was unreasonable and inconsistent with the requirements of Section M, which called for a full evaluation of the feasibility and risk associated with proposals, including staffing plans.

## D. <u>The Army's Price Evaluation Failed To Consider The Impact Of Awardee's Use Of Excessive Overtime</u>

Where a solicitation contemplates the award of a fixed-price contract, the "realism" of offerors' proposed prices is not ordinarily considered. *Human Res. Sys., Inc.; Health Staffers, Inc.*, B-262254.3 et al., Dec. 21, 1995, 9d6-1 CPD ¶ 35, at 5. "However, because there is a risk of poor performance in certain circumstances, such as where a contractor fails to obtain and keep qualified personnel, an agency may, in its discretion, provide for a price realism analysis in the solicitation of fixed-price proposals." *OMNIPLEX World Servs. Corp.*, B-291105, Nov. 6, 2002, 2002 CPD ¶ 199, at 8.

Thus, the Solicitation's language dictates the nature and extent of an agency's price realism. *Cardinal Scientific, Inc.*, B-270309, Feb. 12, 1996, 96-1 CPD ¶ 70, at 4. Where, as here, the Solicitation requires that the agency conduct a price realism evaluation, the agency cannot conduct a price analysis (i.e. fair and reasonable analysis), in lieu of a price realism evaluation and hide behind the fact that the solicitation contemplates a fixed-price contract to justify its failure to act in accordance with the solicitation. *See e.g., OMNIPLEX World Servs. Corp.*, B-291105, Nov. 6, 2002, 2002 CPD ¶ 199, at 9 (finding agency's decision to conduct a price analysis in lieu of the price realism evaluation that the solicitation required was erroneous because "[t]he two types of analysis have two very different purposes and are not interchangeable").

In this case, the Solicitation required all offerors to demonstrate that their proposed prices were (a) "<u>adequate</u>," meaning that "[t]he proposed price and the scope of work are compatible"; (b) "<u>reasonable and realistic</u>," meaning that the "price is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business"; and (c) "<u>complete</u>," meaning that the price was "[r]esponsive to all RFP

requirements, all Contract Line Items (CLINs) are included, and estimates can be traced without mathematical errors." AR Tab 1 at 95. Consistent with these requirements, the Solicitation required the Army to evaluate each offeror's proposed price "to determine the extent to which it is adequate, reasonable, and complete." AR Tab 1 at 100.

Despite these requirements, the Army's evaluation of Joeun's proposed price was limited to the following:

- First, the Army compared Joeun's proposed rates to the [redacted]. This comparison was flawed in that it [redacted], thus [redacted] the actual difference between Joeun and the other offerors. *See supra,* notes 11, 12. More importantly, this comparison does not address whether Joeun's [redacted] or total price were realistic for the work proposed.
- Second, the Army relied on DCAA's evaluation of Joeun's proposed rates. Although it noted that Joeun's rates are [redacted] (AR Tab 28 at 490), DCAA's evaluation did not purport to evaluate the realism of Joeun's proposed rates or total price; instead, DCAA made clear in its report that its review was limited (at the direction of the Army) to (a) determining "the basis for [Joeun's] proposed rates"; (b) determining whether Jouen included the required fringe benefits; and (c) comparing Joeun's proposed rates with the [redacted] proposed rates. *Id.*

The Army's price analysis was thus limited to determining whether Joeun's proposed prices were "fair and reasonable." Nowhere did the price analysis performed by the CO or DCAA consider whether Joeun's proposed rates or total price was realistic. In particular, the Army did not consider the impact Joeun's proposal to require [redacted] would have on the realism of its proposed price – either its failure to include [redacted], or its failure

to account for any [redacted]. In fact, the Army expressly admitted that its price analysis focused solely on the "reasonableness" of rates, with no consideration of the realism of those rates, or the realism of Joeun's overall price based on its proposed staff and use of overtime. *See* AR Tab 11 at 337 (evaluation focused on "price reasonableness" of "proposed, loaded labor rates" with no effort to "determine the acceptability of any proposed staffing levels in relation to reasonableness of proposed prices).

To the extent DCAA did touch at all on Joeun's use of overtime, DCAA's analysis suffers both legal and factual flaws. The DCAA report states, in pertinent part:

> [redacted]

AR Tab 28 at 491.

As a threshold matter, DCAA did not express any opinion as to whether this [redacted] comports with Korean labor law. In addition, DCAA's discussion is based on the erroneous assumption that Joeun's proposed rates were computed based on a [redacted] work week; as discussed above Joeun's proposal in fact shows that its supervisors [redacted] per week.

In short, the awardee's proposal calls for employees to [redacted] required under Korean law. Although the Solicitation required the Army to consider whether the awardee's prices were "adequate, reasonable, and complete" for the work required, the Army ignored the impact of the awardee's [redacted] in its evaluation of price. The price evaluation was therefore irrational and inconsistent with the stated evaluation criteria.

## E. <u>The Army's Conduct Throughout The Entire Procurement Process Deprived SecureNet Of The Opportunity To Compete Equally And Fairly</u>

It is a basic tenet of procurement law that contracting officials must, in all matters, "[e]nsure that contractors receive impartial, fair, and equitable treatment." FAR 1.602-2(b). Thus, in conducting a procurement, contracting officials must ensure that "offerors [are] treated equally; that is, offerors must be provided with a common basis for the preparation of proposals, and award must be based upon the requirements stated in the solicitation, unless the offerors are notified of changes in (or relaxation of) the agency's stated requirements." *See For Your Info., Inc.,* B-278352, Dec. 15, 1997, 97-2 CPD ¶ 164, at *4. In addition to favoring Joeun through improper discussions, the Army has failed to comply with its duty of fairness by disclosing SecureNet's winning price for these services to the Awardee during the procurement process and failing to take any action to mitigate the unfair advantage cause by this disclosure; and by relaxing a material requirement of the Solicitation for Joeun.

### 1. <u>The Army's Implementation Of Corrective Action Provided Joeun With An Unwarranted Competitive Advantage</u>

After the Army awarded SecureNet the Second Contract, it notified all unsuccessful offerors of its award decision, explaining that the contract was awarded to the lowest priced technically acceptable proposal, SecureNet, for a total price of W139,061,989,279 ($115,384,989.44). Accordingly, Joeun received notice of SecureNet's winning price. AR Tab 40 at 1592. Subsequent to this disclosure, the Army decided to take corrective action in response to Group 4's protest and reopen the Solicitation. In implementing this corrective action, however, the Army unfairly allowed Joeun to make wholesale revisions to its proposal – including unfairly lowering its price after having seen SecureNet's winning price.

While a contracting agency has "broad discretion to take corrective action where the agency determines that such action is necessary to ensure fair and impartial competition," it must

exercise that discretion as appropriate to remedy the impropriety. *Rockville Mailing Serv., Inc.*, B- 270,161, *et al.*, Apr. 10, 1996, 96-1 CPD ¶ 184, at 3-4. Here, allowing Joeun to revise their entire proposal was not necessary to ensure fair and impartial competition, nor was it necessary to remedy the supervisor labor hour issue that prompted the Second Revised Solicitation. Indeed, all that was required was to allow offerors to updated their previous proposals to incorporate the additional Supervisor hours.[18] In fact, this was precisely what was required by Amendment Nos. 7 through 9; precisely what SecureNet did in submitting its revised proposal; and precisely what the Army argued was required in response to an earlier bid protest challenging the short turnaround time for submission of revised proposals. Nevertheless, the Army allowed Joeun to make significant reductions in its proposed prices on all CLINs – including those CLINs unaffected by Amendment No. 7. By allowing Joeun to slash its prices across the board, and undercut SecureNet's proposed price in the re-opened competition. This was patently unfair, and an abuse of the Army's discretion in implementing its corrective action.

Alternatively, the Army could have satisfied its obligation to maintain a level playing field by providing SecureNet with comparable information to neutralize any unfair competitive advantage provided by the disclosure of SecureNet's winning price to Joeun.[19] In fact, the FAR requires that if an agency issues a new request for revised proposals as a result of a bid protest, the contracting officer shall provide the following information to all offerors that were in the competitive range and are requested to submit revised proposals: (i) "[i]nformation provided to

---

[18] *See, e.g., Serv-Air, Inc.*, B-258243.4, Mar. 3, 1995, 95-1 CPD ¶ 125, at 2-3 (holding that where discussions are reopened after an award has been made to remedy a defect in the procurement process, and aspects of offerors' technical and/or price proposals have been revealed, the scope of discussions and proposal revisions may be limited).

[19] *See, e.g., Networks Elec. Corp.*,; *KPMG Peat Marwick*, B-251902.3, Nov. 8, 1993, 93-2 CPD ¶ 272, at 8-9 ("The disclosure of information to equalize competition is appropriate to remedy a potentially unfair (even if not improperly obtained) competitive advantage.").

unsuccessful offerors in any debriefings conducted on the original award regarding the successful offeror's proposal"; and (ii) "[o]ther nonproprietary information that would have been provided to the original offerors." FAR 15.507. Thus, in *ManTech Telecommunications and Information Systems Corp. v. United States*, 49 Fed. Cl. 57, 79 (2001), this court held that FAR 15.507 *requires* that the government provide the previous awardee with the "same type of information" regarding the other offeror's proposal that the Army previously disclosed to the other offeror during the debriefing. Applying that same rationale here, the Army should have, at a minimum, disclosed to SecureNet the proposed prices of all other bidders under the prior solicitation. Its failure to do so tainted the competition under the Second Revised Solicitation.

2. The Army Unfairly And Improperly Relaxed The Solicitation's Requirements

"It is a fundamental principle of federal procurement that offerors be treated equally; that is, offerors must be provided with a common basis for the preparation of proposals, and award must be based upon the requirements stated in the solicitation, unless the offerors are notified of changes in (or relaxation of) the agency's stated requirements." *See For Your Info., Inc.,* B-278352, Dec. 15, 1997, 97-2 CPD ¶ 164, at *4 (citing *Meridian Mgmt. Corp.; Consol. Eng'g Servs., Inc.*, B-271557 et al., Jul. 29, 1996, 96-2 CPD ¶ 64, at *5). In this case, the Army violated this fundamental principle by allowing Joeun to propose a staffing plan that failed to comply with the mandatory requirements of Korean labor law.

The Solicitation required that offerors propose to perform the contract in compliance with Korean Labor Law. However, Joeun's proposal clearly violated this requirement by requiring its employees to [redacted], and by failing to provide for [redacted] required by law. By allowing Joeun to flout these requirements, the Army relaxed the terms of the Solicitation with respect to Joeun's proposal, and allowed Joeun to understate its wage rates and staffing levels. SecureNet, however, complied with the

Solicitation's terms in preparing its proposal and, thus, offered the Army a higher priced proposal. Thus, the Army's conduct provided Joeun with an unfair competitive advantage. *See Dubinsky v. United States*, 43 Fed.Cl. 243, 271 (1999); *Vertiflite, Inc.*, 94-1 CPD ¶ 304, at 2-3 (1994); ("To consider [an offeror]'s offer to perform using more favorable payment terms would provide [the offeror] with an unfair competitive advantage since the other offerors submitted their offers based upon the terms of the solicitation.").

**F. The Army Failed To Evaluate Whether Joeun's Proposed Staffing Approach Complied With Korean Labor Law, And In Fact Ignored The Clear Evidence That Joeun's Proposed Use Of [redacted] Violated Korean Law**

It is well-settled that "[i]n negotiated procurements, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award." *Beckman Coulter,* 1998 WL 950692 *4 (Comp. Gen. Dec. 21, 1998). In this case, the Army violated this fundamental precept by awarding to a contractor whose proposal does not comply with relevant restrictions imposed by Korean labor law – restrictions that were a material part of the Solicitation. In particular, the Army awarded to Joeun even though its proposal clearly called for [redacted].

1. Limits On Overtime Hours Under Korean Labor Law

The Solicitation at issue in this case incorporated FAR 52.0000-4404, which required that each offeror's proposal comply with the constraints of Korean Labor Law. The importance of this clause is reinforced by the fact that "[f]ailure to comply may be deemed breach or default of the contract and evidence of nonresponsibility" on this and other contracts. (AR Tab 1 at 77)

In September 2003, the Korean National Assembly enacted significant changes to the Korean Labor Standards Act, the law governing wages and hours. The primary purpose of these changes was to reduce the standard workweek from 44-hours to 40-hours per week, and to

introduce an 8-hour workday. Act No. 5039, Labor Standards Act, Art. 49(1), (2) (2003) (Exhibit D).[20] As a result of the revisions enacted in September 2003, all hours in excess of 40 hours per week are considered overtime (or "extended") hours, for which the employee must be paid "additional remuneration of more than fifty percentage points of normal remuneration . . . ." *Id.,* Art. 55. Alternatively, instead of paying additional overtime wages, the employer may "grant . . . leave" to compensate the worker for the extended time, provided the employee/union agrees to this alternative compensation. *Id.* Art. 55-2.

In addition to mandating a 40-hour workweek and 8-hour workday, the 2003 revisions to the Labor Standards Act also made changes to the rules regarding "Flexible Working Hours." Under these revised rules, the employer and employee/union may agree to have an employee work up to 52-hours during a specific week, or up to 8-hours for a specific day. *Id.*, Art. 50(2). Even under these rules, the average number of hours worked over a three month period cannot exceed 40 hours. *Id.* In addition, even under Flexible Working Hour rules, the hours worked may not exceed 52 hours in a specific week or 12 hours in a specific day. *Id.*

Finally, the September 2003 revisions to the Act reduced the *maximum number of overtime hours* that an employee can work, from 16 hours per week to 12 hours per week. *Id.,* Art. 52. Although companies with more than 1,000 employees (such as Joeun)[21] were required to begin complying with the revised Act no later than July 1, 2004, *Id.,* Sept. 2003 Addendum, Art. 1 ("Enforcement Date"), the Act provided companies with an additional three-year "grace period" for compliance with this 12-hour per week limit on overtime. *Id.*, Sept. 2003 Addendum, Art. 3 ("Special Cases Concerning Extended Work"). Pursuant to this three-year

---

[20] *See also generally* Exhibit E (Korean Ministry of Labor summary of 2003 revisions). Prior to the 2004 revision of the Labor Standards Act, the 1989 version of the Act stipulated a 44-hour workweek. *Id.* Prior to that, the Act stipulated a 48-hour workweek. *Id.*

[21] *See* AR Tab 28 at 493 ("As of December 31, 2005, Joeun employed 1,828 permanent employees, . . . .").

"grace period," employers and employees could continue to apply the previous 16-hour per week limit on overtime for the three-year period beginning from the enforcement date (*i.e.,* from July 1, 2004 through June 30, 2007 for companies such as Joeun). *Id.,* Sept. 2003 Addendum, Art. 3(1). Also, to lessen the financial impact of these changes on businesses, the Act reduced the overtime premium for the first four hours of overtime from 50% to 25%. *Id.,* Sept. 2003 Addendum, Art. 3(2). After this three year period, however, the obligation to pay a 50% overtime premium, as well as the 12-hour per week limit on overtime, would apply.

2. Joeun's Proposed Staffing Approach Violates The Legal Limit On Overtime

As a company with more than 1,000 employees, Joeun is permitted to apply the 16-hour per week cap on overtime for a period of three years ending on June 30, 2007; after that date, Joeun is subject to the 12-hour per week limit on overtime hours called for in the September 2003 revisions to the Labor Standards Act. Sept. 2003 Addendum, Art. 3(1). In fact, the Ministry of Labor confirmed this fact in its May 22 letter to Joeun (which was requested by Joeun at the behest of the Army), when it stated in reference to the application of the 16-hour per week cap that "[t]he time period your company can applies this law is from July 1, 2004 to Jun 30, 2007 in limitation." (AR Tab 28 at 505).[22]

In this case, Joeun's proposed staffing approach requires it to [redacted]. In particular, Joeun's proposed staffing approach thus calls for each Supervisor to work an average of nearly [redacted] per week – or nearly [redacted] of overtime per week. Exhibit B-1. If permitted to take this approach, Joeun would exceed [redacted]

---

[22] *See also* AR Tab 32 at 505 ("IAW Article 52 of the Standard Labor Act, if the parties concerned reach agreement, working hours may be extended up to 12 hours per week and also the Article 3 of Addenda stipulates that 12 hours of extended work hours per week of Article 52 may be extended up to 16 hours for the first 3 years in limitation from the effective date of the Standard Labor Act amended.").

[redacted]. *See id*. Multiplied by the [redacted] proposed by Joeun over a 52 week period, Joeun has proposed more than [redacted]. Exhibit B-2. Viewed differently, this means that there are approximately [redacted][23] of required supervisory support that, by law, cannot be performed by the staff proposed by Joeun. *Id.*

The flaw in Joeun's approach is even more significant beginning July 1, 2007 (approximately the beginning of the first option year),[24] when Joeun will become subject to the 12-hour weekly cap on overtime. AR Tab 32 at 505. At that point, Joeun's proposed staffing approach would call for each Supervisors to work nearly [redacted]. *Id.* Viewed in terms of personnel, this equates to nearly [redacted][25] of required Supervisor support that, by law, cannot be delivered under the staffing plan proposed by Joeun. *Id.*

Despite the obvious flaw in Joeun's approach, the record contains no evidence that the Army ever considered whether Joeun could comply with the strictures of applicable overtime laws as called for in FAR 52.0000-4404. In fact, the CO so at GAO, when he explained the manner in which the evaluation was conducted:

[redacted]

[23] This assumes an employee can work up to 2,912 hours per year (56 hrs per week x 52 weeks) until July 1, 2007.

[24] *See* Contract No. W91QVN-06-D-6003 at 2 of 86.

[25] This assumes an employee can work up to 2,703 hours per year (52 hours per week x 52 weeks) after July 1, 2007.

[redacted].

AR Tab 33 at 529. Thus, while the Solicitation clearly requires compliance with Korean labor laws, the Army reasoned that it was not required to evaluate offeror's compliance (or non-compliance) with these laws because (a) it assumed that it was the contractor's obligation to ensure compliance, and (b) this issue was not specifically called out in Section M.

The Army's claim that it was not required to evaluate Joeun's compliance with Korean labor law is undermined by the fact that the Army did in fact request that DCAA review portions of Joeun's proposal to determine its compliance with certain selected aspects Korean labor law – specifically, to "[v]erif[y] that the proposed fringe benefits rates are . . . in compliance with the Korea [sic] labor law." (AR Tab 28 at 489) Unfortunately, while the Army understood it was obligated to evaluate compliance with labor laws, it neglected to analyze Joeun's compliance with key aspects of those laws – particularly those related to [redacted].

The Army's failure to analyze Joeun's compliance with labor law was also patently unreasonable, particularly since the proposal showed quite clearly that Joeun's approach would not comply. As the GAO has recognized in a variety of contexts, an agency's failure to consider an offeror's failure to comply with a material term of a solicitation, particularly in the face of evidence of an offeror's obvious non-compliance, is a prejudicial error. For example, in *Sonshine Enterprises*, B-246268, Feb. 26, 1992, 92-1 CPD ¶ 232, the GAO held that an agency acted improperly when it awarded to an offeror whose proposal included exceptions to the standard FAR termination for default and convenience clauses. Although there was no indication that evaluation of these standard clauses was called out as an evaluation criteria, GAO recognized that "any proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award." GAO

therefore concluded that the "the agency improperly accepted a proposal that took exception to material terms of the solicitation."[26]

In this case, Joeun submitted a proposal that on its face called for [redacted] limitations imposed by Korean labor law. The Army was clearly aware of the [redacted] proposed by Joeun – in fact, it attempted to use [redacted] to allay its concerns over Joeun's [redacted]. (AR Tab 11 at 339) The Army was also aware of the requirement that offerors comply with Korean labor law, as evidenced by its narrowly-focused request to DCAA to verify that Joeun's proposed rates complied with selected provisions of Korean law (*i.e.,* certain fringe benefits requirements) (AR Tab 28 at 489) Because the Army failed to consider whether Joeun complied with the important legal restrictions on overtime hours, and in fact ignored the clear evidence that Joeun's approach violated these requirements, its decision was arbitrary and capricious and contrary to law.

## IV.
## INJUNCTIVE RELIEF

As detailed above, SecureNet has established that the decision to award the Contract to Joeun, and process followed by the Army in reaching this award decision, were arbitrary, capricious, and abuse of discretion and contrary to law. SecureNet also satisfies the remaining prongs of the test for injunctive relief.

First, SecureNet will suffer irreparable harm if Defendant's actions are not enjoined because (1) it will be denied an effective remedy if the awardee is permitted to continue with performance of the contract; (2) it will have been denied the opportunity to compete fairly and

---

[26] *See also Orincon Corp.,* B-276704, July 18, 1997, 97-2 CPD ¶ 26 ("[W]here a proposal, on its face, should lead an agency to the conclusion that an offeror could not and would not comply with the subcontracting limitation, we have considered this to be a matter of the proposal's technical acceptability; a proposal that fails to conform to a material term and condition of the solicitation such as the subcontracting limitation is unacceptable and may not form the basis for an award.").

obtain the Contract; and (3) it will have lost the ability to obtain the profits that SecureNet would have earned had it been awarded the Contract. As this has recognized, the "denial of the right to have a bid fairly and lawfully considered constitutes irreparable harm." *Overstreet Elec. Co.*, 47 Fed. Cl. 728, 744 n.25 (2000).[27] Absent injunctive relief, SecureNet would also be deprived of the opportunity to obtain the significant profits that it would have received under the Third Contract, another form of irreparable harm recognized by this Court. *See, e.g.*, *United Payors*, 55 Fed. Cl. at 333; *United Payors*, 55 Fed. Cl. at 333 ("As the contract at issue is still in the first year of a five-year period of performance, an award of bid and proposal costs would not adequately compensate plaintiff for its loss of this contract award.")

By contrast the Defendant will not suffer prejudice as a result of a grant of the injunction. These services have been being performed throughout this procurement (including during stop works imposed in connection with other protests) by the current bridge contractor, Group4 Force Korea ("Group4FK"). Group4FK was a technically acceptable bidder for each of the three contracts and is clearly qualified to continue providing the services.

Finally, the public interest will be promoted by issuance of the injunctive relief sought by SecureNet. This Court has stated "[i]t is beyond peradventure that the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *Overstreet Elec. Co.*, 47 Fed. Cl. at 744. In this case, the integrity of the procurement system demands that the Army conduct this competition in a manner that is consistent with applicable regulations and the evaluation criteria

---

[27] *Accord Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000) ("[A] lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm."); *see also Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 398 (1999).

of the Solicitation. Because the Army has failed to meet this standard, the requested relief will promote the integrity of the procurement system and the public's confidence in that system.

## V.
## CONCLUSION

For the reasons stated above, SecureNet respectfully requests that the Court issue an order that the Army's actions in this procurement and its award of the resulting contract to Joeun were not in accordance with law; that the Army's contract award to Joeun be declared invalid; that no contract award under this Solicitation may be made to Joeun as it is a technically unacceptable offeror; that if the Army makes a new award on this Solicitation, it must award to SecureNet as the lowest priced, technically acceptable offeror. Alternatively, if the Army amends or cancels the Solicitation in this procurement, SecureNet is entitled to recover all proposal preparation costs incurred in connection with this procurement.