FILED UNDER SEAL [1/]

# In the United States Court of Federal Claims

No. 06-564C
(Filed: September 18, 2006)

* * * * * * * * * * * * * * * * * * * * * * *
SECURENET CO. LTD.,

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant*,

* * * * * * * * * * * * * * * * * * * * * * *

Post-Award Bid Protest; RCFC 52.1, Judgment on the Administrative Record; Reasonableness versus Realism Determination.

*Rand L. Allen,* Washington, D.C., for plaintiff. *Thomas J. Seymour*, Seoul, Korea, *Kevin Maynard* and *Antonella Karlin*, Washington, D.C., of counsel.

*Michael Austin*, U.S. Department of Justice, Trial Attorney, Commercial Litigation Branch, Civil Division, Washington, D.C., with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, and *Brian M. Simkin*, Assistant Director, for defendant. *Major Sunny Ahn*, United States Army, Contract Appeals Division, of counsel.

---

OPINION

---

BRUGGINK, *Judge*.

This is a post-award bid protest involving the award of a United States

[1] This opinion is issued under seal. The parties are directed to confer and submit to chambers a copy of this opinion containing stipulated redactions on or before September 27, 2006 at 5:00 PM EST.

Army contract for security services throughout the Korean Peninsula. Award was made to Joeun Systems, Co. Ltd. SecureNet Co, Ltd., an unsuccessful offeror, challenges the award. Currently pending is plaintiff's motion for judgment on the administrative record and request for declaratory and injunctive relief. Plaintiff claims 1) that the government did not adhere to the solicitation requirements by accepting an offer not in compliance with Korean labor law, and 2) that the Army failed to ensure a fair competition on its last resolicitation. Defendant has filed a cross-motion. The matter has been fully briefed and oral argument was heard on September 14, 2006. For the reasons set out below, we grant defendant's motion and deny plaintiff's motion.

BACKGROUND

The United States Army Contracting Command Korea ("Army") contracts for security guard services at over sixty military installations throughout four geographically dispersed areas in the Republic of South Korea ("ROK"). The Army does this on behalf of the U.S. Forces Korea ("USFK") and the Installation Management Agency Korean Region Office ("IMA KORO"). The Army intended to enter into a contract for security services for a period of five years–one base year and four option years. The solicitation at issue here was the third solicitation attempted for the same contract services. The prior two solicitations were canceled. SecureNet was selected for the prior two awards.

**The Solicitation**

The first solicitation, W91QVN-05-R-0087, was announced on May 25, 2005 ("first solicitation" or "original solicitation"). The solicitation was based on a "firm fixed price" and "requirements type" contract. Administrative Record ("AR") Tab 1 at 2. The original solicitation called for security services in four areas in South Korea.[2/] Each area is geographically separated and has different security needs. All of the areas have multiple security posts that must be manned twenty-four hours a day, seven days a week. The original solicitation called for three different types of security personnel to guard these military installations: 1) Supervisors ("Area Commander," "Sergeant of Guard" and "Corporal of Guard"); English

---

[2] The areas are referred to in the solicitation and throughout this opinion as Area I, Area II, Area III, and Area IV.

Qualified Guards ("ER Guard"); and 3) Non-English Qualified Guards ("NER Guard"). The first solicitation specified total yearly estimated labor hours required for ER and NER Guards. It did not, however, estimate the hours necessary for supervisors, leaving that up to the discretion of the offerors based on the performance requirements set forth in the original solicitation.

Proposals were to contain three volumes of information in order to provide sufficient detail on how each offeror proposed to perform the tasks set forth in the Performance of Work Statement ("PWS"): Volume I (Factor A), Management Proposal; Volume II (Factor B), Technical Proposal; and Volume III (Factor C), Pricing. Factors A and B were divided into subfactors.

Offerors were required to submit a staffing plan as part of their technical proposal. With regard to supervisors, the solicitation stated that proposals should include a staffing chart "to reflect, at a minimum, the number of supervisors, areas that supervisors are responsible for by post, the contractor chain of command and the hours per supervisor . . . ." AR Tab 2 at 163.

Factor C, the price proposal, had to include a breakdown of pricing for 1) materials, 2) labor (loaded hourly rates by employee category), 3) transportation and equipment, and 4) other items. Offerors had to demonstrate that their hourly pricing was "adequate, complete and reasonable to assess the offeror's understanding of the solicitation." AR Tab 2 at 164.

In two separate places, the solicitation stated that the contractor was required to comply with Korean law. Section C.5 of the PWS reflects that "The Contractor shall comply with all . . . local ROK laws and requirements necessary for performance of this contract." AR Tab 1 at 50. Section H of the solicitation included FAR Clause 52.0000-4404, which stated that the "Contractor shall honor employee's rights in full compliance with Korean Labor Law . . . ." AR Tab 1 at 77.

**Evaluation**

The award was to go to the "responsible offeror submitting the lowest priced, technically acceptable offer that receives a technical acceptable rating in all factors and subfactors, and satisfies all terms and conditions of this solicitation." AR Tab 1 at 100. The Army also evaluated each Management and Technical subfactor on an acceptable or unacceptable basis "in terms of the offeror's feasibility of approach and the Government's perceived risk of

unsuccessful performance." *Id.* Once the Army determined a group of acceptable offerors, no further assessment was made.

Within the acceptable group, the Army stated that it would perform a price analysis to "determine the extent to which it is adequate, reasonable, and complete." AR Tab 1 at 100. A price was only to be considered "adequate" if "the proposed price and the scope of work are compatible," "reasonable and realistic" if, "in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business;" and "complete" if the price was "[r]esponsive to all RFP requirements, all Contract Line Items (CLINS) are included, and estimates can be traced without mathematical errors." AR Tab 1 at 95. In accordance with Section B of the solicitation, offerors were to provide unit prices (*i.e.*, loaded hourly rates) for each type of employee.

Three of the offers were initially found to be technically acceptable, including SecureNet and Jouen. The Army found SecureNet to be the lowest-priced, technically acceptable offeror and awarded it the contract on August 19, 2005. A protest was filed with the Government Accountability Office ("GAO"), however. On August 31, 2005, the Army issued a Stop Work Order ("SWO") to SecureNet because of the protest.

GAO dismissed the protest, and on September 22, 2005, the Army lifted the SWO. The contract was adjusted to a start date of November 1, 2005 and on that date SecureNet commenced Phase-In. On November 16, 2005, however, the Army terminated the contract for convenience without providing SecureNet an explanation. The Army's actions up to this point are not challenged.

**The First Revised Solicitation**

A revised solicitation, No. W91QVN-06-R-0062, was issued on December 23, 2005. This solicitation ("first revised solicitation") was nearly identical to the previous one but called for a reduced scope of services. Proposals were due by January 10, 2006. After review of fifteen proposals by a Technical Evaluation Board ("TEB") and a Management Evaluation Board ("MEB"), SecureNet was once again determined to be the lowest priced, technically acceptable offeror. SecureNet was awarded the contract on January 27, 2006, with a winning bid of KRW139,061,989,279 (Korean Won) or USD $115,384,989.44.

Between the award date and February 3, 2006, the Army conducted five debriefings of unsuccessful offerors. The Army disclosed SecureNet's name as the successful offeror and its price. Offerors that did not request a debriefing, including Joeun, received a notice of contract award that also provided SecureNet's name and its winning price.

On February 6 and 10, 2006, two unsuccessful offerors filed GAO protests in response to the award. AR Tab 41 at 1593, 1601. One protest, filed by Group 4 Falck ("Group 4"), the incumbent on the contract, argued that SecureNet's proposed number of supervisors was insufficient to comply with Section C.6.6.4 of the PWS and, therefore, the Army's award was arbitrary and capricious. Section C.6.6.4 stated, "Supervisors (on duty) shall be available on-site or by telephone or radio communications to the security guards and capable of responding to guard posts within fifteen (15) minutes from receipt of an emergency call." AR Tab 1 at 53. Group 4 argued that this requirement meant that a supervisor had to be able to respond physically and be at a guard post within fifteen minutes. *Id.* Based on the information Group 4 had received in its debriefing relating to the number of supervisors SecureNet proposed to have on duty at any one time and the significant distances between some of the posts, it would not have been possible for SecureNet's supervisors to respond to some emergencies in the time expected by the solicitation. *Id.* On March 9, 2006, the Army apparently agreed that there was a problem. It decided to take corrective action in response to the Group 4 protest and requested that GAO dismiss both protests as moot, which GAO later did. AR Tab 41 at 1624-27.

In the interim, however, on March 10, 2006, the Army contacted SecureNet and asked it to clarify how the number of supervisors and number of supervisor hours it proposed by area and per post would meet Section C.6.6.4 of the PWS. AR Tab 57 at 2119. SecureNet was given until 10:00 AM on March 13, 2006 to respond. SecureNet filed a response on the afternoon of March 11, 2006 requesting more time, but the Contracting Officer ("CO") in a response on March 13, 2006, stated that SecureNet had sufficient time to reply and that the Army was now pursuing an alternate resolution to the issue. AR Tab 56 at 2118; AR Tab 14 at 353. SecureNet filed a responsive letter later that same day, but it was apparently too late. SecureNet was later terminated for convenience.

**The Second Revised Solicitation**

On March 13, 2006, the Army issued Amendment 0007 to the solicitation ("second revised solicitation") requesting revised proposals from all previous offerors. The amendment focused primarily on estimated supervisory hours and supervisors' response to emergencies. Section C.6.6.4 was changed to read, "Supervisors on duty . . . shall be available on-site or by telephone or radio communications to the security guards and capable of departing in response to guard posts within five (5) minutes from receipt of an emergency call." AR Tab 2 at 165. The amendment also specified the supervisor posts and the estimated number of labor hours per year for supervisors at the posts in each area. AR Tab 2. The amendment required offerors to make revisions to their proposals in accordance with a specific estimate of supervisory hours per year.[3/] *Id.* The estimated 475,960 hours appear to be based on the Army requiring full supervisory coverage of all of camps, twenty-four hours each day, seven days each week. A number of the camps and posts in the attachments to the amendment are designated either "red," which means the camp "will change within the year," or "yellow," which means the camp "may change within the year.[4/] AR Tab 1 at 101C-101R; AR Tab 2 at 166-182. Thus, the solicitation informed offerors that the estimated number of supervisory hours would not equal the Army's actual requirement.

Neither the original solicitation nor the amendment specified how many supervisors the offerors had to have available to fulfill the estimated hours requirement. The original solicitation did state, however, that "security guards, to include supervisors, shall not work in excess of twelve consecutive hours due to readiness and safety concerns." AR Tab 1 at 61. The amendment stated, "[o]fferors may submit only those portions of their proposals affected by this amendment." AR Tab 2 at 165.

On March 15 and 16, 2006, the Army issued two more amendments to

---

[3]This estimate included 134,320 supervisor hours per year in Area I, 143,080 supervisor hours per year in Area II, 46,720 supervisor hours per year in Area III, and 151,840 supervisor hours per year in Area IV. AR Tab 2 at 176, 179, 180, 182.

[4] These camps include Camp Howze, Dodge, Colbern, DRMO, and Hialeah (red) and Kimpo and Humphreys (yellow).

the solicitation. Amendment 0008 corrected the proposal due date and clerical errors in the attachment references. Amendment 0009 provided answers to offerors' questions regarding Amendment 0007. In response to one question, Amendment 0009 stated, "Offerors may submit a revised price & technical proposal or may submit only the Staffing Plan and revised price proposal according to Amendment 0007." AR Tab 4 at 186. Revised proposals were due on March 17, 2006, three days after Amendment 0007 was issued and one day after Amendment 0009 was issued.

**SecureNet's Proposal**

SecureNet was one of eleven offerors to respond to the second revised solicitation. It only revised its staffing plan and pricing to adjust for the Army's new required supervisor hours. In order to meet these new demands, SecureNet increased its proposed number of supervisors from 103 to 226. AR Tab 36 at 1353-54; AR Tab 39 at 1557-66. This change increased SecureNet's overall proposal price from approximately USD $115 million to $131 million. AR Tab 39 at 1555.

**Joeun's Proposal**

Joeun originally proposed 108 supervisors for the contract. In its revised offer, Joeun proposed 148 supervisors. AR Tab 34 at 638; AR Tab 35 at 978. Joeun proposed that it would only need 148 supervisors based on the expectation that it would require supervisors to "work 240 [hours] or above" each month. *Id.* Joeun, however, adjusted other areas of its proposal, in addition to its staffing plan and pricing in accordance with Amendment 0007. The amendment also increased the number of Guard hours necessary for Area IV but did not decrease hours in any of the other areas. Although Joeun added ER and NER Guards to Area IV, it decreased Guards in other areas. In total, it added three ER Guards but it reduced its total NER Guards from 143 down to 131. AR Tab 34 at 638; AR Tab 35 at 978. It also significantly reduced its proposed prices and hourly rates for ER and NER Guards as well. *See* AR Tab 34 at 708; AR Tab 35 at 1059.

**Protest of the Second Revised Solicitation**

HDS Security Company, another offeror, filed a GAO protest on March 24, 2006. HDS argued that the Army violated Federal Acquisition Regulation ("FAR") 14.202 by providing insufficient time for offerors to respond to the

second revised solicitation. AR Tab 41 at 1619-23. The Army responded that the four day response time (March 13 to March 17, 2006) "was deemed to be sufficient because the only change to the solicitation as stated in Amendment 0007 was the requirement for supervisory personnel responding to emergency situations." AR Tab 41 at 1631. Ultimately, HDS withdrew its protest on April 12, 2006. AR Tab 43 at 1941.

**Evaluation Under the Second Revised Solicitation**

Once again, the proposals were evaluated based on technical acceptability and price. The TEB and the MEB were responsible for evaluating and determining if each offer was technically acceptable.[5/] The CO found only the proposals of Joeun, SecureNet, and Group 4 Falck to be overall technically acceptable. AR Tab 11 at 336-37. Once again, no comparative ranking was done. In a Price Negotiation Memorandum ("PNM"), the Army stated:

> Discussions with any of the three (3) offerors with a total evaluated price lower than Joeun would not result in an otherwise technically acceptable proposal since they did not propose in any form acceptable experience performing security guard services of a like and similar scope and/or magnitude. Because no other offeror submitted a lower priced, technically acceptable proposal, there is no need to discuss the technical acceptability of any of the remaining six proposals (CAPS TEC, DongDo, SecureNet, Seoun Security, FMTEC, and Kukje).[6/]

AR Tab 11 at 337.

The Army then conducted a price analysis of all three technically acceptable offers, which is preserved in the PNM. *Id.* An analysis chart reflects that, because "[t]he Government will place delivery orders against these requirements contract line items ("CLIN") for the desired number of

---

[5] In some instances, the Source Selection Authority ("SSA"), at the request of the boards, performed additional fact finding regarding technical acceptability. AR Tab 11 at 333.

[6] The inclusion of SecureNet's name as one of the unacceptable offers is a clerical error.

supervisors . . . [and] security guards by geographic location," then "no discussion is required to determine the acceptability of any proposed staffing levels in relation to the reasonableness of proposed prices." *Id.* What this appears to mean is that in the price analysis (as opposed to the technical evaluation) the Army is primarily interested in the unit price (*i.e.*, loaded hourly labor rate) for personnel, rather than the actual number of supervisors and guards proposed, because the Army will order supervisors and guards at the contractual unit price on an as needed basis.

The Army compared Joeun's total price to the average prices of the three acceptable offers. *See* AR Tab 11 at 339. Joeun's rates for supervisory work ranged from 13.9% to 14.7% below the average price. *Id.* Its ER Guard rates ranged from 4.6% to 6.1% below average, but its NER Guard rates ranged from 1.3% to 4.3% above average. *Id.* The Army also compared Joeun's overall price of $120,125,061.03 to the Independent Government Cost Estimate ("IGCE") of $122,514,232.53, a difference of approximately 2 percent. *See* AR Tab 11 at 326, 337.

The CO performed an analysis of Joeun's prices and the price differences and concluded that "[o]verall, considering Joeun's extensive experience recruiting security guard personnel in the Korean labor market, the proposed loaded labor rates for supervisory [and ER and NER] security guard personnel [are] considered fair and reasonable." *Id.* at 339-40.

On March 31, 2006, the CO requested the Defense Contract Audit Agency ("DCAA") to perform an audit on Joeun's prices to "validate labor rate reasonableness and fringe benefits compliance with labor law(s)." AR Tab 54 at 2106.[7/] The DCAA reported that:

> [A]s discussed subsequently with your office, we applied agreed

[7] The PNM states that the CO requested the DCAA review of Joeun's proposal to audit the "financial capability and the labor rate reasonableness & fringe benefits compliance with Republic of Korea labor law(s) for Samkoo Development Co., Ltd. and Joeun Systems Corporation." AR Tab 11 at 330. It is not clear what prompted the Army's request, or why the Army requested an evaluation of Samkoo's proposal. A determination of an offeror's financial capability is in line with a responsibility determination of the apparent successful offeror.

> upon procedures to the proposed labor rates and fringe benefits rates of Joeun Systems Corp. for the period May 1, 2006 through April 30, 2011 . . . The purpose of our engagement was to compare the labor rates and fringe benefit rates used in the contractor's proposal to the incumbent contractor's proposed rates for the same solicitation to assist the contracting officer to determine the reasonableness of the proposed labor rates and to determine whether fringe benefit rates are in accordance with Korean labor law.

AR Tab 28 at 489.

In DCAA's summary of findings with respect to labor rates, it states, "We determined that the contractor properly included all required allowances in its computation and its established practices are in compliance with the Korean Labor law. However, the proposed monthly wages are understated compared to the incumbent contractor's proposed rates submitted on March 17, 2006 except Area Commander." *Id.* at 490. In the summary of findings with respect to fringe benefit rates, it states: "We noted no differences between the contractor's proposed fringe benefit rates and the rates required by Korean labor law . . . ." *Id.* at 491. In short, the DCAA saw nothing alarming with respect to Joeun's loaded labor rates in terms of its compliance with Korean labor law.

The DCAA did not analyze or make any findings regarding whether Joeun's proposal complied with the overtime requirements of Korean labor law. DCAA noted that wages were computed based on 44 hours per week, even though Joeun's proposal stated that supervisors would work at least 240 hours per month. DCAA also performed a financial risk assessment of Joeun and found the risk to be of an acceptable level. AR Tab 33 at 531-35.

**Award**

On April 28, 2006, the Army awarded the contract to Joeun as the lowest priced technically acceptable offeror Joeun's final price was KRW144,774,723,550, or USD $120,125,061.03. On the same day, the Army faxed a termination for convenience notice to SecureNet for the contract awarded in January 2006 and an unsuccessful offeror letter.

SecureNet filed a GAO protest challenging the award on May 8, 2006.

It argued that the Army failed to comply with terms of the solicitation and Korean labor law regarding overtime restrictions and failed to ensure a fair competition in the final procurement. AR Tab 96 at 2807-16. The Army filed a timely request for summary dismissal that was granted by GAO on July 20, 2006.

One of the reasons that GAO denied the protest, at least with respect to the overtime issue, had to do with a letter from the Korean Ministry of Labor ("MOL") to Joeun dated May 23, 2006. AR Tab 32. MOL was replying to a question Joeun had posed to it regarding the current Standard Labor Act: "your company has inquired of whether your company can make the supervisors work within 279 hours a month in case of applying 16 hours of weekly extended work."[8/] *Id.* at 505 (English translation of the document). In replying to the question, MOL stated:

> IAW Article 52 of the Standard Labor Act, if the parties concerned reach agreement, working hours may be extended up to 12 hours per week and also the Article 3 of Addenda stipulates that 12 hours of extended work hours per week of Article 52 may be extended up to 16 hours for the first 3 years in limitation from the effective date of the Standard Labor Act amended.
>
> Since your company has defined the 269 working hours per month for your employees, we understand that this monthly working hour is the issue, whether it exceeds the maximum extended working hour regulated in the Standard Labor Act. Reviewing this issue, it is 13.6 hours per week. It is therefore judged that it is not against the Standard Labor Act because it is lower than the 16 hour of extended working hour. The time period your company can applies this law is from July 1, 2004 to Jun 30, 2007 in limitation. The extended working should be reached between the parties.

---

[8]The number of monthly supervisor hours given by MOL in this statement, 279 hours, does not correspond with the 269 hours it uses to calculate weekly supervisor hours subsequently in its reply letter. Neither MOL, nor defendant, ever clarify this discrepancy.

*Id.* (English translation of the document).

SecureNet then filed this protest here on August 1, 2006.

DISCUSSION

I. Standard of Review

We have jurisdiction pursuant to the Tucker Act over "an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2000). Review is pursuant to the standard set out in the Administrative Procedure Act ("APA").[9/] *Id.* § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Accordingly, this Court can hold unlawful and set aside agency action which is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000). As applied to our bid protest jurisdiction, this means that we may only set aside an agency's procurement decision if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (citations omitted). The burden rests on the disappointed bidder to prove that either the agency failed to provide a "coherent and reasonable explanation of its exercise of discretion" or that there was a "clear and prejudicial violation of applicable statutes or regulations." *PHT Supply Corp. v. United States*, 71 Fed. Cl. 1, 11 (2006) (quoting *Banknote*, 365 F.3d at 1351).

II. Overview

The principal concern raised in the protest is that the Army awarded Joeun the contract based on a proposed staffing approach that SecureNet believes would be difficult, if not impossible, to perform.[10/] The solicitation

---

[9]Administrative Procedure Act of 1946, June 11, 1946, ch. 324, 60 Stat. 237 (codified as amended in scattered sections of 5 U.S.C.).

[10] Although a discussion of SecureNet's additional protest grounds follow, a substantial amount of the complaint relates to Joeun's supervisor to hours ratio.

required offerors to propose loaded hourly rates for supervisors in accordance with an estimated 475,960 annual supervisory hours in four geographic areas. The solicitation also required offerors to propose a number of supervisors in a staffing chart. Joeun offered to do the job with 148 supervisors.[11/] AR Tab 35 at 978. SecureNet believes 148 supervisors is insufficient to perform the requirements of the subject contract because it creates a ratio of supervisors to hours that will force Joeun to violate the overtime rules under Korean labor law and, because it is excessively burdensome to employees.

The Army believes there was nothing improper with the award decision because the TEB's evaluation of Joeun's proposal was consistent with the stated evaluation factors, none of which specifically called for an assessment of overtime issues. The Army argues that the TEB considered the number of supervisors and the loaded rates to be feasible and not pose a risk of unsuccessful performance.

Although not specifically emphasized in defendant's briefing, during oral arguments, defendant emphasized that, although the subject contract is a fixed-price contract, it is also a requirements type contract. In other words, the estimated 475,690 hours represented an amount needed to staff every supervisory post (twenty-four hours each day, seven days each week) if the Army required such services. What had to be evaluated was the reasonableness of the hourly rates and the overall number of employees available. We agree that the type of contract establishes a critical framework for our review of the TEB's evaluation and award decision.

In Section I of the solicitation, FAR Clause 52.216-21 is incorporated by full text. The Clause reads in pertinent part:

> (a) This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are *estimates only* and are *not purchased by this contract*. Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the

---

[11] In contrast, SecureNet proposed 226 supervisors. AR Tab 36 at 1353-54.

> Schedule, that fact shall not constitute the basis for an equitable price adjustment.
>
> (b) Delivery or performance shall be made only as authorized *by orders* issued in accordance with the Ordering clause.

AR Tab 1 at 81 (emphasis added). Additionally, the solicitation informed offerors that "[t]he Contractor shall furnish all personnel, equipment, and supplies . . . *as required*" and that "[t]his is a Firm Fixed Priced and Requirement Type Contract." AR Tab 1 at 2 (emphasis added). The solicitation listed CLINs 0001, 1001, 2001, 3001, and 4001 as the firm fixed price CLINs, and CLINs 0002-0005, 1002-1005, 2001-2005, 3001-3005, and 4002-4005 as the requirement CLINs[12/] that "will be ordered and funded by each delivery order *as needed basis* [sic]." *Id.* *See also* AR Tab 2 at 104 ("Contractor is required to provide a Supervisory Personnel's loaded hourly rate and ESTIMATED YEARLY TOTALS [sic] HOURS").

It is apparent that the Army asked for loaded hourly rates for supervisors in order to purchase (*i.e.* order) guard services at a fixed price in accordance with its particular requirements. The Army did not promise to order a certain number of supervisory hours. Rather, it intended to negotiate the number of hours with the contractor before issuing a delivery order. The fact that the solicitation informed offerors that a number of the camps would change (*i.e.,* "red" or "yellow") is further evidence that the Army's own estimated total supervisory hours of 475,960 was not necessarily the number of hours the Army would require for supervisory personnel. In effect, the offerors were asked to propose a loaded hourly labor rate for supervisory personnel, which would become the fixed rate, irrespective of the number of hours of supervisory services the Army subsequently ordered.

The flaw in SecureNet's protest, in relation to the supervisor to hours ratio, is that SecureNet is treating the subject contract as a contract between Joeun and the Army to perform 475,960 supervisory hours each year. Stemming from this erroneous premise, SecureNet articulated three arguments:

---

[12] The requirement CLINs called for the services of Supervisory Personnel, English Required Guards, and Non-English Required Guards for each of the four geographic areas, and for the base year and four option years.

1. The Army's general failure to consider or determine that Joeun will violate the overtime limits under Korean labor law if Joeun performs the contract as proposed (Section C.5.2 and FAR Clause 52.000-4404),

2. The Army's failure to evaluate the feasability of Joeun's staffing approach and the risk of unsuccessful contract performance in light of the overtime limitations of Korean labor law (Factor B, Subfactor 5), and

3. The Army's failure to determine whether Joeun's price was realistic (Factor C).

We quote in full three solicitation provisions that support this aspect of SecureNet's protest. First, Section C.5.2 of the Performance Work Statement:

> The Contractor shall comply with all applicable U.S. Federal, Department of Defense, and the local ROK laws and requirements necessary for performance of this contract.

AR Tab 1 at 50. Second, Section H of the solicitation, which incorporated by full text FAR Clause 52.000-4404:

> Contractor shall honor employees' rights in full compliance with Korean Labor Law, including the rights of succession of employment. Failure to comply may be deemed breach or default of the contract and evidence of nonresponsibility. Such violation of Korean Labor Law may be evidenced by a Republic of Korea Ministry of Labor determination, a court decision, or a Labor Relations Commission adjudication. If a contractor is found to be in serious violation and fails to take adequate corrective action promptly, USFK may consider this grounds for determining the contractor to be non-responsible for future Government contracts.

AR Tab 1 at 77. Third, Section M of the solicitation, which describes the evaluation factors that form the basis for award:

> **Factor A. Management:** The proposed management plan will be evaluated by the Government on an acceptable or unacceptable basis in terms of the offeror's feasibility of

> approach and the Government's perceived risk of unsuccessful performance.
>
> Subfactor 1. Phase-In/Phase-Out Plan (Ref. PWS Section C.6.3)
> Subfactor 2. Staffing Plan (Ref. PWS Section C.6.6.1 thru C.6.6.4)[13]
> Subfactor 3. Quality Control Plan (Ref. PWS Section C.5.3 & C.7.2)
> Subfactor 4. Contingency Plan (Ref. PWS Section C.6.4)
>
> **Factor B. Technical:** The proposed technical approach will be evaluated by the Government on an acceptable or unacceptable basis in terms of the offeror's feasibility of approach and the Government's perceived risk of unsuccessful performance.
>
> Subfactor 1. License (Ref. PWS Section C.6.1)
> Subfactor 2. Experience with Similar or Equal Effort (Ref. PWS Section C.6.6.5)
> Subfactor 3. Training Plan and Safety Concept (Ref. PWS Section C.5 & C.6)
> Subfactor 4. English Speaking Guard Plan (Ref. PWS Section C.6.7.1):
>
> **Factor C. Section B of Solicitation:** Price analysis will be performed to determine the extent to which it is adequate, reasonable, and complete. (Ref. Section L.2.c.)

AR Tab 1 at 100.

---

[13] The Source Selection Plan indicates that Subfactor 2 (Staffing Plan) under Factor A (Management) at some point was renumbered Subfactor 5 under Factor B (Technical) prior to evaluation of proposals. *See* AR Tab 5 at 189. We note that Amendments 0001 through 0006 are missing from the administrative record, and presume one of these missing amendments effectuated this change to Section M. For the purposes of this discussion, we will refer to the evaluation of the staffing plan as Subfactor 5 under Factor B (Technical).

## III. The Army's Consideration of Joeun's Compliance with the Overtime Limits Under Korean Labor Law

SecureNet argues that the TEB failed to consider whether Joeun's proposed staffing level would enable Joeun to comply with the overtime limitations in Korean labor law. According to SecureNet, recent revisions to Korean labor law, among other things, reduced the number of overtime hours an employee may work from 16 hours each week to 12 hours each week. Pl. Br. at 35. The reduction to 12 hours of overtime each week will not apply to Joeun until June 30, 2007.[14/] *Id.* at 35-36.

SecureNet's basic contention is that "Joeun's proposed staffing approach requires it to exceed both of the 16-hour and 12-hour caps on overtime by a wide margin." Pl. Br. at 36. SecureNet illustrates this conclusion using Exhibit B to its motion for judgment on the record. In Exhibit B, SecureNet takes the total number of annual supervisory hours required by the solicitation, and then divides by the number of actual supervisors Joeun proposed for a particular area. The result, according to SecureNet, is a figure representing the total number of hours each supervisor must work in a year under Joeun's staffing plan. SecureNet then further

---

[14] SecureNet provided a copy of the Korean Labor Standards Act, Act No. 5039, Mar. 13, 1997 as amended by Act No. 6974, Sep. 15, 2003, as Exhibit D to its motion for judgment on the record. The Army requested that we strike SecureNet's Exhibits A through E, attached to SecureNet's Motion for Judgment on the Administrative Record. D. Br. at 1, n.1. The Army cites *Advanced Systems Development, Inc. v. United States,* 2006 WL 2130548 (July 21, 2006) for the proposition that on a Rule 52.1 motion for judgment on the administrative record, our "review should be [] confined to the 'administrative record already in existence, not some new record made initially in the reviewing court.'" *Id.* (quoting *Comprehensive Health Serv., Inc. v. United States*, 70 Fed. Cl. 700, 719 (2006)). The attachments do not need to be stricken, however. Exhibits A, B and C are charts with various data from Joeun's proposal and resulting mathematical calculations. The information to support these calculations is based entirely on data already existing in the administrative record. Exhibit D is copy of the Korean Labor Standards Act as amended in 2003, and Exhibit E is a Korean Ministry of Labor press release describing the key provisions of the 2003 amendment. The latter exhibits are thus within our purview as legal background.

divided the annual hours per supervisor by 52 weeks in a year to obtain the number of hours each supervisor must work each week under Joeun's staffing plan. Thus, for all four geographic areas, the 475,960 total supervisory hours required by Amendment 0007, divided by Joeun's proposed 148 supervisors, results in 3,215 annual hours for each supervisor. When divided by 52 weeks in a year, SecureNet contends that each supervisor must work 61.8 hours each week, or "nearly 22 hours of overtime per week." *Id.* Thus, SecureNet contends that using the number of supervisors in Joeun's proposal, Joeun cannot comply with the 16-hour, and later 12-hour, limitation on weekly overtime under Korean labor law. SecureNet believes Joeun's ratio of supervisors to hours required is thus an "obvious flaw" in its proposal. *Id.* at 37.

SecureNet essentially argues that the Army had an obligation above and beyond its evaluation of proposals under the criteria in Section M to confirm Joeun's ability to comply with Korean labor law.[15] *Id.* Under this theory, SecureNet insists that FAR Clause 52.0000-4404, coupled with the language in the PWS instructing the contractor to comply with "all local ROK laws and requirements necessary for performance of this contract," is a material term of the solicitation, which Joeun, in effect, excepted in its proposal. *Id.* at 37-38.

SecureNet cites the GAO's decisions in *Sonshine Enterprises*, B-246268, Feb. 26, 1992, 92-1 CPD ¶ 232 and *Orincon Corp.,* B-276704, July 18, 1997, 97-2 CPD ¶ 26 for the proposition that "any proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award." *Sonshine* at 4. Both decisions are distinguishable from the facts in this protest, however. In *Sonshine*, the awardee's proposal expressly took exception to the solicitation's Default clause and Termination for Convenience clause, as well as the requirement to propose a fixed price. *See id.* at 4-5. In *Orincon*, the protester did not propose to incur at least 50 percent of the personnel costs of performance with its own employees even though that was expressly required by FAR Clause 52.219-14 in the solicitation. *See Orincon* at 1-2. In both decisions, the proposals took exception to a requirement in the solicitation.

---

[15] As discussed, *infra.*, SecureNet also argues that Section M required the Army to evaluate Joeun's ability to comply with Korean labor law under the "feasibility of approach" and "perceived risk of unsuccessful performance" standard applied against Joeun's staffing plan.

Conversely, Joeun's proposal acknowledges all of the estimated supervisory hours and posts for each of the four geographic areas as required by the solicitation. *See, e.g.* AR Tab 35 at 978, 990. Moreover, Joeun's proposal did not attach conditions, exemptions, or otherwise take exception to FAR Clause 52.0000-4404.

SecureNet's contention that the Army was obligated to confirm Joeun's ability to comply with Korean labor law because the "[s]olicitation clearly requires compliance with Korean labor laws" is misplaced. Pl. Br. at 37. FAR Clause 52.0000-4404 is actually a special contract requirement found in Section H of the solicitation and describes the obligations of contractors to comply with Korean labor law once performance begins. The Clause states that a contractor's failure to comply with Korean labor law "may be deemed a breach or default of the contract and evidence of nonresponsibility." *Id.* A contractor's failure to remedy the violation may be "grounds for determining the contractor to be non-responsible for future Government contracts." *Id.* The Clause is future-oriented, in other words, and any violation of the Clause would not be apparent until actual contract performance. Indeed, the contract as awarded to Joeun fully requires Joeun to comply with Korean labor law or risk a possible default or non-responsibility determination. Thus, as a preliminary matter, there would have been no occasion to assess Joeun's compliance with the Clause during the evaluation of proposals.

The evaluation factors set forth in section M establish the only factors by which an offeror's proposal may be evaluated – none of which include the likelihood of future compliance with various FAR provisions in the solicitation. In other words, the solicitation does not authorize the TEB to evaluate offeror's ability to comply with the Korean labor laws, even though FAR Clause 52.0000-4404 and Paragraph C.5.2 of the PWS requires such compliance during performance. The evaluation of proposals is limited to the factors and criteria set forth in section M. For this reason, SecureNet's contention that the Army was obligated to determine Joeun's ability to comply with Korean labor law is in error.[16/]

---

[16] SecureNet also contends that the Army's instruction to DCAA to review Joeun's fringe benefits in light of Korean labor law is evidence of the Army's obligation to evaluate Joeun's proposal for overtime violations. Pl. Br. at 37. We disagree. *Continued . . .*

IV. Feasibility of Approach and Perceived Risk of Unsuccessful Performance

SecureNet also argues that it is unrealistic, in light of what it demonstrates in its exhibits, to ignore, during proposal evaluations, the feasibility and the risks inherent in Joeun's proposed labor practices. SecureNet reasons that had the TEB evaluated Joeun's staffing plan in light of the overtime limits under Korean labor law, then the TEB would have realized that Joeun's proposed staffing level required its supervisors to work far in excess of these overtime limitations. Such a finding, according to SecureNet, would obligate the TEB to find Joeun's proposal to be technically unacceptable because the approach was not feasible or posed too great a risk of unsuccessful performance and that the Army thus should have disqualified Joeun's proposal for award.

More specifically, SecureNet argues first that the Army did not consider Joeun's "failure to account for all productive hours required to perform the work [and] its impact on the feasibility or risk of Joeun's proposal." Pl. Br. at 25. SecureNet insists that because Joeun intends to compensate employees for overtime hours with paid leave, Joeun's proposal in fact could not achieve the estimated 475,960 supervisory hours required by the solicitation. As further explained during oral arguments, SecureNet's theory is that the additional paid leave time must be accommodated out of the 475,960 supervisory hours in Joeun's proposal, which means that Joeun did not account for all of the required "productive" hours.

Second, SecureNet argues that the Army did not consider the risk that Joeun's use of long hours for less pay than the rate paid by the incumbent contractor would affect its "ability to assemble and retain a qualified workforce to perform these important services." Pl. Br. at 25. Third, in a repeat of its prior argument, SecureNet contends that the Army did not consider the risk that Joeun would not be able to meet all of the performance requirements because of the limitations on overtime hours under Korean labor

---

The CO's use of Korean labor law to evaluate the reasonableness of Joeun's loaded labor rates during his price evaluation (Factor C) does not then obligate the CO to conduct technical evaluations in light of Korean labor law because such an evaluation would be inconsistent with the evaluation criteria in Section M.

law. Pl. Br. at 26. SecureNet's basic contention is that Joeun's employees will not be allowed to work the roughly 62 hours each week under Korean labor law and therefore, there is a risk that Joeun will not be able to perform all of the requirements.[17]

We disagree with each of SecureNet's contentions. Section M instructs the TEB to evaluate Joeun's staffing plan in terms of its "feasibility of approach and the Government's perceived risk of unsuccessful performance." AR Tab 1 at 100. In this regard, the TEB report clearly reflects that the Army evaluated the feasibility and perceived risk of Joeun's staffing plan:

> (1) On page 60 a staffing chart is provided that shows the number of supervisors. On page 65-66, there is a break out showing the areas each supervisor is responsible for. Attachment 1 clearly defines requirements for supervisors.
>
> (2) The board consensus is that the staffing plan is an overall acceptable for feasibility and risk.

AR Tab 10 at 307. SecureNets contends that the TEB's report is a "conclusory statement" and that the TEB did not conduct a "substantive evaluation of the adequacy of Joeun's proposed staffing plan." Pl. Br. at 26.

If it is true, as SecureNet contends, that the TEB did not thoroughly evaluate the mathematical implications of Joeun's proposed number of supervisors and the 475,960 estimated hours in the solicitation, we do not believe it was unreasonable in failing to do so. SecureNet's mathematical calculations use 475,960 total supervisory hours as a constant figure to determine the amount of overtime Joeun's supervisors will have to work. The solicitation, however, repeatedly informed offerors that services would be ordered "as required," that the hours are estimates only, and that the requirements for a number of the guard posts would change within the first year of contract performance.

The risk that Joeun would violate the overtime limitations under Korean

---

[17] Presumably, if Joeun was faced with a choice between violating the overtime rules or hiring additional supervisors, it would have the latter option, even if that meant a losing contract.

labor law if awarded the contract, as SecureNet's calculations make clear, depends on 100% utilization of the estimated 475,690 supervisory hours. In light of the fact that the subject contract is a requirements contract with no certain hours, it was not unreasonable for the Army to focus on the labor costs per hour without making worst case scenario assumptions that 100% of potential capacity would be utilized immediately and continuously. To the extent the Army used one hour less of the estimated 475,690 supervisory hours, the risks SecureNet points to go down. Any risk associated with Joeun's commitment of 148 supervisors and reliance on overtime was therefore acceptable and explains the Army's focus on loaded labor rates, not actual hours that might be performed.

The Army would pay the same hourly rate irrespective of what time of day an employee worked or whether the employee was working overtime. The TEB appears to have been more interested in the effective management of the staff and how Joeun proposed to accomplish the specific requirements of the PWS than it was on the ratio of supervisors to hours proposed.[18/] Indeed, we

---

[18] Section L.2.a(b) of the solicitation sheds additional light on the requirements of the staffing plan that the TEB evaluated:

> The offeror is required to submit as part of the technical proposal, a complete staffing plan through which, the offeror shall acknowledge and provide a methodology of how all the specific tasks and responsibilities in the PWS would be accomplished, demonstrate effective overall management of this requirement, effective management of subcontractors (if applicable), effective management of supervisory personnel (overall the Government requests the offerors to provide their management approach to include how the contractor intends to provide and staff supervisors. The Government wants a STAFFING CHART to reflect, at a minimum, the number of supervisors, areas that supervisors are responsible for by post, the contractor chain of command and the hours per supervisor), demonstrate Contractor employee's physical ability, effective use of company's key personnel, general staff experience and skills and proper qualification and authority of management staff. *Continued . . .*

note that the CO's statement in SecureNet's earlier protest to GAO, although not a contemporaneous evaluation document, explains the TEB's focus during the evaluation:

> The Technical Evaluation Board (TEB) evaluated the supervisory portion of each offeror's proposal in the context of the soundness of their staffing approach in accordance with Section L of the solicitation. Thus, the focus of the TEB was not on the offerors' conformity with Korean Labor Law, but rather soundness of business approach. The TEB considered an offeror's number of supervisors proposed acceptable if the number did not require an offeror to work their supervisors beyond a 12-hour work day.

AR Tab 33 at 529. In this regard, the TEB determined that Joeun's proposed staffing approach was feasible and any perceived risk was acceptable. We find no reason to reverse the Army's decision.

V. Price Realism Analysis

SecureNet's third theory pertaining to Joeun's proposed ratio of supervisors to hours relates to the evaluation of Joeun's price under Factor C of the evaluation factors.

SecureNet argues that the TEB was required to conduct a price realism analysis on Joeun's proposal, but instead, conducted only a price reasonableness analysis. As support for this argument, SecureNet cites to section L.2.c.(1), which, according to SecureNet, requires the TEB to determine if Joeun's price was "adequate," "reasonable and realistic," and "complete." SecureNet argues that had the TEB evaluated the realism of

---

> The plan shall include an organizational structure chart for overall management, clearly identifying decision making authorities, and levels of authority to negotiate and sign modifications.

AR Tab 1 at 94. The lengthy parenthetical requesting a detailed staffing chart (with the number of supervisors and hours) relates to the requirement that the offeror demonstrate effective management.

Joeun's price, it would have found Joeun's price unrealistically low, and therefore unacceptable.

To support its argument, SecureNet cites *OMNIPLEX World Servs. Corp.*, B-291105, Nov. 6, 2002, 2002 CPD ¶ 199 and *Int'l Outsourcing Servs., LLC*, B-295959, May 25, 2005, 2006 CPD ¶ 6 for the proposition that where "the Solicitation requires that the agency conduct a price realism evaluation, the agency cannot conduct a price analysis (i.e. fair and reasonable analysis), in lieu of a price realism evaluation and hide behind the fact that the solicitation contemplates a fixed-price contract to justify its failure to act in accordance with the solicitation." Pl. Opp'n and Reply at 27. GAO's decisions in *OMNIPLEX* and *Int'l Outsourcing* are distinguishable from the facts in this case. In *OMNIPLEX*, the solicitation "explicitly required the agency to conduct a price realism evaluation." *OMNIPLEX* at 9. In *Int'l Outsourcing*, "the solicitation expressly provided that '[p]roposals will be evaluated to determine whether offered prices are realistic.'" *Int'l Outsourcing* at 6.

In the instant solicitation, there was no explicit price realism requirement, however. Indeed, the evaluation factors in section M of the solicitation do not call for a price realism analysis.[19] Rather, the evaluation factor for price states only that "[p]rice analysis will be performed to determine the extent to which it is adequate, reasonable, and complete." AR Tab 1 at 100.[20]

The price evaluation factor in Section M references Section L.2.c. There, the threefold price evaluation from Section M is described in more detail:

The proposed price shall:

---

[19] We note that a cost realism analysis is not mandated by the FAR because the subject contract is a fixed-price and requirements contract, rather than a cost-reimbursement type contract. *See* FAR Part 15.404-1(d)(2) ("Cost realism analyses shall be performed on cost-reimbursement contracts to determine the probable cost of performance for each offeror").

[20] We also note that the word "realistic" only appears in Section L, not in the evaluation factors in Section M.

> (a) Be adequate – The proposed price and the scope of work are compatible.
> (b) Be reasonable and realistic – price is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business.
> (c) Be complete – Responsive to all RFP requirements, all Contract Line Items (CLINS) are included, and estimates can be traced without mathematical errors.

Section L.2.c, AR Tab 1 at 95. Thus, section L defines each of the three price evaluation criteria. A price is adequate if the price and the scope of the work are compatible. A price is complete if it is responsive to all of the solicitation requirements, includes all of the CLINS, and price estimates can be traced without mathematical errors. A price is "reasonable and realistic" if it does not exceed an amount which a prudent person would incur in the conduct of competitive business.

The only reference to price "realism" in the solicitation is therefore defined in terms of whether the offer is too high, rather than too low (*i.e.*, reasonable, rather than realistic). The solicitation instructed offerors to submit reasonable and realistic prices, but the evaluation factors in section M announced that the TEB would only evaluate price reasonableness. Therefore, it was not improper for the TEB to evaluate only Joeun's price reasonableness when determining the acceptability of the price proposed.

During oral arguments, SecureNet argued that the requirement to evaluate Joeun's price for adequacy is another way of calling for a price realism analysis. Assuming this is true, we do not find reversible error in the Army's determination that Joeun's price was acceptable.

SecureNet asserts two possible flaws in the Army's price analysis of Joeun's proposal. The first is "its failure to include required overtime premiums" or second, in the alternative, "its failure to account for any paid leave hours to be provided as compensation for those significant overtime hours." Pl. Br. at 29. SecureNet insists that Joeun will have to pay its supervisors overtime premiums (*i.e.,* 150% of the base wage) based on its own calculations of weekly hours per supervisor using the estimated 475,690 hours each year. SecureNet argues that Joeun's offer breakdown does not include an allowance for overtime, which conflicts with Section B of the solicitation:

> Loaded Rate: The loaded rate for the Requirement Portion should include all associated cost; for sample [sic] Basic Pay, Fringe Benefit, Uniforms (with explain) [sic], Transportation (with explain), Communication Equipment (with explain)[sic], G&A, Profit, and Off-Post Facilities if applicable. All associated costs should be reflected in the offer breakdown with detailed explanations.

AR Tab 1 at 2. SecureNet also believes Joeun's failure to include overtime premium payments in its offer breakdown conflicts with Section M of the solicitation:

> For a proposal to be considered technically acceptable, an offeror must submit an offer breakdown (without cost data) for each contract line item. The offer breakdown must demonstrate that the offeror understands the Performance Work Statement by listing an appropriate amount of . . . labor . . . required to perform the contract. Failure to include a significant element in the data may indicate that the offeror fails to understand the requirement, and may be grounds for finding the proposal to be technically unacceptable.

AR Tab 1 at100.

We disagree. SecureNet acknowledges that under Korean labor law, paid leave may be provided to employees in lieu of overtime premiums. Pl. Br. at 14. Thus, even assuming the TEB knew with certainty that Joeun's supervisors would have to work overtime under the contract, Joeun was entitled under Korean labor law to compensate its employees with additional paid leave.[21/] Therefore, it was not improper that Joeun's price breakdown did not include an allowance for overtime premiums.

SecureNet argues in the alternative that Joeun failed to account for hours above and beyond 475,690 for the hours necessary to compensate its employees for overtime worked. As we have already discussed, the 475,690

---

[21] And, in fact, Joeun informed DCAA that is "did not proposed [sic] overtime pay but proposed 12 days of monthly leaves [sic]." AR Tab 28 at 491.

hours is an estimate reflecting the total possible number of hours the Army may need if it requires and orders supervisory personnel at every post listed in the solicitation. Joeun acknowledged these hours in its proposal. If Joeun intended to provide its supervisors with additional paid leave time, Joeun did not need to report these hours in its proposal. After all, the solicitation only asked offerors to submit the loaded rates for supervisors "in accordance with the estimated hours" for supervisors. AR Tab 2 at 164. In this regard, Joeun provided its loaded rates in accordance with the estimated 475,690 hours. If the TEB had to conduct a realism analysis, it assessed the realism of the loaded labor rates, not how Joeun intended to provide additional paid leave time because the focus of the TEB was on the hourly rates rather than the hours.

Section M provides instances when an offeror's price may be found unacceptable, but does not require a finding of unacceptability when an offeror's price breakdown does not include, for example, overtime premiums or paid leave time. The Army evaluated Joeun's offer breakdown and concluded the hourly rate was "fair and reasonable." AR Tab 11 at 339. Additionally, the Army compared Joeun's overall total price to the IGCE and determined the difference to amount to only two percent. In this regard, we have no reason to question the TEB's assessment of Joeun's hourly rates. Accordingly, the Army's acceptability determination of Joeun's price was not improper.

## IV. The Army's Discussions With Joeun

SecureNet also contends that the award decision was flawed because the Army held improper discussions with Joeun after submission of final proposal revisions on March 17, 2006. After Joeun was determined to be the lowest price technically acceptable offeror, but before award of the contract, the CO requested DCAA to evaluate Joeun's proposal for price reasonableness and compliance with fringe benefit requirements under Korean labor law. The DCAA report states that on April 12, 2006, DCAA contacted Mr. Kim Chul Shoo, the Executive Director of Joeun, with respect to the factual matters involved in the audit and its findings. SecureNet alleges that the report contained the following additional information that was not contained in Joeun's submitted proposal:

> First, in analyzing the basis for Joeun's proposal rates, DCAA explained that Joeun's proposed monthly wages were "based on the estimates of Joeun's management," and that Joeun

> "considered but did not use payroll records of commercial guards to determine wages for USFK guard services because the job qualifications are different . . . ." Second, in analyzing the basis for Joeun's proposed monthly wages, DCAA also remarked that they were "based on a 44 hour work week to reduce overtime costs . . . ." Third, the DCAA explained that "[b]ecause of 44 hours per week schedule, Joeun did not proposed [sic] overtime pay but proposed 12 days of monthly leaves [sic]." Fourth, DCAA explained that in developing its proposed price, "Joeun estimated 23 non-working days per year, including 12 days of national holiday and 12 days of monthly leaves [sic] in lieu of overtime." Finally, DCAA's review stated that Joeun's revised proposal was based on a 5.10% annual leave allowance.

Pl. Br. at 22 (quoting AR Tab 28 at 490-92). SecureNet alleges that Joeun's proposal does not contain any of this information, and that DCAA obtained this information from Joeun during improper discussions.

SecureNet contends that the Army violated provisions of the FAR when it relied on the information obtained by DCAA during communications with Joeun to make the contract award. FAR 15.306(d) addresses exchanges with offerors after establishment of the competitive range:

> Negotiations are exchanges . . . . between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal. These negotiations may include bargaining. Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements . . . or other terms of the proposed contract.

SecureNet argues that if the Army held discussions with Joeun, it was obligated to hold discussions with all other offerors in the competitive range. SecureNet cites to FAR 15.306(d)(1) for the proposition that if discussions are held with one offeror, in order to not favor one offeror over the others, discussions must be held with all of them. *See Int'l Res. Group*, B-286663, Jan. 31, 2001 CPD ¶ 35 at 6. This is reinforced by a similar clause in the

actual solicitation.[22]

The Army concedes that DCAA sought clarification of Joeun's proposed labor rates while conducting its audit. It argues, however, that these were not improper discussions under FAR 15.306(d) because they were not intended and did not lead toward any type of proposal revision. DCAA sought this information in order to verify the reasonableness of Joeun's price and its compliance with Korean labor law regarding fringe benefit rates. FAR 15.404-1(a)(5) states that the CO "may request the advice and assistance of other experts to ensure that an appropriate analysis is performed" when considering proposal price. In fact, the CO "is responsible for obtaining information that is adequate for evaluating the reasonableness of the price or determining cost realism, but the contracting officer should not obtain more information than is necessary." FAR 15.403-3(a)(1).

We agree with defendant. The Army did not conduct improper discussions when requesting DCAA to perform a price reasonableness evaluation of Joeun's proposal. Rather, the Army's communications, through DCAA, amounted to mere clarifications of its pricing data. Discussions are distinct from clarifications. As we have held:

> [T]he term "discussions" has a specific legal definition: "discussions involve negotiations" and "are undertaken with the intent of allowing the offeror to revise its proposal." *Info. Tech. & Applications Corp.*, 316 F.3d at 1321 (citations omitted). In contrast, "clarifications" are "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." *Id.*

*Park Tower Management, Ltd. v. U.S.*, 67 Fed. Cl. 548, 564 (2005).

DCAA did not negotiate with Joeun and the record does not reflect any intention on the part of the Army to allow Joeun to modify its proposal. The information obtained by DCAA did not change a technically unacceptable proposal into an acceptable one. DCAA did not seek anything omitted from

---

[22] "[I]f the Government conducts discussion with any offeror in the competitive range, the Government shall conduct discussions with all offerors in the competitive range." Solicitation Section L.1.a(3) at 92.

the proposal that was required to meet the technical acceptability standards.[23] In this regard, the only clarifications provided to DCAA included an explanation that Joeun's wages were based on "management's estimates," an explanation that wages were computed using a 44-hour work week to reduce overtime, an explanation that Joeun employees would have 23 non-working days each year (including 12 days of national holiday), an explanation that Joeun intended to compensate employees with leave time instead of overtime pay, and an explanation of the rate Joeun used to calculate wage rates. *See* Pl. Reply and Opp'n Br. at 14-15. Even if the TEB ultimately considered these clarifications in its evaluation of Joeun's proposal, that fact does not change the nature of DCAA's audit. *See Park Tower Management, Ltd.,* 67 Fed. Cl. at 564 ("Although the [Source Selection Evaluation Board] admits to considering the information received from [the awardee], as discussed here, this fact alone does not transform clarifications into improper discussions").

V. SecureNet's Opportunity to Compete Equally and Fairly

Finally, SecureNet argues that the Army's conduct throughout the procurement as a whole created an environment of unfair competition, which renders the award to Joeun arbitrary and capricious and not in accordance with law.

First, SecureNet contends that the Army's debriefing letter to Joeun (and other offerors) on January 27, 2006, disclosing SecureNet's winning offer amount, provided Joeun a competitive advantage when it later submitted a revised proposal in response to Amendment 0007. Although not an improper disclosure in itself, SecureNet argues that because Amendment 0007 "did not change the type of work, nor did it change the geographic location of the work" and that the "award would be based only on price," the Army's disclosure of SecureNet's winning price gave Joeun a "significant advantage." Pl. Opp'n and Reply Br. at 23.

Second, SecureNet argues that Amendment 0007 expressly limited proposal revisions to the solicitation changes described in the amendment. Amendment 0007 states, "Offerors may submit only those portions of their

---

[23] We also note that SecureNet does not offer any reason to believe its own proposal would have changed if comparative questions were put to SecureNet.

proposals affected by this amendment." AR Tab 2 at 165. Shortly after the issuance of Amendment 0007, the Army issued Amendment 0009 to incorporate various questions and answers to and from the contracting officer. One of the questions and answers follows:

> QUESTION: Do we have to prepare technical proposals as before?
>
> ANSWER: Offerors may submit a revised price & technical proposal or may submit only the Staffing Plan and revised price proposal according to Amendment 0007.

AR Tab 4 at 186. SecureNet argues that while the revisions to its proposal were limited to the changes in Amendment 0007, Joeun's revisions included various changes to its proposal "across the board," which essentially allowed Joeun to incorporate the addition of supervisor hours in accordance with Amendment 0007 and simultaneously reduce its prices for the ER and NER guards, thereby keeping its overall price low. Pl. Br. at 31-32. SecureNet contends that the Army's acceptance of the revised portions of Joeun's proposal not affected by Amendment 0007 was improper because it violated the terms of the amendment and SecureNet was not afforded this same opportunity.[24/]

We disagree. With respect to the disclosure of SecureNet's previously winning offer, the five-year award amount was the only information provided to Joeun in the debriefing letter. AR Tab 40 at 1592. The debriefing letter did not disclose how SecureNet arrived at that price, the break-down of fringe benefits, G&A, profit, the number of guards and supervisors proposed, or a break-down of the offer by option year. Moreover, Amendment 0007

---

[24] SecureNet also argues that the Army improperly and unfairly relaxed the requirement in the solicitation that all offerors "propose to perform the contract in compliance with Korean Labor Law" when evaluating Joeun's proposal. Pl. Br. at 33. However, as previously discussed, the evaluation factors did not direct the TEB to evaluate offeror's compliance with Korean labor law. Even if such a requirement was in the solicitation, SecureNet cannot argue that the TEB treated its proposal unequally because the TEB did not evaluate any of the eleven proposals for compliance with the overtime restrictions in Korean labor law.

significantly changed the scope of work by establishing a specific number of estimated hours for the supervisors in each of the four Areas and by requiring supervisors "to be capable of departing in response to guard posts within five (5) minutes from receipt of emergency calls." AR Tab 2 at 165. In response to the changes called for in Amendment 0007, SecureNet raised its offer approximately $15 million, suggesting in itself that SecureNet perceived the changes as substantial. Additionally, four of the other ten offerors submitted revised proposals with prices *higher* than SecureNet's revised proposal. AR Tab 11 at 330. Thus, there is no indication that the offerors held a competitive advantage by knowing SecureNet's outdated price.

With respect to the apparent ambiguity created by the question and answer in Amendment 0009, the Army's acceptance and evaluation of Joeun's revised proposal was not improper. There is no evidence in the record, and SecureNet does not contend, either that SecureNet would have lowered its price more than $15 million if allowed to make revisions to its entire proposal, or conversely, that Joeun's proposal would have been $15 million higher if Joeun was not allowed to revise portions of its proposal not affected by Amendment 0007. Because we find no prejudice, we need not discuss further the nature of the ambiguity.

## CONCLUSION

For the reasons set out above, we grant defendant's motion for judgment on the administrative record and deny plaintiff's motion. The Clerk is directed to dismiss the complaint. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge