IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-564C (Bid Protest)
(Judge Bruggink)

SECURENET CO, LTD.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**PUBLIC VERSION OF DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND DEFENDANT'S OPPOSITION TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND FOR DECLARATORY AND INJUNCTIVE RELIEF**

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRIAN SIMKIN
Assistant Director

MICHAEL D. AUSTIN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 305-7562
Facsimile: (202) 305-7644

OF COUNSEL:

MAJOR SUNNY AHN
Trial Attorney
United States Army
Contract Appeals Division
901 North Stuart Street
Arlington, VA 22203

September 1, 2006

Attorneys for Defendant

## TABLE OF CONTENTS

**PAGE(S)**

DEFENDANT'S MEMORANDUM....................................2

STATEMENT OF THE ISSUE....................................2

STATEMENT OF THE CASE.....................................2

I. Nature Of The Case.....................................2

II. Statement Of Facts....................................3

A. First Solicitation.....................................3

B. The Decision To Take Corrective Action...........6

C. The Award To Joeun.....................................8

ARGUMENT..................................................13

I. STANDARD OF REVIEW....................................13

II. THE AGENCY'S DECISION TO RESOLICIT THE DECEMBER 23, 2005 SOLICITATION WAS PROPER; AS A RESULT SECURENET CANNOT MEET ITS BURDEN TO SHOW ...ACTIONABLE ERROR WITH THAT DECISION........................................19

III. THE AGENCY'S DECISION TO AWARD THE CONTRACT TO JOEUN WAS THE PRODUCT OF A RATIONAL REASONABLE PROCUREMENT PROCESS AND WAS MADE IN ACCORDANCE WITH APPLICABLE LEGAL GUIDANCE.........................21

IV. THERE IS NO MERIT TO SECURENET'S ASSIGNMENT OF ERRORS REGARDING THIS PROCUREMENT.................24

A. The Agency Did Not Conduct Discussions With Joeun After Receipt Of Joeun's Revised Proposal........................................24

B. The Agency Reasonably Determined That The Feasibility And Risk Associated With Joeun's Proposal Was Acceptable.........................26

C. The Government Properly Determined That Joeun's Proposed Price Was Reasonable...........28

D. The Agency Treated All Offerors Equally.........32

V. SecureNet is Not Entitled To Injunctive Relief.......36

CONCLUSION.................................................38

## TABLE OF AUTHORITIES

### CASES

**PAGE(S)**


AM-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002) .......................... 32, 33

Advanced Systems Development, Inc. v. United States,
2006 WL 2130548 (July 21, 2006) .......................... 1

Aerolease Long Beach v. United States,
31 Fed. Cl. 342 aff'd 39 F.3d 1198 (Fed. Cir. 1994) ...... 21

Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,
56 Fed. Cl. 502 (2003) .................................. 17

Amoco Prod. Co. v. Vill. of Gambell Alaska,
480 U.S. 531 ............................................ 36

Avtel Services, Inc. v. United States,
70 Fed. Cl. 173 (2005) .................................. 36

Banknote Corp. Of Am. v. United States,
365 F.3d 1345 (Fed. Cir. 2004) .......................... 16

Bannum, Inc. v. U.S.,
404 F.3d 1346 (Fed. Cir. 2005) .................. 14, 15, 16

CC Distributors, Inc. v. United States,
38 Fed. Cl. 771 (1997) .......................... 21, 22, 23

CC Distributors, Inc. v. United States,
69 Fed. Cl. 277 (2006) .......................... 24, 25, 26

Chapman Law Firm Co. et. al. v. United States,
71 Fed. Cl. 124 (2006) .................................. 20

Comprehensive Health Serv., Inc. v. United States,
70 Fed. Cl. 700 (2006) ................................... 1

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) .......................... 16

Information Tech. & Applics. Corp. v United States,
316 F.3d 1312 (Fed. Cir. 2003) .......................... 32

Itt Fed. Servs. Corp. v. United States,

45 Fed. Cl. 174 (1999) ................................... 27

Lions Raisins, Inc. v. United States,
51 Fed. Cl. 238 (2001) ................................... 14

NVT Technologies, Inc. v. United States,
370 F.3d 1153 (Fed. Cir. 2004) ........................... 35

PGBA, LLC v. United States,
389 F.3d 1219 (Fed. Cir. 2004) ....................... 14, 36

PHT Supply Corp. v. United States,
71 Fed. Cl. 1 (2006) ............................ 16, 27, 29

R & W Flammann Gmbh v. United States,
339 F.3d 1320 (Fed. Cir. 2003) ........................... 33

Statistica, Inc. v. Christopher,
102 F.3d 1577 (Fed. Cir 1996) ............................ 17

Tech Systems, Inc. v. United States,
50 Fed. Cl. 216 (2001) ................................... 14

Triax Pac., Inc. v. West,
130 F.3d 1469 (Fed. Cir. 1997) ....................... 35, 36

ViroMed Laboratories, Inc. v. United States,
62 Fed Cl. 206 (2004) ............................... 15, 27

**STATUTES AND REGULATIONS**

5 U.S.C. § 706(2) ........................................ 15

28 U.S.C. § 1491 ......................................... 14

28 U.S.C. 1491(b)(1) ................................. 14, 38

28 U.S.C. 1491(b)(3) ................................. 14, 37

FAR 1.602-2 .............................................. 33

FAR 1.602-2(b) ........................................... 32

FAR 15.101-2(a) .......................................... 21

FAR 15.101-2(b) .......................................... 22

FAR 15.305 ............................................... 22

FAR 15.306(d) .......................................... 25

FAR 15.306............................................ 22

FAR 15.403-1.......................................... 22

FAR 15.403-3(a) ....................................... 26

FAR 15.404-1(a)(1) .................................... 22

FAR 15.404-1(b)(1) .................................... 25

FAR 33.104(a) ......................................... 19

FAR 15.507............................................ 19

FAR 52.215-20.......................................... 5

**MISCELLANEOUS**

Administrative Dispute Resolution Act of 1996 ("ADRA"),
Pub. L. No. 104-320, 110................................. 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SECURENET CO, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | **PUBLIC VERSION** |
| | ) | |
| v. | ) | No. 06-564C |
| | ) | |
| THE UNITED STATES, | ) | (Judge Bruggink) |
| | ) | |
| Defendant, | ) | Bid Protest |

**PUBLIC VERSION OF DEFENDANT'S MOTION FOR JUDGEMENT UPON THE ADMINISTRATIVE RECORD AND DEFENDANT'S OPPOSITION TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND FOR DECLARATORY AND INJUNCTIVE RELIEF**[1]

Pursuant to Rule 52.1, of the Rules of the United States Court of Federal Claims, and the Court's order dated August 9, 2006, defendant, the United States, respectfully submits this motion for judgement upon the administrative record and opposition to plaintiff's memorandum in support of its motion for judgement upon the administrative record and for declaratory and injunctive relief. In support of our motion we rely upon

[1] We note at the outset that SecureNet has attached several extra record documents to its brief at exhibits A-E, without also filing a motion to supplement the administrative record. This Court has recently proclaimed that this Court: "reviews a challenged procurement decision through the prism of the administrative record under the procedures established by RCFC 52.1 . . . for motions for judgment on the administrative record. Because [this Court] test[s] the decision under the arbitrary and capricious standard, [this Court's] review should be necessarily confined to the 'administrative record already in existence, not some new record made initially in the reviewing court.'" Advanced Systems Development, Inc. v. United States, 2006 WL 2130548, (July 21, 2006) (quoting Comprehensive Health Serv., Inc. v. United States, 70 Fed. Cl. 700, 719 (2006)). We have already filed the administrative record. The exhibits which SecureNet attaches are simply documents which SecureNet attaches to support a hypothetical construct without regard to the standard of review in this case. Thus, we respectfully request that this Court strike those documents from SecureNet's brief.

plaintiff's complaint, the administrative record which was previously filed, and the following memorandum of law. Based upon the reasons advanced below, we respectfully request that this Court enter judgement in favor of the United States as plaintiff, SecureNet Co., Ltd. ("SecureNet") has not and cannot demonstrate that it is entitled to any relief.

## DEFENDANT'S MEMORANDUM

## STATEMENT OF THE ISSUE

Whether the decision of the Government to award Contract no. W91QVN-06-D-6003 to Joeun Systems, Co. Ltd. should be affirmed when the award decision was the product of a rational and reasonable process which treated all offerors equally and was made in accordance with all applicable statutes and regulations.

## STATEMENT OF THE CASE

### I. Nature of the Case

On August 1, 2006, SecureNet filed a 5 count complaint in this Court challenging the Government's, acting through the United States Army Contracting Command Korea ("Army" or "agency"), decision to award Contract no. W91QVN-06-D-6003 ("contract"), AR Tab 58, for security guard services in Korea to Joeun Systems, Co. Ltd. ("Joeun" or "awardee"). There are in fact two agency decisions at issue. First, is the agency's decision to cancel the December 23, 2005 solicitation. Second is

the agency's decision to award the contract to Joeun. According to SecureNet, the agency in both decisions committed legal error which prejudiced SecureNet to the extent that among other things, SecureNet requests that the instant award be set aside. Complaint, Requested Relief, ¶2. SecureNet further requests a declaration that the contract was awarded contrary to applicable procurement laws and regulations. Id. at ¶1.

## II. Statement of Facts[2]

### A. First Solicitation

On December 23, 2005, the agency issued solicitation No. W91QVN-06-R-0062 ("solicitation"), requesting proposals for a firm fixed priced and requirements contract to furnish all personnel, equipment, and supplies in order to provide security guard services throughout the Republic of Korea for the U.S. Forces Korea and Installation Management Agency Korean Region Office installations.[3] AR, Tab 1 at 1. As announced in the

[2] We understand that RCFC 52.1 requires the party opposing a motion for judgement upon the administrative record to file a counter statement of facts. We note that SecureNet's statement of facts contains numerous citations to documents in the administrative record. We agree with those stated facts to the extent support by the referenced document. Further, in effort to assist the Court we have added our own statement of facts.

[3] This requirement for security guard services was initially issued on May 26, 2005 as solicitation No. W91QVN-05-R-0087 with a closing date of July 8, 2005. A contract was awarded to plaintiff on August 19, 2005. However, on November 16, 2005, the contract was terminated for convenience as a result of a procurement irregularity that was discovered. The agency took corrective action and issued a new solicitation No. W91QVN-26-R-0062 on December 23, 2005. AR, Tab 11 at 329.

solicitation "[a]ward shall be made to the responsible offeror submitting the lowest priced, technically acceptable offer that receives a technical acceptable rating in all factors and subfactors, and satisfies all terms and conditions of this solicitation." Id. at 100.

Section H of the solicitation, titled "Special Contract Requirements", contained clause 52.0000-4404, titled "Korean Labor Law" that stated:

> **Contractor** shall honor employees' rights in full compliance with Korean Labor Law, including the rights of succession of employment. Failure to comply may be deemed breach or default of the contract and evidence of nonresponsibility. Such violation of Korean Labor Law may be evidenced by a Republic of Korea Ministry of Labor determination, a court decision, or a Labor Relations Commission adjudication. If a **contractor** is found to be in serious violation and fails to take adequate corrective action promptly, USFK may consider this grounds for determining the contractor to be non-responsible for future Government contracts.

(Emphasis added). AR, Tab 1 at 77. Section C.6.26(a) of the Performance Work Section ("PWS") stated that, "Security guards, to include supervisors, shall not work in excess of twelve consecutive hours due to readiness and safety concerns." AR, Tab 1 at 61. The solicitation also incorporated in full, FAR 52.215-20. In accordance with that provision, submission of cost or pricing data was not required. Id. at 98.

The agency received 15 offers in response to the solicitation. Following the guidance set forth in the

solicitation, AR Tab 1 and the source selection plan, AR Tab 5, the agency, on January 27, 2006, awarded the contract to the lowest priced technically acceptable offeror, SecureNet with a contract price of [redacted]. AR, Tab 40. Written notices were sent to all of the unsuccessful offerors that contained the following information: 1) the successful offeror's name and address; 2) the total price of the offer; and 3) the award date.[4]

Following receipt of the written notices, two unsuccessful offerors, HDS Security Company ("HDS") and Group 4 Falck ("G4F") Korea, filed Government Accountability Office ("GAO") protests. AR, Tab 41. HDS filed its GAO protest B-297952, on February 6, 2006, and G4F filed its GAO protest B-297952.2 on February 10, 2006.[5]

In its protest, G4F alleged that based upon information it received from SecureNet post-award, it believed that SecureNet could not meet a key provision of the solicitation. AR, Tab 41 at 1611. Specifically, G4F alleged that SecureNet would not be able to meet the supervisors' emergency response time as required by section C, para. 6.6.4. Id. at 1611-1612. That provision required among other things that "[s]upervisors (on duty) shall

[4] AR, Tab 40 is the unsuccessful offeror letter that was sent to Joeun after award of the contract to plaintiff. It has been provided as an example of the letters sent by the agency to all of the unsuccessful offerors which contained the same information about plaintiff.

[5] The agency filed a request to summarily dismiss HDS's protest on Febraruy 24, 2006. GAO did not render a decision regarding this request due to the corrective action taken by the agency, in response to G4F's protest, which rendered HDS's protest moot.

be available on-site or by telephone or radio communications to the security guards and capable of responding to guard posts within fifteen (15) minutes from receipt of an emergency call." AR, Tab 1 at 53. According to G4F, based upon the distances between installations and the number of supervisors SecureNet proposed, it would be impossible for SecureNet to met the response time requirement. Alternatively, G4F's alleged that section C, para. 6.6.4 contained a material and latent ambiguity because it may have been unclear whether "responding" to an emergency call required the physical presence of a supervisor on-site within 15 minutes. Id. at 1612-1613. The agency agreed with the first allegation. AR, Tab 28 at 496, Tab 33, at 528.

B. The Decision To Take Corrective Action

Based on G4F's protest, the agency decided to take corrective action by amending the solicitation, requesting revised proposals from all offerors who submitted a proposal for the solicitation, and making a new source selection decision. Id. The agency notified the GAO on March 9, 2006 of its intent to take the above corrective action and requested that both HDS's and Group 4's protests be dismissed based upon the proposed taking of corrective action. Accordingly, on March 13, 2006, the GAO dismissed both protests as a result of the agency's intent to take the corrective action.

Meanwhile, in a letter dated March 10, 2006, the contracting officer, Mr. Thomas Powers, requested that SecureNet explain in writing, no later than 10:00 a.m. on March, 13, 2006, how its proposal, with the number of supervisors and hours, by area and per post, would meet the Government's requirement contained in Section C, paragraph 6.6.4. AR, Tab 57. On March 11, 2006, SecureNet requested additional time to respond to the agency's request. AR, Tab 56. On March 13, 2006, Mr. Powers, presumably before he received a response from SecureNet, notified SecureNet that he believed that SecureNet had been given adequate time to respond and because SecureNet did not submit a response, the agency would take the course of action that it had informed GAO that it would take. AR, Tab 14. Later that same day, SecureNet did submit a response. AR, Tab 15. That response however, did not explicitly demonstrate that SecureNet would meet the 15 minute response time requirement. Indeed, SecureNet stated that "it is our clear understanding and strong belief that a number of supervisors are negotiable IAW Section C.6.6.4 . . . ." Id. at 354.

C. The Award To Joeun

On March 14, 2006, the agency issued, Amendment 0007, ("revised solicitation"), changing the time requirement and manner for supervisory personnel to respond to emergency calls and failed call-ins. The amendment also increased the number of supervisors and provided detailed information as to where the

supervisory personnel were to be located. AR, Tab 2. Specifically, Amendment 0007 replaced Sections C.6.6.4 and C.6.15.a of the performance of work statement ("PWS") with the following:

> C.6.6.4. Supervisors (on duty), as identified in Section J, Attachment #10-1 thru #10-4 shall be available on-site or by telephone or radio communications to the security guards and **capable of departing in response to guard posts within five (5) minutes from receipt of an emergency call**. After award the government reserves the right to negotiate the associated hours prior to the issuance of each delivery order to adjust to any changes to the scope of work. These supervisor personnel shall not perform any duties as an assigned guard.
>
> C.6.15.a. Standard Operating Procedure (SOP): a. Frequency and method of inspection of guard posts shall be by contract supervisory personnel that includes – checking in person each post at a minimum every four hours. The SOP shall include an hourly scheduled radio or telephone call-in check made by each post to the supervisor. **The supervisor will depart in response, in person, to each failed call-in within five minutes after the scheduled call-in check** at camps where supervisors are assigned in Section J, Attachment #10-1 thru #10-4

(Emphasis added). AR, Tab 2 at 131, 134, 135, 165. Amendment 0007 further included Attachments #11-1, 11-2, 11-3, and 11-4 that provided the specific areas that were to be guarded and provided the total yearly number of supervisor hours required for Areas I, II, III, and IV. Id. at 174-182. Amendment 0007 also stated that, "Offerors may submit only those portions affected by this amendment." Id. at 165 (emphasis added). Thus, award would

still be made to the lowest priced, technically acceptable offeror.

Amendment 0009 was posted on March 15, 2006. It addressed five questions that were submitted by the offerors.[6] AR, Tab 4. Question 4 asked, "Do we have to prepare technical proposal as before?" Id. at 186. The answer to question 4 was, "Offerors may submit a revised price & technical proposal or may submit only the Staffing Plan and revised price proposal according to Amendment 0007." Id.

The agency received 11 proposals in response to the revised solicitation. AR Tab 11, at 329-330. Following another round of technical and management evaluations, the agency determined that Joeun was the lowest priced, technically acceptable offeror. On March 31, 2006, the contracting officer submitted a written request to the Defense Contract Audit Agency ("DCAA") to analyze whether Joeun's labor rates, as proposed were reasonable and whether its fringe benefits complied with Korean labor laws. AR, Tab 54. In response to the agency's request, DCAA performed a financial risk assessment of the awardee. AR, Tab 33 at 531-535. DCAA's April 11, 2006 memorandum stated that the purpose of the risk assessment was to:

---

[6] Amendment 0008 was issued on March 14, 2006. AR, Tab 3. The amendment corrected various administrative errors that were contained in amendment 0007 as follows: 1) changed the proposal submission closing date from January 10, 2006 to March 17, 2006; 2) changed the time to submit proposals based on the format of the proposal; and 3) changed the attachment numbers that are referenced in the amendments.

> determine if there are indications of any significant financial conditions that would warrant the performance of a financial capability audit, and to assist the contracting officer in determining whether the contractor has the adequate financial resources to perform on government contracts in the current and near-term (less than one year) including the contract No. W91QVN-06-R-0062.

Id. at 531.

DCAA's risk analysis procedures included an analysis of "key financial statement items, computation of key financial ratios and comparison to industry averages, trend analysis, and analysis of the contractor's ability to met contract capital requirements." Id. at 531, 533-535. DCAA's report concluded that its risk assessment did not disclose any significant financial indicators that the awardee could not financially perform on the subject contract in the near term and that the awardee had sufficient funds to finance the subject contract for 60 days before receiving the first payment from the agency. Id. at 531.

In addition to the risk analysis, DCAA report No. 4201-2006A28000005, dated April 14, 2006, reviewed the reasonableness of the awardee's proposed labor rates and whether the awardee's fringe benefits complied with Korean labor law. AR, Tab 28 at 488-495. In reference to the awardee's labor rates, the report stated that DCAA "determined that the contractor properly included all required allowances in its computation and its established practices are in compliance with the Korean Labor

law." Id. at 490. The report also made reference to the payment of overtime. Specifically, DCAA noted that: 1) the awardee's monthly wages were computed based on a [redacted] week to reduce overtime costs; 2) a company can negotiate with the labor union to use flexible work hours to deviate from the 40 work week; and 3) the awardee did not [redacted] AR, Tab 2 at 491.

On April 26, 2006, the source selection authority selected Joeun for award of the contract. AR, Tab 23. On April 28, 2006, the agency faxed to SecureNet a termination for convenience notice for contract W91QVN-06-D-00017 and an unsuccessful offeror letter. SecureNet filed a GAO bid protest on May 8, 2006 which was docketed as B-297952.4. SecureNet's protest alleged that: 1) the awardee's proposal could not have been in compliance with the terms of the solicitation and Korean law; 2) the bidding procedure was not fair; and 3) that it received an inadequate debriefing. AR Tab 96.

On May 22, 2006, subsequent to SecureNet's filing of its GAO protest, Joeun requested that the Korean Ministry of Labor ("MOL") opine whether its performance of the contract, as it pertained to the number of supervisor hours, complied with Korean labor law. AR, Tab 32 at 513. The MOL's southern Seoul district office of the Seoul regional labor office replied as follows:

a. The point of your question

> - IAW current Standard Labor Act – the Article 3 of Addenda, your company has inquired whether your company can make the supervisors work within [redacted] hours a month in case of applying [redacted] hours of weekly extended work.
>
> b. Reply
> - IAW Article 52 of the Standard Labor Act, if the parties concerned reach agreement, working hours may be extended up to 12 hours per week and also the Article 3 of Addenda stipulates that 12 hours of extended work hours per week of Article 52 may be extended up to 16 hours for the first 3 years in limitation from the effective date of the Standard Labor Act amended.
>
> - Since your company has defined the [redacted] per month for you employees, we understand that this monthly working hour is the issue, whether it exceeds the maximum extended working hour regulated in the Standard Labor Act. Reviewing this issue, it is [redacted] per week. **It is therefore judged that it is not against the Standard Labor Act** because [redacted] the 16 hours of extended working hour. The time period your company can applies this law is from July 1, 2004 to Jun 30, 2007 in limitation. The extended working should be reached between parties.

(Emphasis added). Id. at 505.[7]

On May 26, 2006, the agency filed its request to summarily dismiss plaintiff's protest with the GAO. AR, Tab 33. On July 20, 2006, the GAO dismissed SecureNet's protest. In dismissing

[7] It appears that the MOL's reference to [redacted] hours is a simple misstatement since Joeun's inquiry made clear that the proposed figure for supervisory hours per week was [redacted]. *See* AR, Tab 32 at 513.

SecureNet's proposal, the GAO considered the above letter from the MOL. This protest followed.

ARGUMENT

I. STANDARD OF REVIEW

Both parties have filed for judgement upon the administrative record. Pursuant to RCFC 52.1, this Court reviews the agency's procurement decisions to determine whether it is supported by the already-existing administrative record. The standards applicable to a motion for judgment upon the administrative record differ from those applied in the context of a Rule 56 motion for summary judgment. Bannum, Inc. v. U.S., 404 F.3d 1346, 1355-56 (Fed. Cir. 2005); Lions Raisins, Inc. v. United States, 51 Fed. Cl. 238, 246-47 (2001); Tech Systems, Inc. v. United States, 50 Fed. Cl. 216, 222 (2001) (explaining basis for summary judgment on the administrative record). Unlike a Rule 56 motion, "proceeding under RCFC [52.1] merely restricts the evidence to the agency record . . . ." Bannum, 404 F.3d at 1356. "Thus, the central inquiry on a motion for summary judgment -- whether the movant has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes summary judgment -- has no bearing on a review of the administrative record . . . ." Tech Systems, 50 Fed. Cl. at 22; accord Bannum, 404 F.3d at 1356 (holding that RCFC [52.1] requires a different standard of review without the burden-shifting and presumptions required pursuant to RCFC 56).

Within this circuit, 28 U.S.C. 1491(b)(1), which was added to the Tucker Act [28 U.S.C. § 1491], as part of the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, 110 Stat., provides this Court with jurisdiction over post-award bid protests such as in this case. PGBA, LLC v. United States, 389 F.3d 1219, 1224 (Fed. Cir. 2004). Section 1491(b)(1) of Title 28, of the United States Code reads in relevant part:

> (b)(1) [T]he Unite[d] States Court of Federal Claims. . . shall have jurisdiction to render judgement on action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. . . . [T]he United Sates Court of Federal Claims . . . shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

Section (b)(4) goes on to state that "[i]n any action under this subsection the courts shall review the agency's decision pursuant to the standards set forth in Section 706 of title 5." Section 706 is commonly referred to as the Administrative Procedures Act ("APA"). The APA states in relevant part that the "[t]he reviewing court shall . . . (2) hold unlawful and set aside agency action, findings and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Thus, for this

Court to exercise its remedial powers it must find that the agency's decision was arbitrary, capricious an abuse of discretion, or otherwise not in accordance with law. Id.; Bannum, 404 F.3d 1346. "Under an arbitrary or capricious standard, the reviewing court should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts." ViroMed Laboratories, Inc. v. United States 62 Fed Cl. 206, 212 (2004) (citations omitted). Consistent with this view, an agency's procurement action should be set aside "only where (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Banknote Corp. Of Am. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ( quoting Impresa construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). Consequently,

> [w]hen a challenge is brought in the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 11 (2006) (quoting Banknote, 365 F.3d at 1351.). Moreover, "[i]t is

critical to note that a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion and greater still, where as here, the procurement is a best-value procurement." PHT Supply, 71 Fed. Cl. at 11 (citations omitted). Once the court finds error in the procurement process, the court must go on to determine if the error caused the protestor "significant prejudice". Bannum, 404 F.3d at 1353. Nevertheless, "[w]here the record establishes no reasonable possibility of competitive prejudice to the protestor, a protest should not be sustained, even if a defect in the procurement is found." Al Ghanim combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States, 56 Fed. Cl. 502, 507 (2003) (citing Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir 1996)). Prejudice is a question of fact. To establish 'significant prejudice' [SecureNet] must show that there was a 'substantial chance' it would have received the contract award but for the errors . . . . [it alleges occurred during the procurement process.]" Id. (citations omitted). As noted above, there are two agency decisions potentially at issue. SecureNet bears the burden to demonstrate that there was error in either decision sufficient to warrant remedial relief. In terms of this procurement, SecureNet bears the burden to show that either the agency made an irrational decision or that the agency violated

some law or regulation. Although, as we will discuss below, SecureNet obliquely implicates the first solicitation, it spends most of its brief attacking the agency's award decision following the resolicitation.

In accordance with the announced revised criteria, the agency awarded the contract to the lowest price technically acceptable offeror, Joeun. Joeun bid a total price of [redacted] for the base year and four option periods. SecureNet was the second lowest technically acceptable offeror, with a bid price of [redacted]. AR Tab 11, at 336. Counts II-V of its Complaint, and the five assignment of errors SecureNet puts forth in its brief, all relate to the award decision. According to SecureNet, the agency: 1) engaged in improper discussions with Joeun after the receipt of the proposals (Count V); 2) failed to properly consider the feasibility and risk of Joeun's use of "excessive" overtime (Count III); 3) failed to conduct a proper price analysis (Count IV); 4) treated SecureNet unfairly during the proposal submission phase of the revised solicitation (Count v); and 5) accepted a proposal which violates Korean Law (Count II). Compl., Counts II-V; Plaintiff's Brief ("Pbr.") pp. 20-40. In supporting its motion, SecureNet fails to consider the record in its entirety. Stripped of its selective quotations from the record and legal hyperbole, SecureNet's protest boils down to a simple proposition: SecureNet believes Joeun's bottom-line price

was too low to be acceptable. Presumably, SecureNet believes that but for any of the above perceived errors, it would have received the award. Thus, accepting any of SecureNet's contentions could potentially result in at least an [redacted] dollar plus increase to the cost of the contract. Still, SecureNet's initial permise is wrong. The evidence in the administrative record amply demonstrates, as we will demonstrate below, that the agency's award decision was proper and made in accordance with all applicable statute and regulations. Consequently, SecureNet is unable to meet its burden to demonstrate that there was actionable error with the agency's procurement of guard services in Korea.

## II. THE AGENCY'S DECISION TO RESOLICIT THE DECEMBER 23, 2005 SOLICITATION WAS PROPER; AS A RESULT SECURENET CANNOT MEET ITS BURDEN TO SHOW ACTIONABLE ERROR WITH THAT DECISION

In Count I of its complaint, SecureNet alleges that the agency failed to follow applicable FAR guidance when it requested revised proposals. Specifically, SecureNet alleges that the Army violated FAR 33.104(a) by not informing SecureNet of the existence of a bid protest and FAR 15.507 by not giving SecureNet as the awardee of the first solicitation the same information the agency provided to the unsuccessful offerors. Compl. ¶¶ 19-20. Even assuming SecureNet is correct, SecureNet fails to demonstrate that any such error caused it substantial prejudice.

For that reason alone, this Court should find in favor of the United States. Nonetheless, the evidence in the administrative record indicates that the agency followed all applicable regulations and treated all offerors equally when it took corrective action.

There is no question that as a result of the December solicitation SecureNet was the lowest price technically acceptable offeror. AR Tab 13 at 350. There is also no question that it was only after a disappointed bidder filed a bid protest before the GAO that the agency became aware that the provision of the contract relating to a supervisor's response time was impossible to meet. See AR Tab 11, 329. Thus, the agency had to revise the scope of work. "When, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation." FAR 15.206(a). Additionally, "amendments issued after the established time and date for receipt of proposals shall be issued to all offerors that have not been eliminated from the competition." FAR 15.206 (c). The agency followed both dictates. See AR Tab 29 at 496. The agency's action was in the nature of corrective action. "Generally, an agency's offer to institute corrective action in response to a protest will render a protest moot and constitute grounds for dismissal." Chapman Law Firm Co. et. al. v. United States, 71 Fed. Cl. 124, 131

(2006). It is only if there is no articulated reason for the corrective action will it be set aside. Id. The agency's decision to take corrective action is well documented. SecureNet does not argue that the decision to take corrective action was unreasonable. Indeed, even SecureNet agrees that it could not meet the supervisor response time as originally described. AR, Tab 15. Moreover, even assuming that there was error in the process which led to the taking of corrective action, the fact that all offerors were given the same opportunity to submit proposals in response to the revised solicitation cured any such error. Moreover, SecureNet did not contest the fact of resolicitation at that time. "If an offeror recognizes an ambiguity or other problem in the solicitation, proper procedure dictates that the offeror challenge the problem before submission of an offer." Aerolease Long Beach v. United States, 31 Fed. Cl. 342, 358, aff'd 39 F.3d 1198 (Fed. Cir. 1994). Accord, CC Distributors, Inc. v. United States, 38 Fed. Cl. 771, 782 (1997) ("[F]or many years, the courts in this Circuit, have recognized a duty on the part of contractors to inquire and seek timely clarification and resolution of problems, inconsistencies, and discrepancies apparent in solicitations."). As it stands, SecureNet is unable to show it suffered substantial prejudice with the decision to take corrective action. Therefore, this Court should reject out of hand any assignment of error with the

first solicitation.

## III. THE AGENCY'S DECISION TO AWARD THE CONTRACT TO JOEUN WAS THE PRODUCT OF A RATIONAL REASONABLE PROCUREMENT PROCESS AND WAS MADE IN ACCORDANCE WITH APPLICABLE LEGAL GUIDANCE

This procurement was a competitive acquisition governed by Part 15 of the FAR. As specified in the solicitation, award would be made to the lowest price technically acceptable offeror. "The lowest price technically acceptable source selection process is appropriate when best value is expected to result from selection of the technically acceptable proposal with the lowest evaluated price." FAR 15.101-2(a). The subprovision goes on to state,

> (b) When using the lowest price technically acceptable process, the following apply:
>
> (1) The evaluation factors and significant subfactors that establish the requirements of acceptability shall be set forth in the solicitation. Solicitations shall specify that award will be made on the basis of the lowest evaluated price of proposals meeting or exceeding the acceptability standards for non-cost factors. . . .
>
> (2) Tradeoffs are not permitted.
>
> (3) Proposals are evaluated for acceptability but not ranked using the non-cost/price factors.
>
> (4) Exchanges may occur (see 15.306).

FAR 15.101-2(b). "Proposal evaluation is an assessment of the proposal and the offeror's ability to perform the contract

successfully. An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." FAR 15.305. Further, the FAR allows the contracting officer to not require cost or pricing data when the contracting officer determines that the agreed upon price would be based upon adequate price competition. FAR 15.403-1. Generally, there is adequate price competition when there are two or more competitive proposals submitted in response to a solicitation and a price analysis is performed which shows that the proposed price is reasonable. Id. Last, the FAR vests the contracting officer with vast discretion as to how to determine whether the stated price is fair and reasonable. "The contracting officer is responsible for evaluating the reasonableness of the offered prices. The analytical techniques and procedures described in this section may be used, singly or in combination with others, to ensure that the final price is fair and reasonable." FAR 15.404-1(a)(1).

The evidence in the record indicates that the agency complied with the above dictates. The agency followed the revised source selection plan which established two evaluation teams. See AR Tab 8. Section M of the solicitation, titled, Basis of Award: Evaluation Factors for Award, set forth the evaluation factors and sub factors. There is no dispute that the evaluation teams applied all of the listed evaluation factors and

sub factors when making the acceptability decision. AR Tab 11 at 342-343. In particular, Joeun was rated as acceptable in both the management and technical evaluation factors. Id. at 342; AR Tabs 9, 10. The contracting officer also found that there were more than two responsible offerors, and that price was a substantial factor in making the award. AR Tab 11 at 343. The contracting officer also had two independent audits done by the DCAA to insure that Joeun's price was reasonable. AR Tabs 26, 28. DCAA, in turn, based its evaluation in part, upon the incumbent's prices. AR Tab 28. As further indication that the proposed price was reasonable, the award price was within [redacted] of the Government's independent cost estimate. Id. at 326. As the agency explained, "[overall considering Joeun's extensive experience recruiting security guard personnel in the Korean labor market, the proposed loaded rates for supervisory security guard personnel is considered fair and reasonable." AR Tab 11 at 339. Accord CC Distributors, Inc. v. United States, 69 Fed. Cl. 277, 281 (2006) ("Thus, under Part 15, comparison of the overall, or total prices submitted can constitute a sufficient analysis of price reasonableness.") (citation omitted). Finally, the Government favorably evaluated Joeun's past performance and made a positive responsibility determination. AR Tabs 11, 12. Thus, the award decision was the result of a rational process conducted in accordance with the applicable regulatory guidance. None of

SecureNet's assignment of errors alters these facts.

## IV. THERE IS NO MERIT TO SECURENET'S ASSIGNMENT OF ERRORS REGARDING THIS PROCUREMENT

### A. The Agency Did Not Conduct Discussions With Joeun After Receipt Of Joeun's Revised Proposal

SecureNet first contends that the agency held improper discussions with Joeun when the DCAA, during its audits of Joeun's proposal, sought clarification of Joeun's proposed labor rates. Pbr. p. 20. It is slightly unclear exactly what harm SecureNet is alleging. It appears that SecureNet is contending that the agency, through DCAA, allowed Joeun to substantively change its proposal to the detriment of other offerors. Id. As such, SecureNet maintains that the agency conducted improper discussions with Joeun. SecureNet is mistaken. The record discloses that the agency did not conduct improper discussions or hold any discussions for that matter with Joeun.

Discussions, as contemplated within a Part 15 procurement is a regulatory term of art. "Negotiations are exchanges, in either a competitive or sole source environment, between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal. . . . . When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussion." FAR 15.306(d). Thus, discussions are talks between the Government and offerors with a view towards proposal

revision. When the DCAA interviewed Joeun, it did so at the request of the contracting officer. AR Tab 54 ("Please validate labor rate reasonableness and fringe benefits compliance with labor rate . . . ."). The purpose of the request was to assist the contracting officer in his duty to ascertain the reasonableness of Joeun's proposed overall price, and compliance with Korean labor law. Id. DCAA reviewed the results of the audit with Joeun, but nothing in Joeun's proposal changed as a result of the review. Most importantly, Joeun's overall price remained the same. SecureNet has cited no evidence in the record which shows that Joeun altered its bottom line price in response to the DCAA audits, or even that DCAA or the contracting officer wanted Joeun to lower its prices. There is nothing improper with the contracting officer availing himself of an independent verification of the reasonableness. "Price analysis is the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit." FAR 15.404-1(b)(1). Moreover, "[t]he contracting officer is responsible for obtaining information that is adequate for evaluating the reasonableness of the price. . . ." FAR 15,403-3 (a). Therefore, the actions of the contracting officer with regards to the post-proposal submission of Joeun's were permissible exercises of the discretion vested in procurement officials. Further, those acts, as a matter of regulatory

interpretation, fail to constitute improper discussions. SecureNet does not cite any persuasive authority or evidence to the contrary.

B. The Agency Reasonably Determined That The Feasibility And Risk Associated With Joeun's Proposal Was Acceptable

SecureNet next argues that the Government's acceptance of Joeun's staffing plan was flawed because, according to SecureNet, the agency failed to consider the risk that Joeun's alleged "excessive" use of overtime would cause to successful contract performance. Pbr. p. 23. SecureNet postulates that the excessive use of overtime would lead to "workforce disruption". Id. at 24. Because, the workforce has just recently begun performance, SecureNet's allegation of disruption is pure speculation at best. In essence, SecureNet wants this court to adopt SecureNet's determination of acceptability of risk, rather than the agency's. Thus, accepting SecureNet's contention would require this Court to substitute this Court's judgement for that of the agency. Such an intervention is beyond the power of this Court. "Technical ratings are aspects of the procurement process involving discretionary determinations of procurement officials which a court should not second guess." Itt Fed. Servs. Corp. v. United States, 45 Fed. Cl. 174, 188 (1999). "Accordingly, in a bid protest which challenges an agency's evaluation of technical proposals or past performance, 'review should be limited to

determining whether the evaluation was reasonable, consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements'". PHT Supply 71 Fed. Cl. at 14 (citations omitted). Accord, ViroMed Labs., 62 Fed. Cl. at 212.

The record discloses that the agency's decision was reasonable. Pursuant to the revised source selection plan, the agency's evaluation teams would evaluate each offeror's staffing plan in accordance with the guidance outlined in Section M of the contract. AR Tab 8 at 280. As explained in Amendment 7 "The offeror is required to submit as part of the technical proposal, a complete staffing plan through which, the offeror shall acknowledge and provide a methodology of how all specific tasks and responsibilities in the PWS would be accomplished, demonstrate effective overall management of this requirement . . . effective management of supervisory personnel []overall the Government requests the offerors to provide their management approach to include how the contractor intends to provide and staff supervisors." AR Tab 2 at 163. Basically, the agency wanted to insure that the offeror understood and was prepared to perform the tasks outlined in the PWS. Following an evaluation of Joeun's plan, the team rated Joeun's staffing plan as acceptable. AR Tab 10 at 307. Based upon the narrative explanation, the agency considered relevant factors in making its

acceptable determination. Id. The agency was satisfied that Joeun's proposed a staffing plan which would meet the needs of the agency. SecureNet has not identified any evaluation factor or subfactor which the agency did not consider. SecureNet does claim that the agency's inquiry was insufficient. Such self-interested disagreement, as we explained above, is outside the scope of this Court's inquiry. Accordingly, this Court should summarily reject SecureNet's assignment of error regarding the acceptance of Joeun's staffing plan.

C. The Government Properly Determined That Joeun's Proposed Price Was Reasonable

Closely related to SecureNet's misguided attack upon the staffing plan attack are SecureNet's two allegations regarding an alleged "excessive use of overtime. According to Securest, Joeun proposes to use an excessive amount of overtime without full compensation in violation of Korean labor law. As SecureNet explains "[although the Solicitation required the Army to consider whether the awardee's prices were "adequate, reasonable, and complete" for the work required, the Army ignored the impact of the awardee's [significant] use of overtime in its evaluation of price." PBr. P. 30. Presumably, SecureNet believes Joeun's proposed price is understated. Even if this is true, which it is not, SecureNet cannot demonstrate that it was prejudiced by the alleged understatement. "It is well settled that in fixed-price

contracting, below-cost pricing is not prohibited and the government cannot withhold an award from a responsible offeror merely because its low offer is below cost. . . . [T]he contract places upon the contractor the risk and responsibility for loss." PHT Supply 71 Fed. Cl. at 21 n13. (citations omitted). Furthermore, "[t]he Comptroller General has held, on numerous occasions, that a disappointed bidder's allegation of a mistake in the price verification efforts used to confirm an awarded's bid provides no basis for a bid protest." Id at 21. Therefore, even if it is true, which it is not, as SecureNet claims, that Joeun failed to include certain elements in its bottom-line price, that fact alone does not give SecureNet grounds to protest the award.

Seemingly in an effort to escape the application of the above rule to its protest, SecureNet attempts to elevate a provision in the Special Contract Requirements section to an evaluation criteria. Section H of the contract contained clause 52.000-4404, titled Korean Labor Law. That clause states:

> Contractor shall honor employees' rights in full compliance with Korean Labor Law, including the rights of succession of employment. Failure to comply may be deemed breach or default of the contract and evidence of nonresponsibility. Such violation of Korean Labor Law may be evidenced by a Republic of Korea Ministry of Labor determination, a court decision, or a Labor Relations Commission adjudication. If

> a contractor is found to be in serious violation and fails to take adequate corrective action promptly, USFK may consider this grounds for determining the contractor to be non-responsible for future Government contracts.

AR, Tab 1 at 77. Thus, by its terms, that provision is operational after contract performance has begun. Once a violation has been found during the performance of the contract, the offending contractor may be in breach of the contract. At this point, prior to full performance of the contract, it is only SecureNet which claims Joeun violated Korean Labor law. We question SecureNet's implicit contention that Joeun's workforce would be incapable of protecting itself against unfair wages, if that became an issue.

Still, SecureNet appears to argue that Joeun cannot comply with Korean labor law by paying the required overtime and still be able to adequately perform the contract at Joeun's proposed price. Thus, SecureNet explicitly alleges that Joeun proposes to violate Korean labor law. As such, according to SecureNet, Joeun's proposal is non-complaint with a material term of the contract; thereby making Joeun ineligible for contract award. We have already demonstrated that the agency listed and followed all of the evaluation factors and sub factors to be used in the award decision. The consideration of "excessive" overtime is not one of those factors. Nevertheless, SecureNet appears to maintain

that it was irrational for the agency to award a contract to an offeror who proposes to violate Korean labor law. SecureNet presupposes that there is a violation. SecureNet is wrong.

The provision requiring adherence to Korean Labor law lists several organizations, among which is the Ministry of Labor, that can determine a violation of Korean labor law. Conspicuously absent from the list is a self-interested disappointed bidder. Other than its own biased writings and calculations, SecureNet fails to support its contention with independent verification. SecureNet's allegation, therefore amounts to nothing more than before the fact conjecture. Indeed, the DCAA, AR Tab 28, the Korean Ministry of Labor, AR Tab 32, the GAO, SecureNet Company Ltd., B-297952.4, July 20, 2006, and the agency, AR Tab 11 at 341, have all opined that Joeun's proposed price complies with Korean law. Most telling is the Ministry of Labor's acknowledgment of compliance. Given the Korean governmental organization tasked with determining violations of Korean labor law explicitly found in Joeun's proposal no violation, SecureNet could never establish otherwise. Finally, Joeun is an experienced Korean contractor. AR Tab 11, 338. It makes little sense that Joeun would submit a proposal which on its face violates Korean law, when it is using a work force familiar with Korean labor law. Thus, SecureNet's assignment of errors

regarding the excessive use overtime are meritless.

D. The Agency Treated All Offerors Equally

SecureNet also contends that the agency failed to allow it to compete equally and fairly for the award of the contract contemplated in the revised solicitation. Specifically, SecureNet maintains "[i]n addition to favoring Joeun through improper discussions, the Army failed to comply with its duty of fairness by disclosing SecureNet's winning price for these services to the Awrdee during the procurement process and failing to take any action to mitigate the unfair advantage cause[d] by this disclosure; and by relaxing a material requirement of the Solicitation for Joeun." Pbr. p. 30. SecureNet's allegations as with all its others, are without merit.

It is elementary that procurement officials have a duty to treat all offerors equally and fairly. FAR 1.602-2(b). "Procurement officers must act to prevent even an appearance of impropriety in order to meet FAR requirements of safeguarding the interests of the United States in its contractual relationships, . . . and ensuring that contractors receive impartial, fair, and equitable treatment . . . ." R & W Flammann Gmbh v. United States, 339 F.3d 1320, 1324 (Fed. Cir. 2003) (quoting FAR 1.602-2). Moreover, procurement officials are presumed to act in good faith. Information Tech. & Applics. Corp. v United States, 316

F.3d 1312, 1323 n.2 (Fed. Cir. 2003) (and cases cited there). Thus, it takes clear and convincing evidence to rebut that presumption. AM-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002) ("[W]e believe the clear and convincing standard most closely approximates the language traditionally used to describe the burden for negating the good faith presumption; the well-nigh, irrefragable proof standard."). SecureNet cannot meet its burden.

SecureNet's allegation of unfair treatment during the bidding process is unsupportable in both fact and logic. As a result of the first solicitation at issue, SecureNet was the awardee. In accordance with applicable regulatory guidance the unsuccessful offerors were sent a letter which simply stated the name of the awardee, and the total price without disclosing anything else, such as thee loaded rates, related to SecureNet's proposal. AR Tab 40. After contract award, there was a protest which resulted in the agency taking corrective action. That action entailed, among other things, submitting a revised proposal based upon an increase in the scope of work. Thus, the proposed overall price of the revised proposal would be higher. Indeed, SecureNet proposed an increase of [redacted] dollars above its first overall price. AR Tab 40. The record discloses that the only information that was not provided to SecureNet that

was provided to the other offerors was SecureNet's winning bid. SecureNet was already aware of that information. Nevertheless, SecureNet argues that it should have been provided the price that the other offerors proposed. Pbr. p. 31. Even if this were true, that fact alone does not satisfy the "substantial prejudice" prong of this Court's analytical review. In the nature of this procurement, where there was an increase in the scope of work, SecureNet does not explain how it was competitively disadvantage by not being provided that information. In fact, if what SecureNet alleges is correct, then presumably every offer submitted would have been lower than SecureNet's proposed price. Such is not the case. At least four higher priced proposals were received. AR Tab 11 at 330. Moreover, as we stated above, SecureNet should have protested before the time for proposal submissions any infirmity it perceived in the call for revise proposal submissions. It did not. It appears that SecureNet took a gamble that it would once again be the lowest price technically acceptable offeror. It lost that bet. Losing a bet is not a sufficient reason to upset an agency's procurement.

Related to SecureNet's lack of information argument, is SecureNet's contention that the agency allowed Joeun to submit wholesale changes to its proposal in contravention of the command

in Amendment 7. Amendment 7 reads in relevant part, "Offerors may submit only those portions of their proposals affected by this amendment." AR Tab 2 at 165 (emphasis added). Although SecureNet alleges that there were impermissible wholesale changes in Joeun's amendment, it fails to cite one example of such an impermissible change. In addition, it is not simply enough to show there was an error in the procurement, SecureNet must also demonstrate prejudice. SecureNet, other than a conclusory assertion that it was harmed, offers no further explanation. For example, SecureNet does not show that if Joeun's alleged impermissible changes were stricken, SecureNet would have been in line for contract award. Nor does SecureNet maintain that if it were allowed to make the type of changes that Joeun allegedly made, SecureNet's bottom line price would have been [redacted] dollars cheaper. Compare AR Tab 34 at 557 with AR Tab 35 at 894 (demonstrating that Joeun [redacted] to its revised proposal). Compare also AR Tab 34 at 562 with AR Tab 35 at 899 (Joeun [redacted]). Nonetheless it is arguable that Amendment 7, when read in conjunction with Amendment 9, could allow submission of changes other than an increase in the cost of supervisors. Thus, at best, from SecureNet's viewpoint, the two amendments are patently ambiguous. "If an ambiguity is obvious and a bidder fails to

inquire with regard to the provision, his interpretation will fail." NVT Technologies, Inc. v. United States, 370 F.3d 1153, 1162 (Fed. Cir. 2004) (citing Triax Pac., Inc. v. West, 130 F.3d 1469, 1475 (Fed. Cir. 1997). If SecureNet was uncertain of the interpretation of the two amendments it should have sought clarification prior to receipt of final proposal revisions. It did not. Therefore it is bound by the Government's interpretation. Consequently, SecureNet cannot demonstrate that the Government violated any duty to treat all offerors equally.

V. SecureNet Is Not Entitled to Injunctive Relief

Finally, SecureNet seeks permanent injunctive relief. Pbr. 39. Although SecureNet does not articulate in its discussion of injunctive relief exactly what relief it is seeking, in its conclusion section, it requests among other relief, that this Court issue an order awarding the contract to "SecureNet as the lowest priced, technically acceptable offeror." Id. at 40. SecureNet's request for relief is misplaced. "In deciding whether a permanent injunction should issue, a court considers (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the

public interest to grant injunctive relief. PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell Alaska,480 U.S. 531 546n. 12 (1987)).

We have conclusively demonstrated above that SecureNet cannot succeed upon the merits. On that basis alone, injunctive relief should be denied. Still, "[c]ourts . . . should interfere with the government procurement process "only in extremely limited circumstances." Avtel Services, Inc. v. United States, 70 Fed. Cl. 173, 226 (2005) (citations omittd). Furthermore, in deciding whether to grant injunctive relief, this Court must "give due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3). Thus, even if this Court were to somehow find that SecureNet succeeded upon the merits, that fact alone does not automatically equate to the issuance of injunctive relief.

In this case, SecureNet bid close to [redacted] dollars higher than Joeun. The gravamen of SecureNet's protest is that Joeun did not adequately account for the payment of overtime. Even if that were true, given that this contract was for a fixed fee price such an understatement should not cost the taxpayers [redacted] dollars.

Moreover, this contract is for guard services on military installations in Korea. We request that the Court take judicial notice of the tensions between North and South Korea. As noted in the solicitation, it takes at 30 days for a change over in contractors. Joeun is currently performing under the contract. If this Court were to issue an immediate injunction displacing Joeun, then potentially our military bases would be unguarded which could prove disastrous. Accordingly, if this Court were to find that injunctive relief is warranted, we respectfully request that Joeun remain in place until the agency is able to take any action consistent with the Court's injunctive relief order.

## CONCLUSION

For the foregoing reasons, the United States requests the Court to deny SecureNet's motion for injunctive relief, find that SecureNet is not entitled to declaratory or injunctive relief, and to judgement in favor of the United States.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

S/BRIAN M. SIMKIN
BRIAN SIMKIN
Assistant Director

OF COUNSEL:
MAJOR SUNNY AHN
Trial Attorney
United States Army
Contract Appeals Division
901 North Stuart Street
Arlington VA 22203

S/MICHAEL D. AUSTIN
MICHAEL D. AUSTIN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.

Washington, D.C. 20530
Tel: (202) 305-7562
Fax: (202) 305-7644

Dated: August 31, 2006

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of August 2006, I caused to be served by electronic filing copies of "**DEFENDANT'S MOTION FOR JUDGEMENT UPON THE ADMINISTRATIVE RECORD AND DEFENDANT'S OPPOSITION TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND FOR DECLARATORY AND INJUNCTIVE RELIEF**", addressed as follows:

Rand L. Allen
Kevin Maynard.
Wiley Rein & Fielding LLP.
1776 K Street, NW 20036
Washington DC

s/Michael D. Austin