**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | | |
|---|---|---|
| SECURENET CO., LTD. | ) | |
| | ) | **No. 00564** |
| | ) | **Judge Bruggink** |
| *Plaintiff,* | ) | |
| v. | ) | **AGREED TO** |
| | ) | **PUBLIC VERSION** |
| UNITED STATES, | ) | |
| *Defendant.* | ) | |

**AGREED TO PUBLIC VERSION OF PLAINTIFF SECURENET'S OPPOSITION AND REPLY TO DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Rand L. Allen
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006
(202) 719-3193 (O)
(202) 719-7049 (F)
rallen@wrf.com
*Counsel for Plaintiff*

*Of counsel*:
Thomas J. Seymour
KIM & CHANG
Seyang Building
223 Naeja-Dong, Jongro-Gu
Seoul, Korea 110-720
(+82-2) 3703-9092

Kevin J. Maynard
Antonella Karlin
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006
(202) 719-3143 (O)
(202) 719-7049 (F)

September 26, 2006

# TABLE OF CONTENTS

**Page**

I. STATEMENT OF THE ISSUES ........ 3
II. STATEMENT OF FACTS ........ 4
  A. The Analysis Provided By SecureNet Is Necessary To The Court's Review Of The Record In This Case ........ 4
  B. Significant Changes In Joeun's Proposed Staffing Approach/Use of Overtime ........ 5
    1. Joeun's Proposed Supervisor Staffing Approach ........ 6
    2. Joeun's Proposed Guard Staffing Approach ........ 7
    3. Joeun's Compensation Approach ........ 8
III. ARGUMENT ........ 9
  A. DCAA's Post-FPR Communications With Joeun Constituted Improper Discussions ........ 9
    1. Discussions May Occur Even Without A Revision To An Offeror's Bottom Line Price ........ 10
    2. Joeun Improperly Supplied Additional Information That Was Necessary To Determine The Acceptability Of Its Proposal ........ 13
  B. The Army Failed To Evaluate The Feasibility And Risk Of Joeun's Proposal ........ 16
  C. The Army Failed To Conduct A Proper Price Realism Analysis ........ 19
  D. The Manner In Which The Army Conducted The Procurement Was Unfair ........ 22
  E. The Army Failed To Consider Joeun's Non-Compliance With Labor Law ........ 25
    1. The Government Was Required To Consider Joeun's Failure To Comply With The Legal Restrictions On Working Hours ........ 25
    2. Previous Reviews Did Not Fully Analyze Joeun's Compliance With Korean Labor Law ........ 26
IV. CONCLUSION ........ 30

# TABLE OF AUTHORITIES

## FEDERAL CASES


*Bannum, Inc. v. United States*, 59 Fed. Cl. 241 (2003) ....................4

*Chapman Law Firm v. United States*, 63 Fed. Cl. 519 (2005), *aff'd mem.*, 163 Fed. Appx. 889 (Fed. Cir. 2006) (per curiam) ....................26

*Comprehensive Health Services, Inc. v. United States*, 70 Fed. Cl. 700 (2006) ....................5

*Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345 (1997) ....................4

*Dubinsky v. United States*, 43 Fed. Cl. 243 (1999) ....................12

*Information Technology & Applications Corp. v. United States*, 316 F.3d 1312 (Fed. Cir. 2003) ....................11

*Mike Hooks, Inc. v. United States*, 39 Fed. Cl. 147 (1997) ....................4, 30

*North Carolina Division of Services v. United States*, 53 Fed. Cl. 147 (2002), *aff'd mem.*, 60 Fed. Appx. 826 (Fed. Cir. 2003) (per curium) ....................5

*Orca Northwest Real Estate Services v. United States*, 65 Fed. Cl. 1 (2005) ....................15

*Orion International Technologies, Inc. v. United States*, 60 Fed. Cl. 338 (2004) ....................5

*PHT Supply Corp. v. United States*, 71 Fed. Cl. 1 (2006) ....................21

*United States v. First National Bank*, 699 F.2d 341 (7th Cir. 1983) ....................5

*Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854 (2d Cir. 1981) ....................5


## AGENCY DECISIONS


*Acepex Management Corp.*, B-279173.5, July 22, 1998, 98-2 CPD ¶ 128 ....................21

*ALT Communications, Inc.,* B-246315, Mar. 2, 1992, 1992 WL 52434 ....................16

*ASR Management & Technical Services*, B-244862, Apr. 23, 1992, 92-1 CPD ¶ 383 ....................16

*Coffman Specialties, Inc.,* B-284546, May 10, 2000, 2000 CPD ¶ 77 ....................26

*DynCorp International, LLC*, B-294232, Sept. 13, 2004, 2004 CPD ¶ 187 ....................11

*eMind*, B-289902, May 8, 2002, 2002 CPD ¶ 82 ....................11, 12

*International Outsourcing Services, LLC*, B-295959, May 25, 2005, 2006 CPD ¶ 6 ....................21

*Jettison Contractors, Inc.*, B-242792, June 5, 1991, 91-1 CPD ¶ 532 ....................11

*KPMG Peat Marwick, LLP,* B-259479, May 9, 1995, 95-2 CPD ¶ 13 ....................16

*L-3 Communications, KDI Precision Products, Inc.,* B-290091, June 14, 2002, 2002 CPD ¶ 155 ....................21

*Landoll Corp.*, B-291381, Dec. 23, 2002, 2003 CPD ¶ 40 ....................11

*Meridian Management Corp.*, B-281287.10, Feb. 8, 2000, 2001 CPD ¶ 5 ....................19

*Molina Engineering, Ltd./Tri-J Industries, Inc. Joint Venture,* May 22, 2000 B-284895, 2000 CPD ¶ 86 ....................21

*OMNIPLEX World Services Corp.*, B-291105, Nov. 6, 2002, 2002 CPD ¶ 199 ....................20

*Orincon Corp.*, B-276704, July 18, 1997, 97-2 CPD ¶ 26 ....................26

*Oshkosh Truck Corp.*, B-252708.2, Aug. 24, 1993, 93-2 CPD ¶ 115 ....................19

*Pacifica Services, Inc.*, B-280921, Dec. 7, 1998, 98-2 CPD ¶ 137 ....................19

*PADCO, Inc.,* B-289096.3, May 3, 2002, 2002 CPD ¶ 135 ....................11

*Quantum Research, Inc.*, B-242020, Mar. 21, 1991, 91-1 CPD ¶ 310 ....................19

*SecureNet Co.,* B-297952.4, July 20, 2006 ....................27

*Southern California Engineering Inc.,* B-296244, July 11, 2005, 2005 CPD ¶ 134 ....................11, 12

*Wyse Technology, Inc.,* B-297454, Jan. 24, 2006, 2006 CPD ¶ 23 ....................25

**FEDERAL REGULATIONS**

FAR § 15.306 ....................10, 11, 13

FAR § 15.404-1 ....................19

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | | |
|---|---|---|
| SECURENET CO., LTD. | ) | |
| | ) | **No. 00564** |
| | ) | **Judge Bruggink** |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **AGREED TO** |
| | ) | **PUBLIC VERSION** |
| UNITED STATES, | ) | |
| | ) | |
| *Defendant.* | ) | |

**AGREED TO PUBLIC VERSION OF PLAINTIFF SECURENET'S OPPOSITION AND REPLY TO DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

In its opposition, the Government acknowledges or does not contest certain key facts relating to each of the errors identified by SecureNet in its protest – including the central fact that the awardee's approach requires its employees to work significant overtime hours. Instead, the Government incorrectly argues that the Army was not required to consider these issues as part of its evaluation, or that the failure to consider these issues was ultimately not prejudicial.

With respect to the *improper discussions* that occurred between Joeun and the Government after receipt of proposals, the Government acknowledges that these exchanges took place, but argues that they were proper because they did not result in a decrease in Joeun's bottom line price. As detailed below, this argument is legally and factually incorrect. Instead, these exchanges constituted improper discussions since they allowed Joeun to provide additional information necessary for the Army to evaluate Joeun's proposed price, as well as its compliance with applicable law.

In defending the Army's evaluation of the *feasibility and risk* of Joeun's staffing approach, the Government does not attempt to rebut the fact that Joeun's proposal calls for Supervisors to [redacted] hours per month, or that Joeun intends [redacted]. Instead, the Government brushes these facts aside as "speculation," and argues that the Army was not required to take these issues into account under the evaluation criteria. However, these issues should have been considered as part of the Army's evaluation of "the offeror's *feasibility of approach* and [it's] *perceived risk of unsuccessful performance*," and its failure to do was unreasonable and inconsistent with the evaluation criteria.

The Government likewise attempts to brush aside the Army's failure to consider the *price realism* of Joeun's proposed staffing approach by arguing that its evaluation of price reasonableness was sufficient, and that in any event Joeun bears the risk if its proposed price [redacted]. Again, this argument is legally unsupportable, since the Solicitation expressly called for an evaluation of price realism (which is separate and distinct from the price reasonableness evaluation that was conducted), in order to determine whether offerors' proposed prices did realistically reflect the cost of performing the work. The failure to consider this important aspect of proposals was therefore unreasonable and inconsistent with the stated evaluation criteria.

In an effort to demonstrate that the Army's implementation of the Second Revised Solicitation was not *unfair*, the Government acknowledges that since the revised solicitation required the submission of "a revised proposal based upon an increase in the scope of work," it was to be expected that "the proposed overall price of the revised proposal would be higher." However, the Government ignores the fact that Joeun's proposed price [redacted] – a fact directly attributable to the Army's decision to allow Joeun to significantly revise its price and staffing, in contravention of the revised proposal instructions.

Finally, in attempting to explain away the Army's failure to consider Joeun's non-compliance with limits on overtime imposed under Korean labor law, the Government argues that this was not an evaluation factor. However, this argument is severely undermined by the Government's own acknowledgement of the Army's "duty to ascertain . . . compliance with Korean labor," as well the evidence in the record showing the Army's limited efforts to evaluate compliance with some (though not all) of those applicable laws. Likewise, the record shows that the various "opinions" regarding Joeun's compliance with Korean labor law are based on limited information or unclear assumptions, are ambiguous at best, and in any event do not address the precise issue in this case. Therefore, these prior opinions are not entitled to any deference, and should not prevent this Court from conducting its own thorough review.

Thus, the errors in this procurement were substantial and prejudicial to SecureNet, which, as the second low-price, technically-acceptable offeror would have received the award if not for the Army's errors. Therefore, any of these errors is sufficient to sustain this protest.

## I.
## STATEMENT OF THE ISSUES

As a threshold matter, the Government argues in its brief that "[t]here are in fact two agency decisions at issue. First, is the agency's decision to cancel the December 23, 2005 solicitation. Second is the agency's decision to award the contract to Joeun." Gov't Br. at 2-3. Notwithstanding the Government's characterization, SecureNet is not challenging the decision to cancel the December 23rd solicitation. Instead, SecureNet is challenging the decision to award the contract to Joeun under the Second Revised Solicitation. This challenge is based on the agency's failure to properly evaluate price, risk and compliance with Korean labor law, as called for under the Solicitation. In addition, SecureNet is challenging the manner in which the agency conducted the procurement – including its decision to engage Joeun in improper discussions, and

its failure to take steps to level the playing field when it issued the Second Revised Solicitation. Although the latter issue implicates the manner in which the Army implemented its decision to cancel the first procurement, SecureNet is not challenging the cancellation decision itself.

## II.
## STATEMENT OF FACTS

### A. The Analysis Provided By SecureNet Is Necessary To The Court's Review Of The Record In This Case

As an initial matter, the Government argues that the Court should strike SecureNet's Exhibits A-E from the record as improperly supplementing the administrative record. This argument is misplaced and lack any legal merit. As this Court has acknowledged, the administrative record in bid protests "is something of a fiction" because, "due to the absence of a formal record, the agency has to exercise some judgment in furnishing the court with the relevant documents." *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345, 350 (1997). Indeed, "allowing the agency to retroactively delineate the scope of review may preclude the 'substantial inquiry' and 'thorough, probing, in-depth review' the court must perform to determine whether the agency's action was arbitrary and capricious." *Mike Hooks, Inc. v. United States*, 39 Fed. Cl. 147, 156 (1997) (citation omitted). Thus, "this court has adopted a flexible approach both in putting together the evidence that will be considered and in discovery, balancing the limited nature of the court's review with the competing need to recognize potential exceptions to treating the agency's submission as the four corners of the inquiry." *Cubic,* 37 Fed. Cl. at 350.

In this case, the exhibits are necessary to provide clarity on the relevant factual and legal issues that the administrative record itself establishes. First, the charts attached as Exhibits A-C do not supplement the record in any way. Rather, they summarize data that are already a part of the administrative record. The charts are admissible because "they serve fairly and accurately to render other evidence more understandable." *Bannum, Inc. v. United States*, 59 Fed. Cl. 241,

245 n.9 (2003) (citations omitted). To the extent that this Court views the charts as supplemental record evidence, they are clearly admissible to facilitate the Court's understanding of the issues. *See Orion Int'l Techs., Inc. v. United States*, 60 Fed. Cl. 338, 343-44 (2004).

Second, the Ministry of Labor guide and statute attached as Exhibits D and E are properly before this Court. The propriety of the Army's review of Joeun's proposal involves issues of Korean Labor Law. Exhibits D and E contain legal information on the contours of Korean Labor Law that will allow this Court to conduct an informed review of the Army's decision and are, therefore, appropriate to supplement the administrative record. *North Carolina Div. of Servs. v. United States*, 53 Fed. Cl. 147, 158-59 (2002) (allowing the plaintiff to supplement the administrative record with an affidavit because it enabled the court's understanding of statutory terms at issue in protest), *aff'd mem.*, 60 Fed. Appx. 826 (Fed. Cir. 2003) (per curiam); *see also Comprehensive Health Servs., Inc. v. United States*, 70 Fed. Cl. 700, 720 (2006). Indeed, under RCFC 44.1, this Court may take judicial notice of the facts set forth in the Ministry of Labor guide and statute in determining the content of the Korean Labor Laws. RCFC 44.1. Indeed, extracts from foreign legal materials are one of the basic modes of proving foreign law. *See, e.g. United States v. First Nat. Bank*, 699 F.2d 341, 344 (7th Cir. 1983) (considering provisions of relevant foreign statute); *Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 860 (2d Cir. 1981) (considering South Vietnamese civil code). Therefore, the materials submitted by SecureNet are properly before the Court for purposes of reviewing the Agency's action.

**B. Significant Changes In Joeun's Proposed Staffing Approach/Use of Overtime**

The Government also argues repeatedly that SecureNet has failed to demonstrate that any of the errors in this procurement resulted in prejudice, and that SecureNet has failed to identify any impermissible changes in Joeun's proposal in response to the Second Revised Solicitation. *See, e.g.,* Gov't Br. at 35. In light of the Government's contention, the following is a summary

of the significant changes and impacts of Joeun's revised proposal, drawn from data in the Administrative Record, which demonstrates that Joeun did in fact make significant changes to its proposal that allowed it to unfairly undercut SecureNet's price in the re-opened competition.

1. <u>Joeun's Proposed Supervisor Staffing Approach</u>

In the Second Revised Solicitation, the Army required that all offerors deliver 475,960 hours of Supervisor support per year. *See* AR Tab 2 at 176, 179-80, 182. To meet this requirement, Joeun proposed to [redacted]:

| Joeun's Initial Supervisor Staffing: January 10 Proposal (AR Tab 34 at 638, 707) | | | | |
|---|---|---|---|---|
| | Yearly Supervisor Hours (a) | Proposed Supervisors (b) | Hrs Per Yr (c) = (a) ÷ (b) | Hrs Per Mo (d) = (c) ÷ 12 |
| Area I | [redacted] hrs | [redacted] | [redacted] per yr | [redacted] per mo |
| Area II | [redacted] hrs | [redacted] | [redacted] per yr | [redacted] per mo |
| Area III | [redacted] hrs | [redacted] | [redacted] per yr | [redacted] per mo |
| Area IV | [redacted] hrs | [redacted] | [redacted] per yr | [redacted] per mo |
| Total/Avg | [redacted] hrs | [redacted] | [redacted] per yr | [redacted] per mo |

| Joeun's Revised Supervisor Staffing: March 17 Proposal (AR Tab 35 at 978, 1058) | | | | |
|---|---|---|---|---|
| | Yearly Supervisor Hours (a) | Proposed Supervisors (b) | Hrs Per Yr (c) = (a) ÷ (b) | Hrs Per Mo (d) = (c) ÷ 12 |
| Area I | [redacted] hrs | [redacted] | [redacted] per yr | [redacted] per mo |
| Area II | [redacted] hrs | [redacted] | [redacted] per yr | [redacted] per mo |
| Area III | [redacted] hrs | [redacted] | [redacted] per yr | [redacted] per mo |
| Area IV | [redacted] hrs | [redacted] | [redacted] per yr | [redacted] per mo |
| Total/Avg | [redacted] hrs | [redacted] | [redacted] per yr | [redacted] per mo |

Thus, while Joeun's proposal stated that Supervisors would work "[redacted]," AR Tab 35 at 978, in reality Joeun's proposal requires Supervisors to work [redacted]. Based on the standard 40-hour workweek[1]

[1] (40 basic work hrs per wk) x (52 weeks per yr) = (2,080 basic work hrs per yr)

mandated by Korean law,[2] this means that each Supervisor would be required to work more than [redacted] of overtime per year.[3] Thus, Joeun's proposal requires a workforce of [redacted] Supervisors to work a total of [redacted].[4]

2. Joeun's Proposed Guard Staffing Approach

The Second Revised Solicitation also increased the estimated number of hours of Guard Support,[5] requiring that offerors deliver 2,161,818 hours of Guard support. AR Tab 1 at 101G, 101K, and 101M; AR Tab 2 at 173. To meet this requirement, Joeun initially proposed a workforce of [redacted] ER/NER Guards. *See* AR Tab 34 at 638. However, in its revised proposal, Joeun actually [redacted], explaining that these employees "[redacted]." AR Tab 35 at 978. On an annual basis this equates to approximately [redacted] hours per Guard per year.[6]

Although Joeun's Guard staffing plan calls for [redacted] on an individual basis when compared to Joeun's Supervisor staffing, this approach likewise requires a [redacted]. Based on the standard 40-hour workweek[7] mandated by Korean law,[8] Joeun's proposal requires that each Guard work more than [redacted] per year.[9] Based on

---

2 Ex. D, Korean Labor Standards Act, Article 49.

3 [redacted]

4 [redacted]

5 The Army adjusted the hours of English and non-English speaking Guards for Area IV, resulting in a net increase of 17,520 Guard hours under the revised solicitation. *Compare* AR Tab 1 at 101Q *with* AR Tab 2 at 173.

6 (2,161,818 hrs per yr) ÷ ([redacted]) = ([redacted])

7 (40 basic work hrs per wk) x (52 weeks per yr) = (2,080 basic work hrs per yr)

8 Ex. D, Korean Labor Standards Act, Article 49.

9 ([redacted]) – (2,080 basic work hrs) = ([redacted])

Joeun's proposed workforce of [redacted], its approach requires its Guard staff to work a total of [redacted].[10]

3. Joeun's Compensation Approach

In total, Joeun proposed more than [redacted] for its Supervisor and Guard Staff. By law, employers are required to compensate employees for all hours worked in excess of 40 hours either by paying an overtime premium of 50% of basic wages or by providing an equivalent amount of paid leave.[11] Despite this requirement, and the [redacted], Joeun's price proposal [redacted]. Instead, the record shows that at the same time that Joeun [redacted] Supervisors and Guards, Joeun also proposed to [redacted] Supervisors and Guards:

| **Joeun's Revised Labor Rates (Base Year)** | | | |
|---|---|---|---|
| **Labor Category** | **January 10 Proposal (AR Tab 34 at 708)** | **March 17 Proposal (AR Tab 35 at 1059)** | **Decrease** |
| Area I Supervisors | [redacted] per hr | [redacted] per hr | ([redacted]) |
| Area I ER | [redacted] per hr | [redacted] per hr | ([redacted]) |
| Area I NER | [redacted] per hr | [redacted] per hr | ([redacted]) |
| | | | |
| Area II Supervisors | [redacted] per hr | [redacted] per hr | ([redacted]) |
| Area II ER | [redacted] per hr | [redacted] per hr | ([redacted]) |
| Area II NER | [redacted] per hr | [redacted] per hr | ([redacted]) |
| | | | |
| Area III Supervisors | [redacted] per hr | [redacted] per hr | ([redacted]) |
| Area III ER | [redacted] per hr | [redacted] per hr | ([redacted]) |
| Area III NER | [redacted] per hr | [redacted] per hr | ([redacted]) |
| | | | |
| Area IV Supervisors | [redacted] per hr | [redacted] per hr | ([redacted]) |
| Area IV ER | [redacted] per hr | [redacted] per hr | ([redacted]) |
| Area IV NER | [redacted] per hr | [redacted] per hr | ([redacted]) |

10 ([redacted]) x ([redacted] Guards) = ([redacted])

11 *See* Ex. D, Korean Labor Standard Act, Article 55.

In fact, information supplied by Joeun after the closing date for submission of proposals explained for the first time that Joeun [redacted]; instead, [redacted]:

> The proposed monthly wages are computed based on [redacted] to reduce overtime costs. Although current Korean labor law, effective July 1, 2005, limits 40 hours per week, it also allows a company to negotiate with labor union to use flexible work hours. . . . Joeun estimated [redacted]. Because of [redacted].

AR Tab 28 at 491. However, Joeun's proposal [redacted], resulting in an understatement of its overall price. That is, it counted the employees' paid leave hours as *productive work hours* to meet the yearly Supervisor hours mandated by the Second Revised Solicitation, but did not similarly count these hours as *productive work hours* (for which the hourly wage would include an overtime premium) to calculate its price. *See* AR Tab 35 at 1058. As a result, Joeun's revised price [redacted], as the Government noted in its brief, offerors were asked to "submit[] a revised proposal based upon an increase in the scope of work," so that "the proposed overall price of the revised proposal would be higher." Gov't Br. at 34.

## III.
## ARGUMENT

### A. DCAA's Post-FPR Communications With Joeun Constituted Improper Discussions

In its brief, the Government acknowledges that the DCAA communicated with Joeun after submission of FPRs, in order to conduct an audit requested by the CO "to assist [him] in his duty to ascertain the reasonableness of Joeun's proposed overall price, and compliance with Korean labor law." Gov't Br. at 25. However, in order to justify these post-FPR communications, which were conducted only with Joeun, the Government argues that:

> nothing in Joeun's proposal changed as a result of the review. More importantly, Joeun's overall price remained the same. SecureNet has cited no evidence in the record which shows that Joeun altered its bottom line price in response to the DCAA audits, or even that DCAA or the contracting officer wanted Joeun to lower its prices. . . . Therefore, the actions of the contracting officer with regards to the post-proposal submission of Joeun's were permissible exercises of the discretion vested in procurement officials.

*Id.* at 25-26.[12]

The Government argues only that because there was no change in Joeun's bottom line price, the communications did not constitute "discussions." This argument is inconsistent with the legal definition of discussions, as well as the evidence in the record, which demonstrates that the Government received additional information which was necessary for the Government to evaluate and determine the acceptability of Joeun's proposal. In order to engage in these communications with Joeun, the Government was required to open discussions with all offerors, and its failure to do so was fundamentally unfair and contrary to its obligations under the FAR.

1. <u>Discussions May Occur Even Without A Revision To An Offeror's Bottom Line Price</u>

Under the FAR, there are two types of communications that may occur between the Government and offerors after the receipt of proposals: "discussions" or "clarifications."[13] As discussed in SecureNet's opening brief, the FAR defines "discussions" as "[e]xchanges . . . [occurring] after the establishment of the competitive range. . . . that are undertaken with the

---

[12] The Government also argues that "[t]here is nothing improper with the contracting officer availing himself of an independent verification of the reasonableness." Gov't. Br. at 26. However, SecureNet is not challenging the CO's decision to request an independent evaluation of cost; instead, SecureNet is challenging the decision to engage in discussions in connection with that requested evaluation, without providing all offerors a similar opportunity.

[13] The FAR also permits agencies to engage in "communications" for the purpose of establishing a competitive range. FAR 15.306(b). However, in this case the Army did not make a competitive range determination since it did not intend to conduct discussions. FAR 15.306(c)(1) ("Agencies shall evaluate all proposals . . ., and, if discussions are to be conducted, establish the competitive range.") *See* AR Tab 11 (Price Negotiation Memorandum showing no competitive range determination was made). In any event, the regulations regarding "communications" make clear that this process "shall not be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, and/or otherwise revise the proposal." FAR 15.306(b)(2).

intent of allowing the offeror to revise its proposal." FAR 15.306(d). When discussions are held with one offeror, they must be held with all offerors. *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319-20 (Fed. Cir. 2003) ("The purpose of the rule that the government may not hold discussions with only one bidder is 'to prevent a bidder from gaining an unfair advantage over its competitors by making its bid more favorable to the government in a context where the other bidders have no opportunity to do so.'") (citations omitted).

When an agency awards without discussions, the only permissible communications with offerors are known as "clarifications." FAR 15.306(a)(1) ("Clarifications … may occur when award without discussions is contemplated.") Unlike discussions, agencies are not required to engage in "clarifications" with all offerors. *See Landoll Corp.*, B-291381, Dec. 23, 2002, 2003 CPD ¶ 40 at *6 ("In contrast to discussions, requesting clarification from one offeror does not trigger a requirement that the agency seek clarification from other offerors.") (citations omitted). However, under the FAR, clarifications are narrowly defined as "limited exchanges," FAR 15.306(a)(1), that may be used to "to clarify certain aspects of proposals . . . or to resolve minor or clerical errors." FAR 15.306(a)(2).[14] Moreover, as the cases make clear, where award is made without discussions "[c]larifications cannot be used to cure [the awardee's] proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal." *S. Cal. Eng'g, Inc.,* B-296244, July 11, 2005, 2005 CPD ¶ 134, at *4 n.5 (citing *DynCorp Int'l LLC*, B-294232, Sept. 13, 2004, 2004 CPD ¶ 187, at *8).[15]

---

[14] *See, e.g., PADCO, Inc.,* B-289096.3, May 3, 2002, 2002 CPD ¶ 135, at *6 n. 1 (agency noted apparent arithmetic error in offeror's cost proposal and requested clarification); *Jettison Contractors, Inc.*, B-242792, June 5, 1991, 91-1 CPD ¶ 532, at *2-3 (agency clarified apparent clerical and mathematical errors in offeror's bid)

[15] *Accord eMind*, B-289902, May 8, 2002, 2002 CPD ¶ 82, at *3 ("Clarifications are limited exchanges between the government and offerors that may occur when award without discussions is contemplated. FAR § 15.306(a)(1). Such communications with offerors are not to be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal.").

For example, in *eMind*, B-289902, May 8, 2002, 2002 CPD ¶ 82 at *1, the RFP required offerors to submit "course descriptions" in order to "demonstrate compliance with the specified requirements" for certain training services. One offeror failed to include certain required course descriptions in its initial proposal, but argued that the agency should have considered the descriptions it submitted after the due date for proposals – even though discussions were not held with other offerors. *Id.*, at *3. GAO rejected the protester's argument that the agency was permitted to consider the newly submitted descriptions as a form of "clarifications," reasoning that "a clarification may not be used to furnish information required to determine the technical acceptability of [a protester's] proposal." *Id.*

Similarly, in *Southern California Engineering, Inc.,* 2005 CPD ¶ 134, at *4 n.5, an RFP explicitly stated that "pump specifications" were a "material aspect of the technical acceptability of the proposal." The protester in that case likewise argued that information it submitted after the due date for proposals regarding its pump specifications were a form of clarifications that the agency could consider. Again, GAO rejected this argument, reasoning that because the specifications were necessary to determine the acceptability of the offeror's proposal, and because the agency did not conduct discussions with the offerors, the required specifications could not have been supplied through clarifications.

Finally, in *Dubinsky v. United States*, 43 Fed. Cl. 243, 261 (1999), this court held that "discussions with one offeror after the issuance of a request for final proposal revisions [FPR] that enable it to make its proposal technically acceptable--as was the case here--are prohibited." *Id.* (citations omitted). In that case, the contracting agency engaged in numerous post-FPR communications with one offeror regarding numerous deficiencies in its initial proposal. *Id.* at 250. Based on these communications, the contracting agency found the offeror's proposal to be

technically acceptable and awarded it the contract. *Id.* at 250-51. The Court held that the contracting agency's exchanges with the offeror constituted discussions in violation of FAR 15.306(d), as they were clearly intended to provide the offeror "an opportunity-unavailable to other offerors-to make its proposal compliant with the RFP." *Id.* at 262.

Thus, contrary to the Government's positions, the Government was not permitted to communicate with Joeun, at the exclusion of other offerors, simply because it did not ask Joeun to lower its bottom line price. Instead, because the communications were necessary for the Army to evaluate material terms of Joeun's proposal (as discussed in the next section), these communications constituted discussions, and should have been conducted with all offerors.

2. <u>Joeun Improperly Supplied Additional Information That Was Necessary To Determine The Acceptability Of Its Proposal</u>

In this case, offerors were informed that compliance with Korean labor law was a material requirement of the Contract resulting from the RFP. *See* AR Tab 1 at 77. In addition, the RFP made clear that that prices would be evaluated to determine whether they were "adequate," "reasonable and realistic," and "complete." AR Tab 1 at 95 (Solicitation at Section L.2.c.(3)(a)). The RFP also stated that "[t]he <u>burden of proof of price credibility is the offeror's responsibility</u>." AR Tab 1 at 96 (Solicitation at Section L.2.c(3)(b)) Thus, offerors were required to provide sufficient information in their proposals for the agency to evaluate the reasonableness of their proposed prices, or risk having their proposal deemed unacceptable:

> For a proposal to be considered technically acceptable, an offeror must submit an offer breakdown (without cost data) for each contract line item. The offer breakdown must demonstrate that the offeror understands the Performance Work Statement by listing <u>an appropriate amount of</u> materials, <u>labor</u>, and transportation and equipment required to perform the contract. <u>Failure to include a significant element in the data may indicate that the offeror fails to understand the requirement, and may be grounds for finding the proposal to be technically unacceptable</u>.

AR Tab 1 at 100.

Despite offerors' burden of complying with Korean law and submitting a price proposal that was adequate, realistic and complete, DCAA engaged in improper discussions with Joeun in order to evaluate these aspects of Joeun's proposal – an evaluation requested by the CO for the very purpose of assisting him "in his duty to ascertain the reasonableness of Joeun's proposed overall price, and compliance with Korean labor law." Gov't Br. at 25. Notwithstanding the Government's argument that Joeun did not revise its bottom line price, the record shows that DCAA relied on new or different information not contained in Joeun's original proposal in conducting the requested evaluation. In particular, the DCAA report includes the following analysis of the basis for Joeun's monthly wages:

> The proposed monthly wages are based on the management's estimates. The contractor considered but did not use its payroll records of commercial guard service contracts since job qualifications are different from those of USFK guard services. The proposed monthly wages are computed [redacted]. Although current Korean labor law, effective July 1, 2005, limits 40 hours per week, it also allows a company to negotiate with labor union to use flexible work hours. . . . Joeun [redacted].

AR Tab 28 at 490-91.

Although this assessment suffers from a number of significant shortcomings (*see infra* Section III.C), it was nevertheless based on significant additional information regarding the basis and calculation of Joeun's proposed rates that was not contained in its proposal:

- [redacted];
- [redacted];

- [redacted];
- [redacted]; and
- [redacted].

AR Tab 28 at 490-92, AR Tab 35 at 1069.

Thus, the record shows that DCAA's evaluation of Joeun's price and compliance with Korean labor law was based on additional information not contained in Joeun's proposal. Under the terms of the Solicitation, it was Joeun's burden to submit this information as part of its initial proposal. Because it failed to do so, the Army should have rejected Joeun's proposal as non-compliant,[16] or enaged in comparable discussions with SecureNet and the other offerors in the competitive range. However, it should not have permitted Joeun to submit this additional information without affording the other offerors a similar opportunity. *See Orca Northwest Real Estate Servs. v. United States*, 65 Fed. Cl. 1, 11 (2005) ("An agency may not hold discussions with one offeror without extending a similar opportunity to all other offeror's within the competitive range--to do otherwise would deprive offerors of their entitlement to meaningful discussion.… Communications with an offeror that create an inadvertent revision opportunity are no different than revisions expressly solicited by the agency.") (citations omitted).

In fact, the Army continued to request and Joeun continued to supply additional information relating to these same issues, even after the award date. First, on May 19, the Army

[16] *See* AR Tab 1 at 100 ("Failure to include a significant element in the [pricing] data may indicate that the offeror fails to understand the requirement, and may be grounds for finding the proposal to be technically unacceptable."); *see also Solicitation* Section L.2.c(3)(a) ("Failure to submit the offer breakdown as required will be grounds for determining the offeror technically unacceptable and ineligible for contract award in accordance with the evaluation criteria set forth in Section M of this solicitation.").

requested additional information from Joeun regarding the manner in which Joeun's proposed monthly working hours were calculated – [redacted]. *See* AR Tab 132 at 3396-98. In particular, this document showed that the "[redacted]," *id.*, far less than [redacted]. Moreover, on May 22, the CO requested and Joeun provided an opinion from the Korean Ministry of Labor purporting to demonstrate that Joeun's proposed staffing approach complied with Korean labor law. AR Tab 32 at 504. Whether requested in response to SecureNet's earlier GAO protest allegations or for some other reason, the fact that the Army was compelled to request this information in order to demonstrate the acceptability of Joeun's proposed approach demonstrates that Joeun failed to provide sufficient information for the Army to evaluate this aspect of Joeun's initial proposal. Allowing Joeun to provide this information to justify its proposed approach, where other offerors were not afforded the same opportunity, was likewise improper.[17]

**B. <u>The Army Failed To Evaluate The Feasibility And Risk Of Joeun's Proposal</u>**

While the Second Revised Solicitation significantly increased the overall level of effort required under the Contract, Joeun's revised proposal increased the number of Supervisors by a [redacted] of Guards on staff, even though

---

[17] *See ALT Comm'ns, Inc.,* B-246315, Mar. 2, 1992, 1992 WL 52434, at *2 ("[A]ward . . . on the basis of initial proposals was improper because [awardee's] initial offer did not demonstrate compliance with the solicitation requirements. That being so, we also view the post-award discussions with [the awardee] as being conducted for the purpose of giving [awardee] the opportunity to make its proposal acceptable. Such discussions with one offeror, instead of with all offerors whose proposals are in a competitive range, are improper."); *ASR Mgmt. & Technical Servs*., B-244862, Apr. 23, 1992, 92-1 CPD ¶ 383, at *5 n.7 ("Where, as here, an agency accepts a proposal that does not show compliance with specifications, and then conducts post-award discussions with the awardee to permit it to comply with the specifications, discussions must be held with all competitive range offerors."); *KPMG Peat Marwick, LLP,* B-259479, May 9, 1995, 95-2 CPD ¶ 13, at *8 ("[T]he post-award communications between the agency and [awardee] clearly constituted discussions since these contacts resulted in [awardee] materially modifying its proposed staff and technical approach.").

the total number of Guard posts and required hours increased. In justifying this approach, Joeun's proposal indicated that its Supervisors would work "[redacted]" (AR Tab 35 at 978), although in reality the data in Joeun's proposal indicated that individual Supervisors would be called on to work far in excess of this amount. Joeun's proposal also indicated that Guards would work "[redacted]" – a [redacted] overtime hours per employee, but a significant number when applied to Joeun's entire workforce of [redacted] Guards. Combined, Jooeun's approach called for more than [redacted] of overtime per year.

Despite the [redacted] of overtime hours required by Joeun's proposed approach, the proposal contained no mention of overtime compensation. In fact, at the same time it was [redacted]. Moreover, in discussions held only with Joeun after submission of proposals, Joeun informed the Government that it [redacted] – even though the record shows employees were receiving that benefit under the predecessor contract. *See* AR Tab 28 at 491 Instead, Joeun indicated in these post-FPR discussions that employees would be compensated through "[redacted]." *Id.* However, Joeun's proposal contained no mention of these [redacted], and based its prices [redacted] under the Solicitation. *See* AR Tab 35 at 1058.

Given this approach, there are a number of significant questions that should have naturally arisen from Joeun's revised proposal to work its Supervisors more than [redacted] per month without any accounting for overtime pay:

- *Is it feasible to require Supervisors to work more than [redacted] a year ([redacted] per week), or are there any performance risks in requiring employees to work this number of hours?*
- *Even if feasible, how did Joeun intend to compensate its employees (Supervisors and Guards) for the significant number of overtime hours proposed, when the [redacted]?*

- *What impact would Joeun's proposed use of* [redacted]*, have on its ability to recruit and retain employees, since the incumbent* [redacted]*?*
- *How would Joeun perform the required work if its Supervisors were prohibited by law from working the* [redacted]*?*

While these risks and concerns in Joeun's approach are obvious on their face, the record shows that the Army failed to consider these issues and, instead, found Joeun's staffing plan acceptable simply because it stated the number of supervisors and their locations. AR Tab 10 at 307.

In its response, the Government claims that "SecureNet has not identified any evaluation factor or subfactor which the agency did not consider." Gov't Br. at 28. In fact, the Government goes so far as to argue that "[t]here is no dispute that the evaluation teams applied all of the listed evaluation factors and subfactors when making the acceptability decision." *Id.* at 23. The Government attempts to characterize this aspect of SecureNet's protest as "pure speculation," which "would require this Court to substitute [its] judgment for that of the agency." *Id.* at 27.

Despite the Government's characterization, SecureNet is not disagreeing with the Government's evaluation, or asking the Court to substitute its judgment for that of the agency. Instead, SecureNet is challenging the Government's failure to even consider whether Joeun's proposed staffing plan was feasible or increased the risk of unsuccessul performance, as called for in Section M, Factor A of the Solicitation. *See* AR Tab 1 at 100 (requiring the Government to evaluate all offerors' technical and management plans "on an acceptable or unacceptable basis" to determine "the offeror's *feasibility of approach* and the Government's *perceived risk of unsuccessful performance*"). Notwithstanding the Government's claim, the record shows that the evaluators failed to consider any of the inherent risk associated with Joeun's [redacted]. This failure to evaluate the risk was inconsistent with the stated evaluation criteria, and unreasonable in light of the significant

risks inherent in Joeuns's proposed approach. *See, e.g., Meridian Mgm't Corp.*, B-281287.10, *et al.*, Feb. 8, 2000, 2001 CPD ¶ 5; *Pacifica Servs., Inc.*, B-280921, Dec. 7, 1998, 98-2 CPD ¶ 137, at *6-8 (holding that proposal was unacceptable where the solicitation required, and the proposal failed to demonstrate, an adequate quantity and allocation of staff for each requirement in the statement of work); *Oshkosh Truck Corp.*, B-252708.2, Aug. 24, 1993, 93-2 CPD ¶ 115 (upholding agency's determination that a proposal offering to use undercompensated staff presented an excessive performance risk); *Quantum Research, Inc.*, B-242020, Mar. 21, 1991, 91-1 CPD ¶ 310 (upholding agency's determination that proposal requiring employees to work an excessive amount of uncompensated overtime presented an excessive performance risk).

## C. The Army Failed To Conduct A Proper Price Realism Analysis

Under the terms of the Solicitation, the Army was required to determine whether the price proposed by Joeun for this effort was "adequate," "reasonable and realistic," and "complete." AR Tab 1 at 95 (Solicitation at Section L.2.C.(3)(a)). In conducting this evaluation, the Army should have considered whether Joeuns's proposed labor rates were realistic for the work proposed in light of its inclusion of more than [redacted] per year, [redacted]. However, the record shows that the Army ignored its obligation to consider these issues in the evaluation of price, and instead focused on "reasonableness."[18] Indeed, the record shows that the Army consciously elected not to evaluate the impact of Joeun's proposed staffing approach or the realism of its proposed rates, reasoning that because "[redacted]

---

[18] *See* AR Tab 11 at 337 (stating that a "comparison of proposed prices received in response to the solicitation was used in accordance with FAR 15.404-1(b)(2)(i)"); FAR 15.404-1(b)(2) (procedures for determining a "fair and reasonable price"); AR Tab 28 at 489 ("The purpose of our engagement was to compare the labor rates and fringe benefit rates used in the contractor's proposal to the incumbent contractor's proposed rates for the same solicitation to assist the contracting officer to determine the *reasonableness* of the proposed labor rates and to determine whether fringe benefit rates are in accordance with Korean labor law.").

[redacted]" AR Tab 11 at 337. This approach was inconsistent with the stated evaluation criteria, and unreasonable in light of the significant cost risk inherent in Joeun's proposed approach.

In its brief, the Government attempts to justify the evaluation based on the Army's consideration of "price reasonableness."[19] However, a number of cases have recognized that where, as here, an agency announces its intent to evaluate fixed price proposals for price *realism*, it cannot rely on a price reasonableness evaluation instead. For example, in *OMNIPLEX World Services Corp.*, B-291105, Nov. 6, 2002, 2002 CPD ¶ 199, at *9, the record showed that "the contracting officer . . . conducted a 'price analysis in lieu of a price realism evaluation,'" even though the Solicitation called for the agency to evaluate both price realism and reasonableness evaluations. In rejecting the Government's argument that this price analysis alone was sufficient, GAO noted that "the solicitation required the [Agency] to evaluate price proposals for both price reasonableness and price realism" and that "[t]he two types of analysis have two very different purposes and are not interchangeable." *Id.* GAO therefore concluded that "[t]he agency's failure to conduct a price realism evaluation of any proposal was clearly contrary to the solicitation's requirements," and therefore sustained the protest. *Id.* Likewise in this case, the Army's focus on the "reasonableness" of Joeun's rates, without regard to whether they were realistic and complete, was inconsistent with the stated evaluation factors, and unreasonable in light of Joeun's [redacted].

[19] *See* Gov't Br. at 10 (acknowledging that CO requested that DCAA "analyze whether Joeun's labor rates, as proposed were *reasonable* and whether its fringe benefits complied with Korean labor laws") (citing AR Tab 54); Gov't Br. at 11 ("[The] DCAA report . . . reviewed the *reasonableness* of the awardee's proposed labor rates and whether the awardee's fringe benefits complied with Korean labor law.") (citing AR Tab 28 at 488-95); *id.* at 28 (arguing that the Army "properly determined that Joeun's proposed price was *reasonable*").

The Government also contends that even if Joeun's proposed price was understated, SecureNet cannot demonstrate that it was prejudiced because "'in fixed-price contracting, below cost pricing is not prohibited and the government cannot withhold an award from a responsible offeror merely because its low offer is below cost. . . . [T]he contract places upon the contractor the risk and responsibility for loss.'" Gov't Br. at 29 (quoting *PHT Supply*, 71 Fed. Cl. at 21, n.13)[20] This is in error. While it may be true that "a proposal's price realism is not ordinarily considered, since a fixed-price contract places the risk and responsibility for contract costs and resulting profit or loss on the contractor," *Int'l Outsourcing Servs., LLC*, B-295959, May 25, 2005, 2006 CPD ¶ 6, at *6, that is not the case where, as here, the Solicitation calls for a price realism analysis to "measur[e] an offeror's understanding of the solicitation requirements, or to avoid the risk of poor performance from a contractor who is forced to provide goods or services at little or no profit." *Id.* In the latter situation, submitting a below cost proposal is a basis for eliminating the offeror from the competition. *See,id.* ("[G]iven the RFP's specific provision regarding the performance of a price realism analysis, as well as the remainder of the RFP's terms, the agency could reject a proposal that lacked price realism, or consider a proposal's lack of price realism in its source selection.").[21] In fact, in this case, the Solicitation expressly notified offerors that "[t]he burden of proof of price credibility is the offeror's responsibility," AR Tab 1 at 96, and that a failure to include a significant component of the price proposal "may

---

[20] The case cited by the Government in its brief, *PHT Supply Corp. v. United States,* 71 Fed. Cl. 1 (2006), in inapposite since it involved the Government's verification of a mistaken bid price, and did not involve the issue here – namely, an agency's failure to conduct a price realism analysis when called for in the Solicitation.

[21] *See also L-3 Commc'ns, KDI Precision Products, Inc.,* B-290091, June 14, 2002, 2002 CPD ¶ 155, at *5 ("[T]he risk of poor performance when a contractor is forced to provide services at little or no profit is a legitimate concern in evaluating proposals. *Molina Eng'g, Ltd./Tri-J Indus., Inc. Joint Venture,* May 22, 2000 B-284895, 2000 CPD ¶ 86 at 4; *see generally Acepex Mgmt. Corp.*, B-279173.5, July 22, 1998, 98-2 CPD ¶ 128 at 6 (although a fixed-price offer that is below cost is legally unobjectionable and cannot be rated lower or downgraded in the price evaluation for source selection by virtue of its low price, the risk of poor performance when a contractor is forced to provide services at little or no profit is of legitimate concern).").

indicate that the offeror fails to understand the requirement, and may be grounds for finding the proposal to be technically unacceptable." AR Tab 1 at 100. Having failed to submit a proposal that showed that its proposed price was realistic for the work to be performed, Joeun should have been found unacceptable, and SecureNet should have been the successful offeror.

Finally, SecureNet was prejudiced because by failing to consider the price realism of Joeun's proposed approach, the Army allowed Joeun to unfairly [redacted]. In the Price Negotiation Memorandum, the CO noted a concern that when Joeun [redacted] in response to the Second Revised Solicitation, there was very [redacted]. AR Tab 11 at 339. Nonetheless, the CO concluded that Joeun's proposed rates for Supervisors were "fair and reasonable" because the [redacted]. *Id.* In other words, Joeun's proposed use of extensive [redacted] was *key* to its ability [redacted] proposed Supervisor rates. Thus, the Army's failure to evaluate the realism of Joeun's proposed price did prejudice SecureNet.

**D. <u>The Manner In Which The Army Conducted The Procurement Was Unfair</u>**

In its opposition, the Government argues that "SecureNet's allegation of unfair treatment during the bidding process is unsupportable in both fact and logic." Gov't Br. at 33. Contrary to the Government's response, SecureNet's claim of unfairness is not based on the Army's notification of award to unsuccessful offerors, nor is it based on the Army's decision to take corrective action. Rather, the unfairness stems from numerous actions that, when taken as a whole, gave Joeun a competitive advantage at the expense of SecureNet.

The Government makes several arguments in response. First, the Government states that after the first contract award to SecureNet, the Army sent unsuccessful offerors "a letter which

simply stated the name of the awardee, and the total price without disclosing anything else, such as the loaded rates, related to SecureNet's proposal." Gov't Br. at 33-34 (citing AR Tab 40). The Government also states that the Army's corrective action resulted in such significant revisions that the first and second Solicitations were essentially different. Gov't Br. at 34 (citing AR Tab 40). From this, the Government concludes that SecureNet could not have been substantially prejudiced because "there was an increase in the scope of work" that made knowledge of SecureNet's total price for the first contract useless. *Id.*

First, the Government conveniently ignores the fact that price was the sole factor used to evaluate proposals under both solicitations. AR Tab 1 at 100. Additionally, contrary to the Government's statement, the Second Revised Solicitation was essentially the same as the First Solicitation. The only difference between the two was that the Second Revised Solicitation required more Supervisor hours. The Second Revised Solicitation did not change the type of work, nor did it change the geographic location of the work. Given that award would be based only on price, and that the revised Solicitation called for the same work as the first Solicitation, it is clear that, contrary to the Government's claim, the Army's disclosure of SecureNet's price gave SecureNet's competitors, including Joeun, a significant advantage in the competition under the Second Revised Solicitation.

Additionally, the Government misstates the basis for SecureNet's claim of unfairness. SecureNet is not challenging the decision to take corrective action; rather it challenges the manner in which it was conducted - in particular, the Army's decision to allow Joeun to lower all of its proposed prices, including those not affected by Amendments 7 to 9 - in light of the competitive advantage created by the Army's disclosure of SecureNet's price. In fact, while the Government claims that "all offerors were given the same opportunity to submit proposals in

response to the revised solicitation" they were not; SecureNet followed the terms of the Second Revised Solicitation and revised only those portions of its proposal that were affected by Amendments 7 to 9; while, the Army allowed Joeun to lower every aspect of its proposed price.

Moreover, SecureNet's challenge is timely. Nothing in the revised Solicitation stated, nor suggested, that offerors could lower the prices of CLINs unaffected by Amendments 7 to 9. To the contrary, the revised Solicitation limited the scope of proposal revisions. And, to the extent that the revised Solicitation was ambiguous on the scope of proposal revisions, it was a latent ambiguity. The Government's brief shows why the language related to the scope of revisions is latently ambiguous. The Government states that "it is arguable that Amendment 7, when read in conjunction with Amendment 9, could allow submission of changes other than an increase in the cost of supervisors." Gov't Br. at 36. Thus, the Government concedes that the proper interpretation is open to debate - the very definition of a latent ambiguity. Moreover, SecureNet's interpretation of the relevant language is entirely reasonable. Indeed, the Army itself thought it reasonable because it used this interpretation to respond to a protest challenging the short period of time for offerors to submit revised proposals:

> [T]he amendment only changed the requirement for supervisors to respond to an emergency, and furthermore, there was no change to the technical evaluation factors. A revised schedule was posted that provided the location of the supervisors and the number of hours, therefore all a firm had to do was revise their Staffing Plan … and make any price revisions.

AR Tab 41 at 1637. Thus, to the extent that the relevant language created an ambiguity, it was latent and SecureNet is not "bound by the Government's interpretation." Gov't Br. at 36.

In sum, it was the disclosure of SecureNet's price coupled with the Army's decision to allow Joeun to lower its prices for CLINs unaffected by Amendments 7 to 9 that created an unequal competition and rendered the award to Joeun arbitrary and capricious and not in

accordance with law, and substantially prejudiced SecureNet by allowing Joeun to unfairly undercut SecureNet's price in the re-opened competition.

**E. The Army Failed To Consider Joeun's Non-Compliance With Labor Law**

Rather than attempt to justify how Joeun could legally propose to work its employees [redacted], the Government attempts to avoid the issue by arguing that it was not required to evaluate Joeun's compliance with law. Alternatively, the Government argues that this court should simply accept the cursory reviews performed by various other entities – none of which had the benefit of the full record before this Court. Neither of these arguments is a compelling basis for asking this Court to forego the thorough, probing review of the record, which shows that Joeun's proposal violates relevant labor laws.

1. The Government Was Required To Consider Joeun's Failure To Comply With The Legal Restrictions On Working Hours

The Government first argues that it was not required to evaluate Joeun's compliance with the Korean labor law because the provision of the Solicitation dealing with Korean labor law "is operational after contract performance has begun," Gov't Br. at 30, and because "consideration of 'excessive' overtime" was not one of the required evaluation factors. *Id.* at 31. However, this argument is undermined by the record, which shows that the Army did consider certain aspects of Korean labor law (such as fringe benefits), AR Tab 28 at 489; as well as the Government's own brief, which acknowledges the Government's "duty to ascertain the reasonableness of Joeun's proposed overall price, and compliance with Korean labor law." Gov't Br. at 25.

Perhaps more importantly, as GAO and this court have recognized, a proposal that indicates on its face that an offeror will not comply with a material term of the Solicitation – even one that is not expressly called out in Section M – is unacceptable and cannot form the

basis for award. *See, e.g., Wyse Tech., Inc.,* B-297454, Jan. 24, 2006, 2006 CPD ¶ 23, at *4 ("Award may not be based upon a proposal, where, as here, the offeror declines to certify compliance, as required, with a material term of the solicitation, in this case the [Trade Agreements Act], such that the proposal consequently fails to establish a legal obligation to comply with that material term.").[22] In this case, it should have been patently obvious that Joeun's proposal to work its Supervisors in excess of [redacted] per week could not comply with Korean law, which limits employees to no more than 56 hours per week until June 30, 2007, and 52 hours per week thereafter. *See* Ex. D, Korean Labor Standards Act, Article 52, Addendum 3.

2. Previous Reviews Did Not Fully Analyze Joeun's Compliance With Korean Labor Law.

The Government also attempts to shield this issue from scrutiny by arguing that "the DCAA, …the Korean Ministry of Labor, …the GAO, …and the agency…have all opined that Joeun's proposed price complies with Korean law." Gov't Br. at 31-32. Despite the weight the Government places on these "opinions," none of these entities had the benefit of the full record currently before this Court, nor did they directly address the specific issue whether an employer can require its employees to work over [redacted] a week with no payment of overtime premiums.

a. GAO

To the extent the Government relies on GAO's decision, which it claims "opined that Joeun's proposed price complies with Korean law," this reliance is entirely misplaced. When it

[22] *See also Chapman Law Firm v. United States,* 63 Fed.Cl. 519, 527 (2005) (in evaluating whether awardee's proposal was acceptable, court "examines [awardee's] proposal to determine whether it complied with the limitation on subcontracting requirement," based on GAO precedent that "'a proposal that fails to conform to a material term and condition of the solicitation, such as the subcontracting limitation, is unacceptable and may not form the basis for an award'") (quoting *Coffman Specialties, Inc.,* B-284546, May 10, 2000, 2000 CPD ¶ 77), *aff'd mem.*, 163 Fed. Appx. 889 (Fed. Cir. 2006) (per curiam); *Orincon Corp.*, B-276704, July 18, 1997, 97-2 CPD ¶ 26, at *3 ("[W]here a proposal, on its face, should lead an agency to the conclusion that an offeror could not and would not comply with the subcontracting limitation, we have considered this to be a matter of the proposal's technical acceptability; a proposal that fails to conform to a material term and condition of the solicitation such as the subcontracting limitation is unacceptable and may not form the basis for an award.").

dismissed SecureNet's protest, GAO did not have the benefit of the full record – including Joeun's proposal, which would have shown on its face that Joeun proposed to work its employees in excess of the legal limits imposed by Korean labor law. Moreover, GAO declined to consider SecureNet's claims of non-compliance, instead noting that it "appeared" from the limited record that DCAA and the Ministry of Labor ("MOL") looked at Joeun's compliance:

> SecureNet asserts that reports from [DCAA] and the Korean Ministry of Labor establish that Joeun's proposal violates Korean law. <u>We need not examine the specifics of SecureNet's allegations</u> since, which these reports relate to Joeun's proposal, neither purports to state that Joeun's proposal takes exception to the law. (In fact, the agency maintains, <u>and its appears from the record,</u> that the DCAA report actually determined that Joeun's labor rates and fringe benefit rates comply with Korean law, and the Korean Ministry report determined that certain proposed hours complied with the law.)

*SecureNet Co.,* B-297952.4, July 20, 2006 at 3.

Given the narrow scope of the record before it, its qualified summary of the documents generated by DCAA and the MOL, and its ultimate conclusion that it "need not examine the specifics of SecureNet's allegations" of labor law violations, GAO could hardly be said to have opined that Joeun's proposal complied with the law.

b. <u>DCAA</u>

Likewise, while the DCAA report "made reference to the payment of overtime" as the Government claims, it hardly opined that Joeun's overtime scheme complied with Korean law. First, DCAA made clear in its report that its review was limited to "[v]erif[ying] that the proposed <u>fringe benefits</u> are consistent with the contractor's established practice and that they are in compliance with the Korea labor law [sic]." AR Tab 28 at 489 Thus, to the extent that DCAA looked at Joeun's compliance with Korean labor law, it did so only with respect to Joeun's fringe benefit rates; it did not review whether Joeun's overtime system complied with Korean law.

Second, DCAA's report relied on the erroneous assumption that Joeun's employees would work a [redacted] workweek. Although Joeun's proposal calls for ER/NER guards to work a [redacted] workweek, its proposal on its face calls for Supervisors to work a [redacted] workweek – far more than the number of work hours assumed by DCAA, and far in excess of what is permitted by Korean labor law.

Third, to the extent the DCAA report relied on Joeun's post-FPR statement that it intended to provide its employees with "[redacted]" in lieu of overtime – information not contained in Joeun's proposal – DCAA never expressed any view whether this was a sufficient amount of compensation. In that regard, since employees are entitled to be compensated at 150% of their basic wages for each hour of overtime,[23] and since the average Supervisor was expected to work more than [redacted] of overtime per year, this suggests Joeun would have been required to grant Supervisors an additional [redacted] – far more than the [redacted] it apparently proposed.

c. Korean MOL

The Government relies most heavily on the letter obtained by Joeun (as the behest of the Army) from the Korean MOL. According to the Government, "[g]iven the Korean governmental organization tasked with determining violations of Korean labor law explicitly found in Joeun's proposal no violation, SecureNet could never establish otherwise." Gov't Br. at 32. Again, this reliance is misplaced.

As an initial matter, the MOL, like GAO, did not have the benefit of Joeun's proposal. Instead, the MOL's letter was based on two specific questions posed by Joeun, neither of which accurately reflects Joeun's proposal. First, Joeun asked the following:

[23] Ex. D, Korean Labor Standard Act, Article 55.

> Can the company make workers work [redacted] per month without overtime charge IAW the existing Labor Standard Act?

AR Tab 32 at 513. However, this question does not accurately reflect Joeun's proposed approach, which requires Supervisors to work over [redacted] per month. Joeun also asked:

> In case of paying overtime charge to the workers under the existing Labor Standard Act, can the company make workers work temporarily in the limitation of [redacted] per week and [redacted] of extended working hours per month IAW the Addenda Article 3?

*Id.* Again, Joeun's question did not accurately reflect the approach set forth in its proposal, which calls for Supervisors to work more than [redacted] of overtime per week (not [redacted] as stated in the letter to MOL). Also, according to the information that Joeun supplied during discussions, Joeun did not contemplate payment of [redacted] (notwithstanding that Joeun's question [redacted] "paying overtime charge to workers"). *Id.*

Thus, the questions posed to the MOL were ambiguous, if not misleading. Unfortunately, for the Government, the MOL's response was just as ambiguous:

> Since your company has defined the [redacted] per month for your employees, we understand that this monthly working hour is the issue, whether it exceeds the maximum extended working hours regulated in the Standard Labor Act. Reviewing this issue, it is [redacted] per week. It is therefore judged that it is not against the Standard Labor Act because [redacted] the 16 hours of extended working hour. The time period your company can applies [sic] this law is from July 1, 2004 to Jun 30, 2007 in limitation. The extended working should be reached between the parties.

AR Tab 32 at 505. First and foremost, the MOL's response does not even mention payment of overtime premiums, let alone suggest that Joeun could work its employees [redacted]. Second, the MOL's response suggests that Joeun intends to work its employees "[redacted]" of overtime, which it concludes is permitted since it is [redacted] 16-hour cap in effect – even though Joeun's proposal calls for more than [redacted] per week of overtime. Finally, even if the MOL's letter could be viewed as somehow endorsing Joeun's approach despite these flaws, the

Ministry concluded by stating that this approach applied only through July 1, 2007, when the limit on working hours drops to 52 hours per week. Thus, the MOL does not address whether or how Joeun could perform during the remaining four years of the contract.

d. Joeun

Finally, the Government asks this Court to accept Joeun's proposed approach because "Joeun is an experienced Korean contractor," and because "[i]t makes little sense that Joeun would submit a proposal which on its face violates Korean labor law, when it is using a work force familiar with Korean labor law" Gov't Br. at 32. While the Army repeatedly used this as rationale for accepting Joeun's proposed rates,[24] such blind acceptance is inconsistent with this Court's role of conducting a "'substantial inquiry' and 'thorough, probing, in-depth review' … to determine whether the agency's action was arbitrary and capricious." *Mike Hooks, Inc.*, 39 Fed. Cl. at 156. Instead, a thorough review shows that Joeun's approach, which was undertaken to undercut SecureNet's previously disclosed price, was contrary to law.

## IV.
## CONCLUSION

For the foregoing reasons, this Court should grant SecureNet's Motion For Judgment On The Administrative Record and deny the Government's Cross-Motion For Judgment On The Administrative Record.

Respectfully Submitted,

s/ Rand L. Allen
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006

[24] *See, e.g.,* AR Tab 11 at 339 ("Overall, considering Joeun's extensive experience recruiting security guard personnel in the Korean labor market, the proposed labor rate for supervisory security guard personnel is considered fair and reasonable."), *id.* at 340 (rate for English and non-English speaking security guards considered "fair and reasonable" based on Joeun's "extensive experience").

(202) 719-3193 (O) (202) 719-7049 (F)
*Counsel for Plaintiff*

*Of counsel*:
Thomas J. Seymour
KIM & CHANG
Seyang Building
223 Naeja-Dong, Jongro-Gu
Seoul, Korea 110-720
(+82-2) 3703-9092

Kevin J. Maynard
Antonella Karlin
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006
(202) 719-3143 (O)
(202) 719-7049 (F)

September 26, 2006